# EXHIBIT D

Not Reported in F.Supp., 1997 WL 47448 (N.D.Ill.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois.
Archie COOK, Plaintiffs,
v.
W. Eugene McCARRON, Defendants.
TEAMSTER LOCAL UNION 705, et al., Plaintiffs,
v.
Daniel C. LIGUROTIS, et al., Defendants.
Nos. 92 C 7042, 95 C 0828.
Jan. 30, 1997.

MEMORANDUM OPINION

MANNING, District Judge.
*1 This matter comes before the court on motion of plaintiff Archie Cook to adopt Special Master Frank J. McGarr's recommended findings of fact as the findings of this court. This court has carefully considered the settlement terms, the strength of plaintiffs' case on the merits, the complexity and expense of further litigation, the opinion of counsel for both sides, as well as various other factors necessary to determine whether this settlement agreement should be approved.
We have reviewed Special Master McGarr's comprehensive and thorough report. Accordingly, this court adopts Special Master McGarr's findings of facts, with respect to the fairness of this settlement agreement. Cooks' motion for adoption of the special master's recommended findings of fact as the findings of this court is granted, and the proposed settlement agreement in this case is approved.

BACKGROUND

I. 92 C 7042

Case number 92 C 7042 was filed on October 22, 1992. On September 1993, Archie Cook ("Cook") filed his second amended complaint, which is the complaint presently pending in this case. At all times since February 1, 1987, Cook has been a participant in the Teamsters Local 705 Health and Welfare Fund ("Health & Welfare Fund") and a member of Teamsters Local 705 ("Local 705").
The defendants named in the Cook complaint are Local 705, W. Eugene McCarron, Stephen Bridge, M.J. Seiwert, Ralph Niedert, John Monroe, John Navigato, Don Heim, Sam Canini, Daniel C. Ligurotis, Gerald Rzewnicki, Gildo Valerio, Harold Burke, Gerald Zero, John McCormack and Robert Persak. The Health & Welfare Fund is also named as a defendant.
The Cook complaint has been brought on behalf of Archie Cook, individually, and on behalf of all participants in, or beneficiaries of, the Health & Welfare Fund between February 1, 1987 and January 31, 1996.
Essentially, Cook claims that the Health & Welfare trustees and other fiduciaries caused or allowed the assets of the Health & Welfare Fund to be wasted by the payment of excessive amounts for administrative expenses and benefits in light of the benefits allowable under the relevant trust documents of the Health & Welfare Fund, all in violation of their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. Section 1001 et seq. ("ERISA"). Further, Cook claims that excessive payments that were made to Local 705 are prohibited transactions under ERISA. Cook seeks both equitable relief with respect to the future operation of the Health & Welfare Fund and damages exceeding $20,000,000.

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 3 of 17

Not Reported in F.Supp.                                              Page 2 of 17

II. 92 C 828

Case No. 92 C 828 was filed on February 9, 1995 by Local 705, John McCormack, Gerald Zero, Robert Persak, Mike Husar, Theodore Clemons, Jr., Freeman Wilson and Michael J. Marasovich. Defendants in the Local 705 suit are Daniel C. Ligurotis, Dr. William D. Dalessandro, William D. Dalessandro, Ltd., D & K Vascular Labs, Inc., Sherman Carmell, W. Eugene McCarron, Gildo Valerio, Richard Mall, Stephen Bridge, Ralph Niedert, Sr., and M.J. Seiwert.

*2 The Local 705 suit has been brought on behalf of two classes: (1) all persons who have been participants in, or beneficiaries of, the Health & Welfare Fund at any time between July 1, 1989, and January 31, 1996; and (2) all persons who have been participants in, or beneficiaries of, the Teamsters Local 705 Pension Fund at any time between July 1, 1989, and January 31, 1996. The Local 705 suit has been brought derivatively on behalf of the Health & Welfare Fund and on behalf of the Pension Fund.

The plaintiffs in the Local 705 suit claim that assets of the Health & Welfare Fund and the Pension Fund have been wasted through four schemes-the construction of a restaurant at a building owned by a wholly owned corporation of the Pension Fund, the construction of a new clinic facility that was grossly overbuilt, an alleged conflict of interest for the attorney representing the Funds, and more favorable contribution treatment for a particular employer participating in the Health & Welfare Fund. The plaintiffs in the Local 705 suit seek damages under ERISA, the Racketeer Influence and Corrupt Organization Act of 1 970, as amended, 18 U.S.C. Section 1961 et seq. and common law fraud. Defendants deny these allegations.

II. Class certification

On February 27, 1996, this court conditionally certified three classes in these cases: (1) in the Cook case, all persons who were participants in, or beneficiaries of, the Health & Welfare Fund at any time between February 1, 1987 and January 31, 1 996; (2) in the Local 705 case, all persons who were participants in, or beneficiaries of, the Health & Welfare Fund at any time between July 1, 1989 and January 31, 1996; and (3) in the Local 705 case, all persons who were participants in, or beneficiaries of, the Teamsters Local 705 Pension Fund at any time between July 1, 1989 and January 31, 1996.

A. Case No. 92 CV 7042

During the class period, there were more than 5,000 participants in the Health & Welfare Fund. Plaintiff in case No. 92 C 7042 has presented this court with issues of law and fact that are common to all members of the class. Defendants allegedly acted inappropriately with respect to the assets of the Health & Welfare Fund. Common issues are (a) whether assets of the Health & Welfare Fund have been misspent and wasted on excessive administrative expenses; (b) whether assets of the Health & Welfare Fund have been misspent and wasted on excessive benefits and expenses in light of the controlling trust documents; (c) whether Local 705 overcharged the Health & Welfare Fund for personal services, office services, and rents; (d) whether the defendants participated in or allowed the waste of assets of the Health & Welfare Fund; and (e) whether the defendant trustees of the Fund used the requisite level of care, skill and diligence in administering the assets of the Health & Welfare Fund.

Each class member has allegedly been injured in the same general way as plaintiff Cook has been injured from the waste of the Health & Welfare Fund's assets. Cook's claims are, therefore, typical of the claims of other class members. The nature and character of Cook's interests are the same as those of other class members.

*3 Cook's attorneys, Charles Pressman, Robin Potter, Stephen Seliger and Joel Hellman are adequate and suitable counsel to represent the class in Case No. 92 C 7042.

Cook seeks to recover for the Health and Welfare Fund money damages allegedly caused by the waste of Fund assets. Cook also seeks equitable relief which governs the future operations of the Health and Welfare Fund. The prosecution of these same claims and issues by individual class members in separate actions would risk inconsistent adjudications, where one adjudication would, as a practical matter, be dispositive of the interests of other class members who are not parties to these proceedings and would substantially impair or impede the rights of other class members to protect their interests. Thus, pursuant to Fed.R.Civ.P. 23(b)(1)(B), this court conditionally certified a class in Case No. 92 C 7042 comprised of all participants in, or beneficiaries of, the Health & Welfare Fund

Case 1:05-cv-00429-GMS    Document 22-3    Filed 09/14/2005    Page 4 of 17

Not Reported in F.Supp.                                                Page 3 of 17

between February 1, 1987 and January 31, 1996, and now certifies the class as set forth above.

B. Case No. 95 C 828

During the class period, there have been in excess of 15,000 participants in the Pension Fund, and over 5,000 participants in the Health and Welfare Fund. Case No. 95 C 828 presents issues of law and fact common to all members of the respective classes. Defendants allegedly acted in a wrongful manner with respect to the assets of the Pension Fund and Health & Welfare Fund. The waste of assets in the pension fund and the Health and Welfare Fund injures all members of the respective classes. Common issues include whether or not the assets of the pension fund and the Health & Welfare Fund have been wasted by the respective schemes set out in the complaint in Case No. 95 C 828.

Each member of the respective class has allegedly been injured from the waste of the Pension Fund's and Health & Welfare Fund's assets, in the same general way that the individual plaintiffs in Case No. 95 C 828 have been. The claims of the individual plaintiffs are typical of the claims of other members of the respective classes. The nature and character of the individual plaintiffs' interests in Case No. 95 C 828 are the same as those of other members of the respective classes. Further, the individual plaintiffs in Case No. 95 C 828 have no conflict of interest with other members of the respective classes in the prosecution of this case.

The attorneys for the individual plaintiffs have substantial prior experience in the prosecution of class actions. John McCormack, Gerald Zero, Robert Persak, Mike Husar, Theodore Clemons, Jr., Freeman Wilson and Michael J. Marasovich are adequate and suitable representatives for the respective classes. Their lawyers, Jeffrey Gilbert, Thomas Johnson, Michael Passino, and Earl Brown are adequate and suitable counsel for the respective classes in Case No. 95 C 828.

The plaintiffs in Case No. 95 C 828 seek to recover money damages for the Health and Welfare Fund that were allegedly suffered by the waste of Fund assets. We have concluded that the prosecution of these claims and issues by individual class members in separate actions would risk inconsistent adjudications, where one adjudication would, as a practical matter, be dispositive of the interests of other class members who are not parties to these proceedings and would substantially impair or impede the rights of other class members to protect their interests. Thus, pursuant to Fed.R.Civ.P. 23 (b)(1)(B), a class has been conditionally certified in Case No. 95 C 828, comprised of all participants in, or beneficiaries of, the Health and Welfare Fund and the Pension Fund at any time between July 1, 1989, and January 31, 1996. The court now certifies the classes as set forth above.

Consolidation of cases

*4 On February 27, 1996, an order conditionally consolidating these two cases was entered by the Court. The fiduciary liability insurer covering the acts of fiduciaries of the Health & Welfare Fund and of the Pension Fund is Aetna Casualty & Surety Co. Defenses have been tendered to Aetna by defendants in Case No. 92 C 7042 and Case No. 95 C 828. Aetna has offered to pay in excess of $13,000,000 in settlement of these two cases, but Aetna has conditioned its offer on the consolidation of these two cases and the dismissal of both cases in a single order. There are common issues between the two cases with respect to the alleged waste of assets of the Health & Welfare Fund. Therefore, consolidation is proper and appropriate in order to effectuate the settlement agreement.

Notice of Class Action Pendency and Settlement

Rule 23(c)(2) provides that in any class action which is maintained under subdivision (b)(3), the members of the class are entitled to the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed.R.Civ.Pro. 23(c) (2) (1987). The notice shall advise each member that (a) the court will exclude the member from the class if the member so requests by a specified date; (b) the judgment, whether favorable or not, will include all members who do not request exclusion; and (c) any member who does not request exclusion may, if the member desires, enter an appearance through counsel. Fed.R.Civ.Pro. 23(c)(2) (1987).

On March 7, 1996, 22,215 copies of the notice attached as Exhibit A to the certificate of providing class action notice were sent by first class mail to persons determined by Local 705 to be members of the classes conditionally certified by this court, as required by the court's order entered on February

Case 1:05-cv-00429-GMS    Document 22-3    Filed 09/14/2005    Page 5 of 17

Not Reported in F.Supp.    Page 4 of 17

27, 1996.

On March 8, 1996, a copy of the notice attached as Exhibit A to the certificate providing class action notice was mailed by certified first class mail to the United States Department of Labor, as required by the court's order entered on February 27, 1996.

On March 7, 1996, a form of notice attached as Exhibit E to the certificate providing class action notice was published in the Chicago Sun Times classified section, as required by this court's February 27, 1996 order.

The notices of class action pendency and settlement both by first class mail and by publication, fully and accurately informed all class members, the United States Department of Labor, and all other interested parties of the material elements of the parties' settlement agreement. Such notices constituted the best notice practicable under the circumstances.

Settlement notice was sent to more than 22,000 class members by first class mail and publication of settlement notice in a daily newspaper of general circulation in the Chicago area.

### REFERRAL TO THE SPECIAL MASTER AND THE APPLICABLE STANDARD OF REVIEW

It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. *Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305, 312 (7th Cir.1980). In the class action context in particular, "there is an overriding public interest in favor of ··· settlement". *Armstrong,* 616 F.2d at 312.

*5 The Armstrong case is particularly illustrative in illuminating the issues before this court:

"Settlement of a class action is not, however, an unmixed blessing. Balanced against the 'overriding public interest in favor of settlement' are strong countervailing public policies which counsel against automatic judicial acceptance of such agreements. First and foremost is the fact that most of those whose rights are affected by a class action settlement, the members of the class, are not involved in its negotiation nor are they present to voice their views in court. The class members must rely upon the representation of the class representatives and class counsel to protect their interests. While this representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interests can best be served by a settlement which is not in the best interests of the class as a whole. Similarly, class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation. In such cases, the class members may find that substantial rights have been bargained away in exchange for relief which inures primarily to the benefit of a few class members or class counsel ···

In addition to this concern with the interests of class members, there is a concern with the interests of the public as a whole. The substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established. In such cases, the ramifications of a settlement can extend far beyond the rights of individual class members. This public interest is present ···· in such economic litigation as antitrust and consumers' rights actions. Uncritical acceptance of a class action settlement can, therefore, disturb important national policies beyond the immediate impact upon the rights of class members".

*Armstrong,* 616 F.2d at 312.

In the last decade, judges have increasingly sought the assistance of special masters in handling complex litigation. *See e.g. In re Joint Eastern and Southern Districts Asbestos Litigation,* NYAL CV 87-1383, CV 87-2273 (E & SDNY 1991); *In re DES Cases,* CV 91-3784., Misc. 91-456 (E.D.N.Y.1992). Federal Rule of Civil Procedure 53(b) provides that reference to a master is the "exception and not the rule". *Fed. R. Civ. Pro. 53(b) (1993).* In actions to be tried by a jury, the reference should take place only when "the issues are complicated; ··· a reference shall be made only upon a showing that some exceptional condition requires it". *Fed.R. Civ.Pro. 53(b) (1993).*

The order of reference to the master may "specify or limit the master's powers and may direct the master to report only upon particular issues or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for filing the master's report". *Fed.R.Civ.Pro. 53(c) (1993).* Subject to the specifications and limitations stated in the order, the master "has and shall exercise the power to regulate all proceedings ··· and to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order". *Fed.R.Civ.Pro. 53(c) (1993).* Thus, the master may require the production of evidence "upon all matters embraced in the reference, including the production of books, papers, vouchers, documents, and writings applicable thereto." *Fed.R.Civ.Pro. 53(c) (1993).* When a party so requests, the master

Case 1:05-cv-00429-GMS    Document 22-3    Filed 09/14/2005    Page 6 of 17

Not Reported in F.Supp.                                                  Page 5 of 17

shall "make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Federal Rules of Evidence for a court sitting without a jury". *Fed. R. Civ. Pro. 53(c) (1993).*

**\*6** Federal Rule of Civil Procedure 53(e)(1) provides that the master shall "prepare a report upon the matters submitted to the master by the order of reference and, if required to make findings of fact and conclusions of law, the master shall file the report with the clerk of the court and serve on all parties notice of the filing". *Fed.R.Civ.Pro. 53(e)(1) (1993).* In an action to be tried without a jury, unless otherwise directed by the order of reference, the master shall file a transcript of the proceedings and of the evidence and the original exhibits with the report. *Fed. R. Civ. Pro. 53(e)(1) (1993).*

In an action to be tried without a jury, Federal Rule 53 provides that the court shall accept the master's findings of fact unless they are clearly erroneous. *Fed.R.Civ.Pro. 53(e)(2) (1993),* see also *Anderson v. Mt. Clemens Pottery,* 328 U.S. 680, 689, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515 (1946). The special master's legal conclusions are reviewed de novo. *Oil, Chem., & Atomic Workers Int'l Union v. National Labor Relations Board,* 547 F.2d 575, 580 (D.C.Cir.1976), cert. denied, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). Within 10 days after being served with notice of filing of the report, any party may serve written objections thereto upon other parties. *Fed.R.Civ.Pro. 53(e)(2) (1993).* The district court has the power to adopt, modify or reject the report, in whole or in part. *Fed.R.Civ.Pro. 53(e)(2) (1993).* The court may also receive further evidence or recommit the report to the special master with further instructions. *Fed.R.Civ.Pro. 53(e)(2) (1993).*

### Referral to Special Master Frank McGarr

This case was initially referred to the Honorable Frank J. McGarr as a Special Master on September 15, 1995 in an effort to facilitate settlement between the parties. The parties in *Cook v. McCarron,* 92 C 7042, and Teamster Local 705, 95 C 0828, participated in extensive negotiations which ultimately resulted in a formal stipulation and agreement of settlement, which has been submitted to this court for approval.

On February 15, 1996, this court preliminarily approved the settlement agreement and conditionally consolidated cases 92 C 7042 and 95 C 0828 for settlement purposes.

On March 19, 1996, this case was again referred to Special Master Frank McGarr to determine the fairness of the settlement agreement. Special Master McGarr was given authority to hold hearings on the objections to the settlement agreement and to make recommended findings with respect to the final approval of the settlement agreement, petitions for attorneys' fees, costs, expenses and any petitions submitted by plaintiff for an incentive award.

Special Master Frank J. McGarr held a hearing on these objections on April 12, 1996. The transcript of that hearing demonstrates that Judge McGarr acted in accordance with the Federal Rules of Evidence. The following attorneys were present at the April 12, 1996 hearing: Charles Pressman, Stephen Seliger, Joel Hellman and Robin Potter all on behalf of the Cook plaintiffs; David Novak, Barbara Hillman, and Jeffrey Gilbert all on behalf of the Local 705 IBT Health and Welfare Fund; Michael Slutsky on behalf of Teamsters Local 705 in the Cook case and the current employee trustees of the Health and Welfare Fund; Lisa Brogan appeared on behalf of Daniel Ligurotis; James Cox appeared on behalf of Stephen Bridge; Daniel Pierce appeared on behalf of Gildo Valerio; Julian Campbell appeared on behalf of Aetna; David Morgans appeared on behalf of Sherman Carmell; Robert D. Boyle appeared on behalf of Trustee Close. Additionally, one member of the pension fund, Robert McGinnis, was present. Special Master McGarr prepared a report and filed a transcript of the proceedings with the report in accordance with the mandate of Federal Rule of Civil Procedure 53. Special Master McGarr's recommended findings of fact with respect to the fairness of the settlement agreement were filed on May 17, 1996.

### Standard for Review of Class Action Settlement

**\*7** District court review of a class action settlement proposal is a two step process. *Armstrong, 616 F.2d at 314.* The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval". *Armstrong, 616 F.2d at 314.* The purpose of the initial hearing is to ascertain whether there is any reason to notify the class members of the proposed settlement and proceed with a fairness hearing. *Armstrong, 616 F.2d at 314.* If the district court finds a settlement proposal "within the range of possible approval", it then proceeds to

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 7 of 17

Not Reported in F.Supp.                                                                                    Page 6 of 17

the second step in the review process, the fairness hearing. *Armstrong, 616 F.2d at 314*. Class members are then notified of the proposed settlement and of the fairness hearing in which they and all interested parties have an opportunity to be heard. *Armstrong, 616 F.2d at 314*.

I. Determination that the settlement agreement is within the range of possible approval

On February 15, 1996, this court preliminarily found, subject to objections and further hearing, that the settlement agreement attached to the motion for preliminary approval of class action settlement was fair, reasonable, adequate and in the best interests of the classes.

II. Fairness hearing

The fairness hearing exists to enable the judge to determine whether the proposed settlement is "fair, reasonable and adequate". *Armstrong, 616 F.2d at 314*. On the basis of all information that is available, the trial judge must decide whether or not to approve the proposed settlement. *Armstrong, 616 F.2d at 314*.
Certain factors have been consistently identified in the determination of fairness. *Armstrong, 616 F.2d at 314*. The court should consider the following in judging the fairness of the proposal:
(1) * * * the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement;
(2) '(T)he defendant's ability to pay';
(3) (T)he complexity, length and expense of further litigation;
(4) (T)he amount of opposition to the settlement;
Additionally, the court should also consider:
(1) * * *
(2) Presence of collusion in reaching a settlement;
(3) The reaction of members of the class to the settlement;
(4) The opinion of competent counsel;
(5) The stage of the proceedings and the amount of discovery completed;
The strength of the plaintiffs' case on the merits balanced against the settlement offer is the most important. *Armstrong, 616 F.2d at 314*. Although the court is required to consider the merits of the dispute to evaluate this factor, the district court must refrain from reaching conclusions on unlitigated issues. *Detroit v. Grinnell Corp.*, 495 F.2d at 456; *Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir.1976)*.
The court of appeals has required that district court approval of a settlement pursuant to Federal Rule of Civil Procedure 23(e), be given only where the district court finds the settlement fair, reasonable and adequate. *Armstrong, 616 F.2d at 312*. In making a determination of fairness, the district court must set forth its reasons clearly in the record. *Dawson v. Pastrick, 600 F.2d 70, 75-76 (7th Cir.1979)*. A district court's determination that a settlement is fair, reasonable and adequate will be reversed only upon a showing that the court clearly abused its discretion. *Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir.1979)*.
*8 When the court of appeals reviews the district court's approval of a class action, it will focus not only on the substantive law which governs the claims asserted in the litigation, but also on the general principles governing approval of class action settlements. *Armstrong, 616 F.2d at 315*. See *Airline Stewards & Stewardesses Ass'n v. American Airlines, Inc., 573 F.2d 960, 963 (7th Cir.)*, *Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir.1979)*. The appellate court views the facts in the light most favorable to the settlement. *Patterson v. Stovall, 528 F.2d 108, 112 (7th Cir.1976)*. The court does not focus on individual components of settlements, but rather views these settlements in their entirety when evaluating their fairness. *McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 425 (7th Cir.1977)*. Since the district court's judgment is directly tied to its familiarity with the litigants, the history of the litigation and the merits of the substantive claims asserted, the court of appeals attempts to give the proper amount of deference to the district judge's decision. *Armstrong, 616 F.2d at 315*.

A. Terms of the settlement

In the instant case, the settlement agreement provides for total payments into escrow of $14,025,000.00. This amount will be allocated as follows:

Case 1:05-cv-00429-GMS    Document 22-3    Filed 09/14/2005    Page 8 of 17

Not Reported in F.Supp.                                                                                       Page 7 of 17

(a) $13,162,862.95 will initially be paid to American National Bank & Trust Co. of Chicago as escrowee, for deposit to an interest-bearing account. Upon a resolution of the initial fee petitions of plaintiff's attorneys, plaintiff's petition for an incentive award, entry of a final order approving the settlement agreement and ruling on the petitions for fees, and an incentive award, the balance of the escrow will be paid to the Health & Welfare Fund.

(b) $387,137.05 will initially be paid to American National Bank & Trust Co. of Chicago as escrowee, for deposit to an interest bearing account. Upon a resolution of the initial fee petitions of plaintiff's attorney, plaintiff's petition for an incentive award, and entry of a final order approving the settlement agreement and ruling on the petitions for fees and an incentive award, the balance of the escrow will be paid to the pension fund.

(c) $450,000.00 will be paid into an escrow controlled by Aetna. These funds will be used to pay the attorneys' fees and litigation expenses of Aetna's insureds that were incurred during the period November 1, 1995, through January 31, 1996. The balance will be paid to the Health & Welfare Fund.

(d) $25,000.00 will be paid into an escrow controlled by Aetna. These funds will be used to pay certain litigation expenses incurred by the Funds after January 31, 1996. The balance will be paid to the Health & Welfare Fund.

In addition, the settlement agreement provides for structural relief concerning the future operation of the Health & Welfare Fund. This structural relief includes the following:

(a) By the latter part of this year, the Health & Welfare Fund will be required to maintain and, thereafter, to update certain essential eligibility data on a computerized eligibility system.

*9 (b) The Health & Welfare Fund will be required to maintain an automated interface between its eligibility system and its claims payment system, in order to prevent automatic payments of benefit claims on behalf of ineligibles.

(c) The Health & Welfare Fund will be required to implement and to maintain procedures: for supplying participants with notices of employers' delinquencies in Fund contributions; for providing opportunities for employees to preserve their eligibility in the Fund by self-payments in the event of employer delinquencies; and for suspending or canceling eligibility if neither employer contributions nor permissible employee self-payments are received after notice of delinquency and a grace period.

(d) The Health & Welfare Fund will be required to set contribution rates at levels sufficient to maintain reserves equal to or greater than twelve months of benefits costs.

(e) The Health & Welfare Fund will be required to set a contribution rate for each benefit level (the Fund being allowed to set different benefit levels within its welfare benefit plan) that is sufficient to cover the costs of benefits at such level. Disparities in contribution rates actually paid by various employers will be greatly reduced; benefits at any given level will not be provided unless an employer makes contributions at a rate within a certain percentage of a base rate set by the Fund for such level.

(f) A consultant will be selected to provide a report on the appropriate level of staffing for the Health & Welfare Fund. The Fund will be required to bring its staffing down to the level designated in the report or bear the burden of proving, before Special Master Frank McGarr that a higher level of staffing would be reasonable with respect to the operations of the Fund.

(g) The Health & Welfare Fund will cease sharing office space, staff, equipment, goods and services with Teamsters Local 705, unless the Fund can show that any such sharing arrangement is reasonable and that no more than reasonable compensation is being paid by the Fund. Any such sharing arrangement must be in writing and approved by the trustees of the fund.

(h) If the Health & Welfare Fund decides to operate its own clinic facility, it will be required to reduce its losses at the clinic over six years to 6 1/4% of the losses in the current year, or to $200,000, whichever is larger. The Fund must also meet certain additional performance standards during each of the next five years. If these performance standards are not met, the Fund must either close the clinic, or bear the burden of proving before Special Master Frank J. McGarr the reasonableness of keeping the clinic open.

The settlement agreement mutually releases all claims in consequence of, arising out of, resulting from or relating to any allegations, claims or defenses which were raised or which could have been raised by, or which arise from or relate to, the facts, transactions, occurrences or subject matter described in, or encompassed by, either of these consolidated cases. The settlement agreement also releases any claims on any bonds and policies of insurance issued by Aetna. The release in the settlement agreement does not release certain claims against enumerated entities that are not parties to either of these consolidated cases; personal or individual claims that do not arise out of the facts, transactions or occurrences of the two cases; or claims for contributions against employers.

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 9 of 17

Not Reported in F.Supp.                                    Page 8 of 17

**\*10** Any claims that the parties might have against William M. Mercer, Inc., arising out of the facts, transactions or occurrences of these consolidated cases will be assigned in subrogation to Aetna.

The settlement agreement also provides that the relative amounts of settlement contributions among various defendants and Aetna will not be disclosed to the plaintiff or class members. However, Aetna and the defendants have disclosed that more than $13,000,000.00 is being paid by Aetna from its own funds.

As a matter of background, the Health and Welfare Fund allegedly lost $25,982,280 in net assets. The monetary relief going directly from the settlement fund to the Health & Welfare Fund is at least $13,162,862.95. This is in excess of 50% of the total losses in the Fund's net assets between February 1987 and January 1994.

The issues relating to this portion of the settlement agreement were hotly contested by the parties, and resulted in compromise by all sides, but the settlement agreement provides meaningful relief for each of the areas which Mr. Cook claimed were problems with the administration of the Health and Welfare Fund.

Continued litigation is a substantial risk for the Health and Welfare Fund and for plaintiffs. Certain of the Health and Welfare Fund's current union-appointed trustees have sued former union-appointed trustees for breaches of fiduciary duties in Case No. 95 C 828. Both current union-appointed trustees and current employer-appointed trustees have denied the allegations in Case No. 92 C 7042, where more than $20,000,000 is being sought for the Fund. The fund has also denied the allegations in case No. 92 C 7042. The plaintiffs in case no. 95 C 828 have complained about the construction of a clinic facility in close proximity to some of Chicago's preeminent medical institutions, but they have vehemently resisted the sale or lease of the facility to another medical institution. Proof of liability or damages may be difficult in light of these divergent positions taken by the current Fund administration.

There are additional risks of continued litigation. The losses in the assets of the Health & Welfare Fund occurred during a period of substantial inflation in medical costs. Plaintiff in case no. 92 C 7042 will be required to prove more than the losses to the Fund; he will be required to prove that the losses were caused by breaches of fiduciary duties by the trustees. In making this proof, plaintiff will be faced with the fact that the trustees sought, obtained and followed advice from William M. Mercer, Inc., an established benefits consultant.

Further, continued litigation of this case creates a risk with respect to the source of funds available to pay for any judgment that might be recovered in this case. The source of more than $13,000,000 in settlement funds is Aetna, the Funds' fiduciary liability carrier. These settlement funds are being paid out of a policy with a limit of $15,000,000. The policy limits cover both benefits to be paid to injured parties and costs of defense, with benefits payable being reduced by the costs of defense. As of the time of Special Master McGarr's report, Aetna was paying on claims being submitted for the work of twenty-six defense counsel. Continued litigation will diminish the source of settlement funds available to pay any judgment in these cases.

**\*11** Aetna has already informed counsel for the parties that it has potential defenses to coverage of claims which create additional risks for the plaintiffs. Among these defenses, Aetna contends that the complaint in case No. 95 C 828 shows that the losses to both Funds were caused by criminal acts, which are not covered by the policy, i.e. Aetna asserts that the insurance applications contained false statements.

In the event that these cases do not settle, there is a strong possibility that the Aetna policy limits will be eroded and further litigation will reduce the ability to collect on any judgment.

OBJECTIONS RAISED BY VARIOUS PARTIES

Objection by Robert McGinnis, Class Member of the Pension Fund

I. McGinnis' "motion" in opposition to pendency and settlement
-McGinnis' Class Answer to Special Master Frank McGarr's Findings of Fact with respect to the fairness of the settlement agreement and the final judgment thereon
-McGinnis' "motion" in opposition to attorney's fees and costs hearing by the Special Master Frank McGarr

On April 4, 1996, Robert McGinnis, a member of the Pension Fund class, filed an objection to the agreement. McGinnis addressed two aspects of the settlement agreement. First, he addressed notice,

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 10 of 17

Not Reported in F.Supp.                                                    Page 9 of 17

asserting that appointment of a special master was an unethical omission. Second, McGinnis addressed the agreement itself.

The majority of McGinnis's "class answer" to Special Master McGarr's recommended findings of fact addresses alleged insufficient notice to many of the class members which caused them to miss attending the April 12, 1996 hearing before Special Master McGarr. McGinnis asserts that the insufficient notice prevented him from submitting relevant materials within the applicable time requirements in order to be heard on those issues at the hearing. Yet, reflected over and over throughout the transcript of that April 12th hearing is Special Master McGarr's assurance to McGinnis that untimeliness of any of his objections which relate to the April 12, 1996 hearing does not prevent him from being heard on those issues.

Apparently after the hearing, on May 1, 1996, McGinnis filed his opposition to attorney's fees and costs. This document addressed McGinnis' dissatisfaction with the attorney fees, costs and the incentive award that had been proposed. Then, on June 3, 1996, McGinnis raised the same objection that he had already raised in his April 4, 1996 objections. That is, that the class members were not properly notified. On June 3, 1996, McGinnis raised issues not previously raised in his earlier objections before Special Master McGarr at the April 12, 1996 hearing. McGinnis asserted that the 401 (h) pension fund contributions were illegal.

McGinnis's arguments regarding IRS approval of transfer money pursuant to Section 401(h) were properly excluded from Special Master McGarr's consideration. The transcript is replete with representations from Local 705 counsel that McGinnis failed to raise the 401(h) issue at any time before the April 12, 1996 hearing before Special Master McGarr. This omission precludes him from doing so after that meeting took place. Although this court is very liberal in interpreting the assertions of those individuals proceeding pro se, McGinnis is held to similar standards as the counsel in this case. He will not be allowed to continuously put forth positions in an untimely fashion. April 12, 1996, or any time before that date, was the appropriate time for McGinnis to raise any objections to the settlement agreement, its approval, petitions for attorneys fees, costs, expenses and issues with regard to the incentive award. Under even the most liberal of standards, McGinnis's submissions with regard to the 401(h) issue are untimely.

*12 As a threshold matter, let us assert that although this court, again, attempts to be sensitive and accommodating to a pro se individual such as Mr. McGinnis, his inarticulate and unsubstantial assertions do a grand disservice to his positions and arguments. As earnestly as we try, it is very difficult to decipher the exact theories McGinnis asserts, i.e. "[T]his is not fair ···", "Special Master Frank J. McGarr appears to be trying to discredit anyone who factually opposes his views and stands up for their rights", or "Almost all of the class members are aware of kangaroo court hearings". This court instead concludes that Special Master McGarr should be commended for a record which reveals the patience, accommodation and evenhanded approach accorded Mr. McGinnis.

McGinnis' "class" answer raises issues which transcend the issues before the court. For instance, McGinnis asked why this settlement agreement allows defendants to become plaintiffs. The settlement agreement does not do this. McGinnis' questions regarding the eventual demise of trustees and fiduciaries who allegedly committed fraud is likewise beyond the scope of this settlement agreement. McGinnis also questions why some past trustees were not named as defendants-such as Baker, Tenuata and others. Again, the determination of which defendants would be named is the plaintiff's determination and beyond the scope of this agreement. This court is not in possession of information that would lead it to conclude that these parties are indeed indispensable to the case and has not been supplied with any such information by McGinnis.

The submissions of McGinnis are replete with serious personal accusations of misconduct directed at various members of Cook counsel, in addition to Special Master McGarr. This court, in the absence of specific support, employs its discretion to disregard these claims as baseless and unfounded.

McGinnis then concurs in objections which he perceives to have been made by the Department of Labor prohibiting the continued association of former trustees with Local 705. We find that Special Master McGarr clearly articulated his reasons for making the determination that he did. In essence, we find nothing in McGinnis' "class" answer which diminishes Judge McGarr's recommended findings of fact with respect to the fairness of the settlement agreement and the final judgment thereon.

On May 13, 1996, McGinnis filed an answer to plaintiff Cook's motion for the adoption of the special master's recommended findings of fact as the findings of the court. It is not clear whether McGinnis is simply listing his objections in numerical order or whether he is specifically responding to Cook's motion. Nevertheless, it is not clear why McGinnis asserts that plaintiff Cook's motion to adopt the special master's recommended findings of fact constitutes a direct violation of the settlement

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 11 of 17

Not Reported in F.Supp.                                                                     Page 10 of 17

agreement. This court finds such a proposition to be nonsensical, completely without merit, and exhibits a total lack of understanding of the procedural posture of this matter. This conclusion equally applies to McGinnis' assertion that plaintiff Cook's motion to adopt the settlement agreement is a direct violation of the settlement agreement. Further, we find no support in the record to conclude that Special Master McGarr's actions associated with the filing of the report of his findings violated Federal Rule of Civil Procedure 53(e)(1) nor do we conclude that Special Master McGarr violated the settlement agreement by failing to address all of the evidence which was presented to him.

*13 Another document dated May 13, 1996 and entitled "Class answer to plaintiff Archie Cook's proposed recommended findings of fact with respect to the fairness of the settlement agreement and final judgment thereon" was filed by McGinnis. In this document, McGinnis asserts that it would be illegal to certify the class under the conditions of the settlement agreement as written. Yet, our decision to do so comports both with Federal Rule of Civil Procedure 23(c)(1) and precedent in this circuit. See Vickers v. Trainor, 546 F.2d 739, 747 (7th Cir.1976); Fujishima v. Board of Education, 460 F.2d 1355, 1360 (7th Cir.1972). Rule 23(c)(1) provides the following:

As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.
Fed. R. Civ. Pro. 23(c)(1) (1987).

We find that our order of February 15, 1996, comports with the mandates of Rule 23(c)(1) and is not illegal, but rather is proper under the circumstances.

It is clear that McGinnis is dissatisfied with the actions of the trustees and administrators of both the Health and Welfare Fund, the Pension Fund, counsel for the parties in this case, Special Master McGarr and probably, this very court. Yet, it is clear that McGinnis' right to object does not entitle him to make scurrilous and baseless accusations with no substantiation. Therefore, to the extent that McGinnis raises cogent arguments that have a relation to the findings of fact we have addressed those arguments. The duplicitous, nonresponsive and unsupported assertions of McGinnis negates the necessity of addressing every one. Further, the appropriate standard of review does not require us to do so. See Marshall v. Milwaukee Boiler Manufacturing, 626 F.2d 1339 (7th Cir.1980). Our review of the remainder of McGinnis' "class" answer to plaintiff Cook's proposed recommended findings of fact leads us to conclude that McGinnis has not presented any assertions which have negated plaintiff Cook's proposed findings of facts.

With respect to pension fund member McGinnis, his manner of both raising and presenting issues to the court makes it very difficult to truly decipher the essence of his positions. Yet, viewing his assertions in their broadest sense, we find McGinnis' objections to be repetitive, redundant and without support. Essentially, we can see that McGinnis is outraged at the present state of the pension fund, as he may deserve to be. However, with regard to those intelligible issues raised by McGinnis we find Special Master McGarr's ultimate determination to be sound and appropriate. The settlement agreement provides the best resolution of the case before us.

160 Participants

On May 1, 1996, participants John Sabath Fraschetti, Douglas Page Chapman and 160 other participants objected in writing to the preliminarily approved settlement. Enclosed in the documents was a petition signed by IBT Local Union 705 participants of the Health and Welfare Fund. Specifically, they objected to the terms of settlement enumerated in (c)(2) and (c)(7) which provided that all claims against William M. Mercer would be assigned to Aetna Casualty and Surety Co., Petitioners contend that any settlement resulting from transactions with Mercer should not be assigned to Aetna but instead should go to the Health and Welfare Fund. Second, because petitioners contend that upwards of 20 million dollars has been dissipated from the pension fund, they contend that $387,137.05 is an inadequate sum to be paid to the pension fund. Third, petitioners assert that complaints have been filed with the Department of Labor, and the Internal Revenue Service under ERISA which may have some bearing on the fiduciary duties of the defendants, trustees and administrators of the funds. Last, petitioners assert that parties who are defendants in one suit should not be allowed to become plaintiffs in a combined suit as proposed by the agreement. We will address each contention in turn.

*14 First, the trustees sought, obtained and followed advice from William M. Mercer, Inc., an established benefits consultant. It appears logical that any cause of action against Mercer for the malfeasance of the trustees should go to the entity that will pay benefits to injured parties and that is

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 12 of 17

Not Reported in F.Supp.                                   Page 11 of 17

paying the costs of defense, which entity is Aetna. It would be unfair to allow Aetna to pay those costs and then prevent it from attempting to recoup its losses elsewhere. Second, the settlement agreement provides that the balance of the escrow of $387,137.05 will be paid to the Pension fund. Nevertheless, we agree with Special Master McGarr in finding that the allocation in the settlement agreement is fair and reasonable and adequately reflects the respective claims of the two funds, the respective likelihood of success and the likely damages that the respective funds might recover.

United States Department of Labor

On April 3, 1996, the United States Department of Labor filed its objections to the proposed settlement agreement. The Department's sole objection to the settlement agreement relates to the absence of any provision which prohibits the continued and future association by employee trustees, former employee trustees, Stephen Bridge and medical service providers Dalessandro, Dalessandro, Ltd., and D & K Vascular Labs, Inc., and attorney Sherman Carmell, with the Local 705 Pension and Health and Welfare Funds. In other words, while the settlement agreement provides a remedy for past financial harm to the Funds' participants allegedly caused by all of the aforementioned parties, it does not preclude their future relationship or involvement with the Funds and the possibility that they will again cause financial harm to the participants. Thus, the department recommends that the settlement agreement be modified to require, as a condition to its final approval by the court, that Stephen Bridge resign as an employer trustee of the Funds and that he, the former employee trustees, William D. Dalessandro, William D. Dalessandro, Ltd., D & K Vascular Labs, Inc., and Sherman Carmell each individually agree to be permanently enjoined from serving as or occupying a position of trustee, fiduciary, service provider or consultant to the Local 705 pension and health and welfare funds, and from exercising, directly or indirectly, any discretionary authority or control with respect to the administration or disposition of the assets of said Funds.

While the United States Department of Labor has requested that the settlement agreement be modified to preclude future participation of certain individuals in the activities of the Funds, this court finds sufficient safeguards in this settlement agreement to police and observe the trustees' future behavior. Cook attempted, in negotiations, to obtain certain relief which related to persons who might control the activities of the Funds, but these efforts were rejected in the course of negotiations. Additionally, at this time, only one of the individuals identified by the Department of Labor is presently associated with the administration of either fund. Therefore, even though the consent decree does not contain the specific terms which are requested by the Department of Labor, we agree with Special Master McGarr in finding that the settlement agreement is reasonable.

Trustee William V. Close

*15 Employer Trustee William V. Close filed an objection to the preliminarily approved settlement on March 26, 1996. One of the current trustees of the funds, William Close, has objected to the settlement on three grounds: (1) that the settlement agreement does not require the immediate closing of the Health & Welfare Fund's clinic facility, which Mr. Close contends is losing millions of dollars; (2) that the settlement agreement does not address the failure of the Pension Fund to follow certain formalities required under the Internal Revenue Code, 26 U.S.C. Section 401(h), in making payments to the Health & Welfare Fund; and (3) that the settlement agreement contains a confidentiality clause precluding defendants from disclosing the allocation of contributions to the settlement funds, other than the disclosure that Aetna is paying more than $13,000,000.

We also agree with the special master in finding that the terms of the settlement agreement which relate to the Health & Welfare Fund's clinic facility are fair and reasonable in the context of the agreement as a whole. The agreement does not require the clinic facility to remain open if the trustees decide to sell it, lease it, or otherwise to close it. The Fund is required to reduce the losses at the clinic facility in order for the facility to remain open. The Fund is required to reduce the losses at the clinic facility over the next several years by millions of dollars, or face the burden of proving to the court that the clinic facility should remain open. A majority of the trustees threatened to reject any settlement offer that required the immediate closing of the clinic facility. Counsel for the class in case no. 92 C 7042 argued for the sale, lease or closing of the clinic facility. We find that the terms of the settlement agreement relating to the clinic facility are the result of reasonable compromise on both sides.

Special Master McGarr found that counsel for the pension fund class has demonstrated that they

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 13 of 17

Not Reported in F.Supp.                                                                                    Page 12 of 17

investigated and considered issues relating to the contributions in light of section 401(h) and reasonably discounted the value of any claim related to the speculative character of the claims described in the objection and the low likelihood of any actionable loss or recovery to the Pension Fund balanced against the benefit of the settlement agreement of the pension fund.

Although we do not find Special Master McGarr's factual findings clearly erroneous, we agree with his conclusions but for reasons different from his. Close properly asserts that 42 U.S.C. 401(a)(2) requires that the use or diversion of funds for any use or purpose other than the exclusive benefit of employees of their beneficiaries is prohibited. Close is also correct when he asserts that 42 U.S.C. 401 (b) also prohibits discrimination in favor of officers, shareholders and highly compensated employees. The settlement agreement does not address the failure of the pension fund to follow formalities which are required by the tax code and ERISA. However, this settlement agreement is not the proper vehicle or the proper mechanism to resolve those issues.

*16 ERISA has established fiduciary standards and rules concerning prohibited transactions that plans must comply with. These requirements were placed under the jurisdiction of the Department of Labor which was given authority to issue individual or class exemptions and to provide guidance relating to fiduciary standards. 42 U.S.C 404, 406, 407 and 408, et seq. Participation in prohibited transactions subjects the offender to an excise tax of up to 100% under the Internal Revenue Code and possible civil liability under the Labor Title of the United States Code. Sinder v. U.S., 655 F.2d 729 (6th Cir.1981), Continental, 87-2 USIC (CCH) 9442 (N.D.Ill.1987). Prohibited transactions are those engaged in by a disqualified person or "a party in interest" such as a fiduciary. Sinder v. U.S., 655 F.2d 729 (6th Cir.1981), Continental, 87-2 USIC (CCH) 9442 (N.D.Ill.1987). When more than one person has been assessed for the same 100% penalty, they are jointly and severally liable. Sinder v. US, 655 F.2d 729 (6th Cir.1981), Continental, 87-2 USIC (CCH) 9442 (N.D.Ill.1987).[FN1]

> FN1. The plaintiffs continual reliance on the determination letter is of no consequence. A determination letter is a written statement issued by the district director that applies the precedents which have been announced by the National Office. Treas. Reg. Section 601.201(a)(3). Section 6110(j)(3) explicitly states that written determinations may not be cited or used as precedent. Further, neither the determination letter that plaintiffs rely upon nor the attached Local 705 International Brotherhood of Teamsters Pension Plan, addresses any aspect of prohibited transfers which are central to Close's objections.

Therefore, although we find Close's assertions are correct, they have no bearing on the Special Master's findings of fact or the ultimate determination related to the fairness of this settlement agreement. Instead, they directly relate to the liability of trustees who initiated, participated in or implicitly acceded to transactions which potentially may be found to be prohibited. The ultimate liability for these decisions rests personally on these trustees and does not bear on the ultimate approval of the settlement agreement.

The confidentiality of the individual defendants is problematic because their individual contributions are directly related to contribution claims which might take place in the future. Yet, this again, is not directly tied to the fairness of the agreement nor its propriety to the situation before us. Reviewing the record, it is clear that individual defendants took the position that they would not agree to the settlement agreement absent a confidentiality clause. Aetna, in turn, would not agree to pay anything into the settlement fund unless all of the individual defendants were parties to the settlement agreement. Counsel for the classes reasonably concluded that the total settlement fund was a fair and adequate settlement amount, which would have been lost by an insistence on a disclosure of the allocations of contributions. Therefore, this provision was reached by compromise by all sides.

On July 3, 1996, Local 705 filed a brief opposing Close's motion for leave to file untimely objections to Special Master McGarr's findings of facts. In open court, Local 705 claimed that Close's objections simply were not timely. At that time in open court, this court advised Close that the motion to file untimely objections would be taken with the case. The motion for leave to file untimely objections is denied.

Throughout all of these negotiations, both sides have been represented by experienced and competent attorneys. These attorneys have opined that the settlement is fair, adequate and in the best interest of the respective classes that they represent. These attorneys have executed the settlement agreement and have provided their personal assents to it. Reviewing Special Master McGarr's findings of fact we find they are not clearly erroneous. Therefore, they are accepted.

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 14 of 17

Not Reported in F.Supp.                                    Page 13 of 17

**\*17** Further, the settlement agreement which has been presented to this court is fair, adequate and reasonable to each of the respective classes and in the best interests of the absent class members in each of the respective classes. Therefore, the settlement agreement is approved in its entirety.

## ATTORNEYS' FEES

When a case such as this results in the creation of a common fund for the benefit of a plaintiff class, the district court will exercise its equitable powers to award plaintiffs' attorneys' fees out of the fund. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The attorneys' fee award is then taken as a share of the fund, thereby diminishing the sum which is ultimately retained by the plaintiff class. *Alyeska,* 421 U.S. at 257-58. The common fund doctrine (also known as the "equitable fund" doctrine and the "fund-in-court" doctrine) is based on the "equitable notion that those who have benefitted from litigation should share its costs." *Skelton v. General Motors Corporation,* 860 F.2d 250, 252 (7th Cir.1988).

The seventh circuit has found that both the lodestar approach and the percentage approach may be appropriate in the determination of attorney's fee awards. *Florin v. Nationsbank of Georgia,* 34 F.3d 560, 565 (7th Cir.1994). The decision of which method to employ remains within the discretion of the district court. *Florin,* 34 F.3d at 565. Special Master McGarr has suggested that this court apply the percentage of recovery rather than the lodestar method for computing an appropriate fee. Just as the seventh circuit acknowledged in *Florin,* this court recognizes that there are advantages to the utilization of the percentage method in common fund cases-mainly the relative simplicity of its administration.

The Seventh Circuit requires the court to balance the competing goals of attorney compensation for services rendered on behalf of the class and the protection of the fund class members' interests. *Skelton v. General Motors Corp.,* 860 F.2d 250, 257 (7th Cir.1988). When the plaintiff class is unrepresented with regard to attorneys' fees, the interests of the class must be guarded. *Florin v. Nationsbank of Georgia,* 60 F.3d 1245, 1247 (7th Cir.1995). Yet, the attorneys who have represented their clients must have an incentive to continue to do so on an "inescapably contingent" basis. *Florin,* 60 F.3d at 1247 citing *Matter of Continental Ill. Sec. Litig.,* 962 F.2d at 569.

Here, counsel for Archie Cook have requested an attorneys' fee of $4.785,000 plus costs in the amount of $1,232,749.16. As a basis for finding such a fee appropriate in this case, Special Master McGarr has asserted that the riskiness of the litigation and the amount of recovery which ultimately will befall the plaintiffs justify the use of the percentage method for the amount of attorneys fees in this case, as Cook counsel were directly responsible for the result. We do not disagree with Special Master McGarr in his assertion that there was riskiness in this litigation; however, because this is a common fund case, we find that we owe a responsibility to return as much as possible to the aggrieved persons in this situation-the plaintiffs. Further, objections which have been raised by individual pensioners in addition to those raised by Local 705 Health and Welfare Fund, require us to examine the actual amount of attorneys fees which are to be awarded in this case. The total immediate cash benefit which has accrued to the Health & Welfare Fund as a result of the Cook litigation is between $14,536,819 (13,162,862 ++ 1,373,957) and 14,998,957 (13,625,000 ++ 1,373,957). The value of the structural relief obtained by Cook class counsel is substantial despite the dispute of the union to plaintiff's evaluation. Yet, as a matter of law, we find the percentage method to be inapplicable to this case as it defeats the whole purpose of attempting to make the plaintiffs whole.

**\*18** Taking these issues into account, we find that the Lodestar method is the better determinant of the attorneys' fees for the plaintiff's counsel in this case. The Lodestar method provides for greater accountability and a more careful check on excessive fees. *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir.1991). Calculation of the lodestar is the starting point for any award of attorney's fees. *Dutchak v. Central States,* 932 F.2d 591 (7th Cir.1991). The Lodestar represents the number of hours which have been reasonably expended multiplied by the appropriate hourly rate. *Dutchak,* 932 F.2d at 595. Once the lodestar is calculated, adjustments, where appropriate, increase or decrease the award in light of other factors. *Dutchak,* 932 F.2d at 595. When attorneys' receipt of payment is contingent on the success of litigation, reasonable compensation may demand that the hourly rate multiplied by the hours worked is increased, because this rate would be the amount that attorneys would have received for services, regardless of success. *Skelton,* 860 F.2d at 257. To account for the contingent nature of the compensation, a court can assess the riskiness of litigation. *Skelton,* 860 F.2d at 257. Although it is difficult, the court must make a retroactive calculation of the probability of

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 15 of 17

Not Reported in F.Supp.                                                                Page 14 of 17

success as measured at the beginning of litigation. *Skelton, 860 F.2d at 257*. Then, the court must place plaintiffs' lawyers in the unseemly position of convincing the court that their clients' case was weak. *Skelton, 860 F.2d at 257*. To avoid this scenario, it has been suggested that a standard risk multiplier be used in contingent fee arrangements. *Skelton, 860 F.2d at 257*. Decisions of the district court, the determination of attorney's fees and its decision of whether to award a risk multiplier, generally are reviewed only for abuse of discretion. *Skelton, 860 F.2d at 257*.

Lodestar, which incorporates reasonable hourly rates and reasonable time expended is appropriate here, with a multiplier of 1.5 which incorporates the degree of risk which Cook counsel have taken as a result of this litigation. We find the hourly rates and submitted time for Cook class counsel which have been proposed are approved as follows:

| Counsel | Hourly rate | Time expended | Total Fee |
|---|---|---|---|
| Charles Pressman | $325 | 1467.6 | 476,970.00 |
| Stephen G. Seliger | $295 | 449.6 | 132,632.00 |
| Joel M. Hellman | $260 | 1475.75 | 383,695.00 |
| Robin Potter | $250 | 1112.23 | 278,057.50 |
| Mary L. Mikva | $235 | 23.00 | 5,405.00 |
| James G. Bradtke | $215 | 164.20 | 35,303.00 |
| Mary Ann Wilson | $215 | 23.00 | 4,945.00 |
| Jennifer Soule | $175 | 4.20 | 735.00 |
| Steven Tandle | $175 | 5.60 | 980.00 |
| Kelly Lambert | $145 | 7.10 | 1029.50 |
| James A. Field | $115 | 8.75 | 1006.25 |
| Paralegals | $80 | 1165.90 | 93,272.00 |
| TOTAL FEES | | | 2,121,045.40 |
| TOTAL FEES X MULTIPLIER OF 1.5 | | | 1,414,030.30 |

We have reviewed the amount of time which has been reported to have been spent on this case by

Case 1:05-cv-00429-GMS    Document 22-3    Filed 09/14/2005    Page 16 of 17

Not Reported in F.Supp.                                                                  Page 15 of 17

various members of Cook class counsel, up to January 31, 1996. Although objectors argue that the hours claimed are excessive, that associates and paralegals were not used for lesser tasks, that hourly rates are excessive, that hours expended in the preparation of fee petitions are improperly included and that the comparison of the amount sought and the hours expended reveals a fee claim with an excessive hourly rate, we find that the hours appear to be representative of the work which was performed by the attorneys here. However, we note that it is preferable to break out the time spent on specific tasks to enable this court, or any reviewing court, to more specifically determine the accuracy of the billing involved.

## COSTS

*19 We have reviewed the following expenses from the Cook class counsel

| Type of Expense | Amount |
|---|---|
| Reporter fees and transcripts | $20,949.05 |
| Consulting experts | |
| Admin Sys Des and OBA | $7,957.50 |
| Reed - Ramsey | $6,080.10 |
| Prof. Albert Madansky | $11,500.00 |
| Prof. Roger Feldman | $1,273.00 |
| Computer Services | |
| Analytical Comp. Serv. | $22,271.00 |
| RIMS | $475.00 |
| Xanadex | $1,647.85 |
| Dedicated space (rent) | |
| Potter & Schaffner | $302.44 |
| Photocopying | |
| Vendors | $26,994.83 |
| In | |

Case 1:05-cv-00429-GMS   Document 22-3   Filed 09/14/2005   Page 17 of 17

Not Reported in F.Supp.                                       Page 16 of 17

| | | |
|---|---|---|
| house Charles Pressman | | |
| 35,997 @ .10 | $ | 3,599.70 |
| Joel M. Hellman | | |
| 35,059 @ .10 | $ | 3,505.90 |
| Robin Potter | | |
| 57,778 @ .20 | $ | 11,555.60 |
| Telephone conference charges | $ | 664.01 |
| Data reporting services | $ | 705.09 |
| Filing, service and witness fees | $ | 757.31 |
| Lexis | $ | 1,569.13 |
| TOTAL EXPENSE | $133,440.31 | |

We agree with objections that have been raised which point out that certain categories of claimed costs are not compensable. Copying costs should properly be 10 cents per page and office space costs are subsumed into attorney's fees. Therefore, Cook class counsel should be reimbursed for costs of $92,258.31, which should be paid from the settlement escrow for the benefit of the Health and Welfare Fund. Further, Local 705 class counsel have incurred $25,617.79 in the prosecution of this action, for which they should be reimbursed out of the settlement fund.

## INCENTIVE AWARD FOR ARCHIE COOK

This circuit has recognized the appropriateness of incentive awards. *In re Continental,* 962 F.2d at 571-572. Archie Cook has spent hundreds of hours submitting himself to formal discovery and has provided an abundance of information to Cook class counsel during the course of litigation. We find that $25,000 is a reasonable incentive award to be paid to Mr. Cook.
N.D.Ill.,1997.
Cook v. McCarron
Not Reported in F.Supp., 1997 WL 47448 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

- 1:95CV00828 (Docket) (Feb. 09, 1995)
- 1:92cv07042 (Docket) (Oct. 22, 1992)
END OF DOCUMENT