**6**

LEXSEE

## ANN M. LANDGRAFF, et al. v. COLUMBIA/HCA HEALTHCARE CORPORATION OF AMERICA, et al.

### No. 3-98-0090

### UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

### 2000 U.S. Dist. LEXIS 21831

### May 24, 2000, Decided
### May 24, 2000, Entered

**SUBSEQUENT HISTORY:** aff'd, Landgraff v. Columbia/HCA Healthcare Corp., 2002 U.S. App. LEXIS 2334 (6th Cir. Tenn. Feb. 7, 2002)

**DISPOSITION:** [*1] . Plaintiffs' action dismissed with prejudice. Defendant's counterclaims for attorneys' fees and costs withdrawn and dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees sued defendants, company and individuals, alleging breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.S. § 1001 et seq., with regard to the company's stock bonus plan (SBP). The matter went before the court for a bench trial.

**OVERVIEW:** As members of the retirement committee, the individuals were charged by the company with administering the SBP. They exercised discretionary authority with respect to the management and disposition of the SBP's assets and were fiduciaries with respect to the SBP within the meaning of ERISA. The employees alleged that the individuals breached their fiduciary duty by failing to investigate and consider whether the assets of the SBP should be diversified as a result of the government's investigation of the company and by maintaining and increasing the amount of company stock owned by the SBP. The employees also alleged that the company was a co-fiduciary to the SBP. The court held that the presumption of prudence applied to the decisions to invest the SBP assets in company stock. The procedure followed by the individuals to review the prudence of investing the assets of the SBP in the company stock was deficient. The employees failed to establish that a reasonable fiduciary would have determined that the investment of the SBP assets in company stock was imprudent and as such failed to rebut the presumption of

reasonableness.

**OUTCOME:** A judgment was entered in favor of the company and the individuals with regard to the claims of breach of fiduciary duty. The counterclaims for attorneys' fees and costs were withdrawn and were dismissed.

**CORE TERMS:** stock, fiduciary, retirement, prudent, prudence, guidelines, invested, fiduciary duty, diversification, diversify, duty, billion, invest, minutes, stock price, per share, diversified, improvident, manager, raid, beneficiaries, imprudent, breached, board of directors, recommendation, short-term, directive, analyst, ownership, eligible

### LexisNexis(R) Headnotes

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities*
[HN1] See 29 U.S.C.S. § 1002(21)(A).

*Pensions & Benefits Law > Employee Benefit Plans*
[HN2] See 29 U.S.C.S. § 1002(2)(A).

*Pensions & Benefits Law > Employee Benefit Plans*
[HN3] See 29 U.S.C.S. § 1107(d)(3).

*Pensions & Benefits Law > Defined Contribution Plans*
[HN4] I.R.C. § 401(a) states that a stock bonus plan is one that is established and maintained by an employer whose benefits are distributable in stock of the employer company. 26 C.F.R. § 1.401-1(b)(1)(iii).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities*
[HN5] See 29 U.S.C.S. § 1104(a)(1).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities*
[HN6] The United States Court of Appeals for the Sixth Circuit has interpreted the general duty of an Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.S. § 1001 et seq., fiduciary as threefold. First, ERISA fiduciaries have a duty of loyalty requiring that the fiduciary make any decisions regarding an ERISA plan with an eye single to the interests of the participants and beneficiaries. Second, ERISA requires that plan fiduciaries carry out their fiduciary duties with the standard of care of a prudent man. Third, an ERISA fiduciary must act for the exclusive purpose of providing benefits to plan beneficiaries.

*Pensions & Benefits Law > Employee Benefit Plans*
[HN7] Both employee stock ownership or option plans (ESOPs) and stock bonus plans (SBPs) are eligible individual account plans subject to the same Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 et seq., requirements.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities*
[HN8] The United States Court of Appeals for the Sixth Circuit noted that Congress created two exceptions for employee stock ownership or option plans (ESOP) fiduciaries from the general duties of Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.S. § 1001 et seq., fiduciaries. First, ESOP fiduciaries are not required to diversify the holdings of ESOPs. Second, ESOP fiduciaries are not prohibited from self-dealing, as is the general rule for ERISA fiduciaries. They can therefore invest more than 10 per cent of ESOP assets in company stock. These exceptions were made for ESOPs to encourage employee ownership in company stock. However, ESOP fiduciaries are not relieved from their duty to act in accordance with the prudent man standard, the duty to act solely in the interests of, and for the exclusive benefit of, the plan participants and beneficiaries.

*Pensions & Benefits Law > Employee Benefit Plans*
[HN9] An employee stock ownership or option plan (ESOP) is an employee retirement account that invests primarily in employer securities. It serves two roles: one

as a retirement fund and another as a technique of corporate finance that would encourage employee ownership. Accordingly, ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at a much greater risk than the typical diversified Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 et seq., plan.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities*
[HN10] The United States Court of Appeals for the Sixth Circuit has established a presumption that an employee stock ownership or option plan (ESOP) fiduciary's decision to remain invested in an employer's securities is reasonable. The presumption of reasonableness in an ESOP fiduciary's decision to remain invested in employer stock may be rebutted by a plaintiff only by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.

*Pensions & Benefits Law > Fiduciary Responsibilities*
[HN11] As all eligible individual account plans (EIAPs) are exempt from the diversification requirement under the Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 et seq., the competing Congressional interest in employee ownership of company stock and the fiduciary's duty of prudence must be balanced with respect to all EIAPs. Therefore, the reasoning upon which the presumption of prudence to the investment decisions of employee stock ownership or option plans (ESOP) fiduciaries not to diversify may equally be applied to the stock bonus plan (SBP) fiduciaries.

*Pensions & Benefits Law > Fiduciary Responsibilities*
[HN12] With regard to employee pension benefit plan not under the Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 et seq., in order to rebut the presumption of prudence, a plaintiff must show that a prudent fiduciary acting under similar circumstances would have made a different investment decision. A plaintiff must meet this burden by showing that a fiduciary failed to investigate and evaluate the merits of his investment decisions and that there is a causal link between the failure to investigate and the harm suffered by the plan. A causal link can be established by demonstrating an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

*Pensions & Benefits Law > Fiduciary Responsibilities*
[HN13] An employee benefit plan fiduciary who is not given discretion to diversify must nevertheless act

prudently.

***Pensions & Benefits Law > Fiduciary Responsibilities***
[HN14] With regard to a claim of breach of fiduciary duty in relation to an employee benefit plan, in addition to proving that the inquiry of the retirement committee was procedurally deficient, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan. Accordingly, a court will also consider whether additional considerations would have revealed to a reasonable fiduciary that the investment at issue was improvident.

**COUNSEL:** For ANN M. LANDGRAFF, GINA MAGARIAN, plaintiffs: John Parker Branham, Branham & Day, P.C., Brentwood, TN.

For ANN M. LANDGRAFF, GINA MAGARIAN, plaintiffs: Render C. Freeman, W. Pitts Carr, Carr, Tabb, Pope & Freeman, LLP, Pratt H. Davis, Crain & Davis, L.L.C., Atlanta, GA.

For ANN M. LANDGRAFF, GINA MAGARIAN, plaintiffs: Michael O. Crain, Crain & Davis, Christopher D. Adams, Adams & Alford, P.C., Athens, GA.

For ANN M. LANDGRAFF, GINA MAGARIAN, plaintiffs: Randall W. Burton, Burton, Dumas & Knight, Nashville, TN.

For COLUMBIA/HCA HEALTHCARE CORPORATION, defendant: H. Lee Barfield, II, Bass, Berry & Sims, John M. Tipps, Walker, Bryant & Tipps, Nashville, TN.

For COLUMBIA/HCA HEALTHCARE CORPORATION, DAVID ANDERSON, STEVEN T. BRAUN, NEIL D. HEMPHILL, BRUCE A. MOORE, JAMES D. SHELTON, defendants: Peter L. Winik, Latham & Watkins, Washington, DC.

For COLUMBIA/HCA HEALTHCARE CORPORATION, defendant: Richard P. Bress, Latham & Watkins, Washington, DC. [*2]

For COLUMBIA/HCA HEALTHCARE CORPORATION, defendant: Julie V. King, Latham & Watkins, Costa Mesa, CA.

For DAVID ANDERSON, NEIL D. HEMPHILL, BRUCE A. MOORE, JAMES A. SHELTON, defendants: Lewis H. Conner, Jr., Grant C. Glassford, Stokes, Bartholomew, Evans & Petree, Nashville, TN.

For DAVID ANDERSON, NEIL D. HEMPHILL, BRUCE A. MOORE, JAMES D. SHELTON,

defendants: Robert N. Eccles, Brian P. Brooks, O'Melveny and Myers, LLP, Washington, DC.

For STEVEN T. BRAUN, defendant: Paul C. Ney, Jr., Doramus, Trauger & Ney, Nashville, TN.

For STEVEN T. BRAUN, defendant: Robert P. Davis, Lawrence S. Robbins, Lily Fu Swenson, Susan J. Luken, Mayer, Brown & Platt, Washington, DC.

For STEVEN T. BRAUN, counter-claimant: Paul C. Ney, Jr., Doramus, Trauger & Ney, Nashville, TN.

For STEVEN T. BRAUN, counter-claimant: Susan J. Luken, Mayer, Brown & Platt, Washington, DC.

For DAVID ANDERSON, NEIL D. HEMPHILL, BRUCE A. MOORE, JAMES D. SHELTON, counter-claimants: Lewis H. Conner, Jr., Grant C. Glassford, Stokes, Bartholomew, Evans & Petree, Nashville, TN.

For ANN M. LANDGRAFF, GINA MAGARIAN, counter-defendants: Render C. Freeman, W. Pitts Carr, Carr, Tabb, Pope & Freeman, [*3] LLP, Pratt H. Davis, Crain & Davis, L.L.C., Atlanta, GA.

For ANN M. LANDGRAFF, GINA MAGARIAN, counter-defendants: Michael O. Crain, Crain & Davis, Christopher D. Adams, Adams & Alford, P.C., Athens, GA.

For ANN M. LANDGRAFF, GINA MAGARIAN, counter-defendants: Randall W. Burton, Burton, Dumas & Knight, Nashville, TN.

**JUDGES:** Thomas A. Higgins, United States District Judge.

**OPINIONBY:** Thomas A. Higgins

**OPINION:**

MEMORANDUM

The plaintiffs, Ann M. Landgraff and Gina Magarian, were employees of Columbia/HCA in 1997, n1 and participated in the company's Stock Bonus Plan. They filed this action for breach of fiduciary duty under the Employment Retirement Securities Act of 1974, Title 29 U.S.C. § 1001, et seq. on behalf of the SBP. As "participants" in the SBP, the plaintiffs have standing to file this action on behalf of the SBP under 29 U.S.C. § 1132(a)(2).

n1 Ms. Landgraff worked for West Paces

Ferry Hospital in Atlanta, Georgia, from 1983 to 1997, as a registered nurse. HCA and later Columbia/HCA owned West Paces Ferry Hospital. Ms. Magarian worked for Gulf Coast Community Hospital, now Columbia Gulf Coast Community Hospital, from 1977 to 1997, as a registration coordinator. The hospital was owned by HCA and later Columbia/HCA throughout her tenure there.

[*4]

The defendant, Columbia/HCA, is a healthcare management company which, at the time in question, owned and operated approximately 300 hospitals throughout the United States and employed nearly 300,000 individuals.

During the time in question, the individual defendants, Stephen T. Braun, David Anderson, Neil D. Hemphill, Bruce A. Moore and James D. Shelton, were executives of Columbia/HCA and served as members of Columbia's retirement committee. n2 Mr. Braun was a senior vice-president and general counsel of Columbia/HCA. Mr. Anderson was the treasurer and vice-president of finance. Mr. Hemphill was senior vice-president of human resources and served on the retirement committee from 1995, to November, 1998. Mr. Moore, at the time in question, was vice-president of benefits and is now vice-president of operations administration. He became a member of the retirement committee in 1996. Since that time, he has been the committee chairman. Finally, Mr. Shelton, the president of the Central Group of Columbia/HCA, served on the retirement committee from May, 1996, to August, 1997.

> n2 In 1997, and 1998, Richard Bracken, president of the Columbia/HCA's western group division, and John M. Franck, II, the corporate secretary, also served on the retirement committee. Both were originally named as defendants in this action. See, second amended complaint (filed April 27, 1998; Docket Entry No. 38). The plaintiffs filed a notice of voluntary dismissal without prejudice with respect to these defendants on July 8, 1998 (Docket Entry No. 70) and on July 9, 1998, the Court entered an order (Docket Entry No. 72) dismissing these defendants without prejudice.

[*5]

As members of the retirement committee, the individual defendants were charged by the company with administering the SBP. They exercised discretionary authority with respect to the management and disposition of the SBP's assets and were therefore fiduciaries with respect to the SBP within the meaning of ERISA. 29 U.S.C. § 1002(21)(A)(i). n3

> n3 [HN1] Under 29 U.S.C. § 1002(21)(A) "a person is a fiduciary with respect to a plan to the extent that (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

The SBP, is a retirement fund sponsored by Columbia/HCA and is an "employee pension benefit plan" under ERISA, Title 29 U.S.C. § 1002(2)(A). n4 Specifically, the SBP was an "eligible individual account [*6] plan," or EIAP, as defined under 29 U.S.C. § 1107(d)(3)(A). n5 Accordingly, the SBP was exempt from ERISA's general requirements that retirement plans hold no more than 10% of their assets in employer's securities and that plan assets be diversified. n6 At all times relevant to this action, the SBP held nearly 100% of its assets in the stock of Columbia/HCA. n7 In January, 1997, the SBP was valued at approximately $ 1.4 billion.

> n4 Title [HN2] 29 U.S.C. § 1002(2)(A) defines an "employee pension benefit plan" as
> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program - (i) provides retirement income to employees . . . regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

> n5 Title [HN3] 29 U.S.C. § 1107(d)(3) states that "(A) The term 'eligible individual account plan' means an individual account plan which is (i) a . . . stock bonus . . . plan . . ; (ii) an employee stock ownership plan; . . . which was in existence on September 2, 1974, and which on such date invested primarily in qualifying employer securities" and "(B) Notwithstanding subparagraph (A), a plan shall be treated as an eligible individual account plan with respect to the acquisition or holding of qualifying employer

. . . securities only if such plan explicitly provides for acquisition and holding of qualifying employer securities."

[*7]

n6 See, 29 U.S.C. §§ 1107(b) and 1104(a)(2).

n7 Once an employee's SBP vests, the employee may choose whether to take his or her share in stock or in cash. The record reflects that a portion of the SBP's assets were not invested in Columbia securities so that SBP could pay employees who were eligible to receive their benefits as they requested them.

In 1997, or earlier, the federal government began an investigation of Columbia/HCA for alleged illegal billing and coding practices. The investigation became public knowledge in March, 1997, and the price of Columbia/HCA stock fell significantly. The plaintiffs contend that the individual defendants subsequently breached their fiduciary duty to the SBP as set forth under ERISA, 29 U.S.C. § 1104, by failing to investigate and consider whether the assets of the SBP should be diversified as the result of the government's investigation of Columbia/HCA and by maintaining and increasing the amount of company stock owned by the SBP. The individual defendants dispute that they acted imprudently (1) in [*8] their consideration of the effects of the investigation, (2) in deciding not to diversify the assets of the SBP and (3) in the purchase of additional company stock. The defendants also argue that even if their procedure for administering the assets of the SBP was deficient under ERISA, the plaintiffs should not prevail because they have not established that "a prudent fiduciary acting under similar circumstances would have made a different investment decision." Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995).

Next, the plaintiffs claim that Columbia/HCA is a co-fiduciary to the SBP and breached its fiduciary duty in two respects. First, the plaintiffs contend that Columbia/HCA breached its duty by authorizing two purchases on behalf of the SBP of approximately $ 25 million each in Columbia/HCA stock. Second, the plaintiffs assert that the company breached its duty by failing to monitor the decisions of the retirement committee and remove any member not meeting his fiduciary duty to the SBP.

Columbia/HCA disputes that it had discretionary authority with respect to the management of the SBP or the disposition of its assets and asserts it was not involved in the [*9] decision to buy or sell stock.

Therefore, the company contends that it was not a fiduciary of the SBP under 29 U.S.C. § 1002(21)(A) with respect to the investment of the SBP assets. Columbia/HCA admits that it was a fiduciary only for the limited purpose of appointing, removing and monitoring the performance of the retirement committee members. It further insists that because the members of the retirement committee did not breach their fiduciary duty with respect to the SBP assets, it did not breach its fiduciary duty with respect to its duty to appoint, remove and monitor the retirement committee members.

The Court has subject matter jurisdiction over this matter under 29 U.S.C. § 1132(f) and venue is proper in this district under 29 U.S.C. § 1132(e).

A trial without the intervention of a jury was held before the Court on June 8-10, 14, 16-18, 29-30, and July 1, 1999. The Court heard oral argument on March 23, 2000. For the reasons set forth below, the Court finds in favor of the defendants with respect to the plaintiffs' claims of breach of fiduciary duty. At oral argument, the counterclaims of the defendants [*10] were withdrawn and will be dismissed.

I.

At the time in question, Columbia/HCA sponsored three employee pension benefit plans governed by ERISA: a money purchase pension plan, n8 a salary deferral plan, called the HealthTrust 401(k) n9 and the SBP. The SBP was entirely funded by Columbia/HCA. The company contributed .5% of each employee's salary to the SBP through cash contributions to the SBP and the SBP purchased Columbia/HCA stock accordingly.

n8 Columbia/HCA made contributions to the money purchase pension plan based on the salary of the employee. The plan was diversified and it did not hold any company stock.

n9 The HealthTrust 401(k) is funded primarily by the employee, with some company matching. It came into existence in 1991, when the HealthTrust ESOP, was terminated and the funds transferred into the 401(k) plan. In 1995, HealthTrust and Columbia/HCA merged and the HealthTrust 401(k) plan was frozen. No new contributions were made to the plan after that date and the assets of the former HealthTrust ESOP were converted from HealthTrust stock to Columbia/HCA stock.

[*11]

In accordance with the SBP document, which states

that Columbia/HCA, through its board of directors, "shall appoint a committee to perform the duties of the Plan Administrator in connection with administration of this Plan and such committee shall give instructions to the Trustee," the Columbia/HCA board of directors appointed the members of the retirement committee to administer the SBP. Defendants' Exhibit 6 at 62. The members of the retirement committee also made up the HealthTrust 401(k) committee and administered the 401(k).

The SBP document states that:

> For purposes of Part 4 of Title I of ERISA, the Plan Sponsor, the Trustee, and the committee shall each be Fiduciaries and shall each discharge their respective duties hereunder with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Id. at 69.

The plan document section titled "Purpose" states that:

> This plan is adopted voluntarily by Columbia/HCA Healthcare Corporation and is intended to qualify under Section 401(a) of the Internal Revenue Code [*12] as a stock bonus plan. All assets acquired under this Plan . . . are to be held and administered for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the plan.

Id. at 11. [HN4] Section 401(a) of the Internal Revenue Code states that a stock bonus plan is one that is "established and maintained by an employer. . . [whose] benefits are distributable in stock of the employer company." 26 C.F.R. § 1.401-1(b)(1)(iii).

The plan also states that the assets of the SBP shall be primarily or exclusively invested in company stock but that it may also invest in other securities, as follows:

> All Employer contributions in cash and any other cash received by the Trust . . . *shall be utilized primarily or exclusively to purchase Company Stock from holders of outstanding stock or stock issued by the Company*. . . . The Trustee may invest Trust Funds which are in excess of current outstanding obligations in Company Stock, savings accounts, and if the Trustee is a bank, savings accounts in the Trustee's banking

department, bank certificates of [*13] deposit, including those issued by the Trustee's banking department, short-term securities, stock, bonds, futures, options, foreign securities (to the extent that such securities satisfy the requirements of ERISA), the participation in any common trust fund or commingled fund for the investment of qualified retirement plan assets which may be established from time to time by the Trustee's banking department, or other investments deemed by the Trustee to be desirable for the Trust, or such funds may be held temporarily in cash, including a demand account in the Trustee's banking department. The Plan Administrator n10 may direct the Trustee to invest up to one hundred percent (100%) of the Trust Assets in Company Stock. *It is the intent of the Plan Sponsor that Trust assets be invested primarily or exclusively in Company Stock.*

Defendants' Exhibit 6 at 48-49 (emphasis added). n11

> n10 According to the SBP plan document, the plan sponsor is Columbia/HCA and the plan administrator is also the plan sponsor. Defendants' Exhibit 6 at 25-26.

> n11 As of September 29, 1998, the SBP plan document was amended to permit plan participants to decide how to allocate the assets in their SBP account among ten investment options, including company stock.

[*14]

In addition to the SBP plan document, on July 24, 1994, the retirement committee approved and adopted the Columbia/HCA Investment Policy and Guidelines pertaining to the investment of the assets of the SBP.

The investment policy guidelines state that "the overall objective of the Plan's assets is to achieve a minimum real rate of return (in excess of inflation) of 7% annualized. The Committee believes that a 10 year period is appropriate in measuring its progress toward achieving this objective." Plaintiffs' Exhibit 117 at 23. The guidelines also provide for the committee's ability to diversify the assets in the SBP, as follows:

> The Committee believes that at certain times additional assets may be added to the portfolio to dampen the volatility of Employer Common Stock without severely damaging the Employee's ability to participate in the growth of the Employer Common Stock.

III. Stock Bonus Plan Portfolio Structure and Overall Fund Guidelines

The Committee is charged with the responsibility of determining the structure of the Plan's portfolio that offers the highest probability of achieving its investment objectives. Moreover, it may update and revise this [*15] structure as the financial needs of the Plan and/or the outlook for the capital markets change.

A. The ranges for the asset allocation of the Plan are designed to allow flexibility of the fund over a time horizon. The ranges are given so the Committee can adjust for any of the following:

> 1. The Committee's assessment of the intermediate term outlook for different types of securities.
>
> 2. Recent divergences in the performance of different classes of securities.
>
> . . . .
>
> 4. The allocation of cash flows.

The Committee has established maximum exposures on the asset classes being employed by the Stock Bonus Plan. They are:

Columbia/HCA        Common        Stock
Maximum 100%
Minimum 50%

Domestic Equities Maximum 50%
Minimum 0%

International Equities Maximum 20%
Minimum 0%

Other Investments Maximum 25%
Minimum 0%

Domestic Fixed Maximum 25%
Minimum 0%

International Fixed Maximum 25%
Minimum 0%

Short Term Investments Maximum 30%
Minimum 3%

B. The target asset allocation mix recommended and approved by the Committee to achieve the long term financial objectives of the Stock Bonus

Plan is as follows:

> **Equities**
> Columbia/HCA [*16] Common Stock 95%
> Domestic 0%
> International 0%
> 95%
>
> **Other Investments** 0%
>
> **Fixed Income**
> Domestic 0%
> International 0%
> 0%
>
> **Cash and Short Term Investments** 5%
>
> **Total Plan** 100%

Id. at 23-24.

II.

A. Fiduciary Duty Under ERISA

ERISA sets forth the following standard of fiduciary duty:

> [HN5] a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
>
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan,
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

29 U.S.C. § 1104(a)(1).

[HN6] The United States Court of Appeals for the Sixth Circuit has interpreted the general duty of an ERISA fiduciary as threefold. Kuper, 66 F.3d at 1458. First, ERISA fiduciaries have a duty of loyalty requiring [*17] that the fiduciary make any decisions regarding an ERISA plan "'with an eye single to the interests of the participants and beneficiaries.'" Id. (quoting Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1162 (6th Cir. 1988) and Donovan v. Bierwirth, 680 F.2d 263, 271 (2nd Cir.), cert. denied, 459 U.S. 1069, 103 S. Ct. 488, 74 L.

Ed. 2d 631 (1982)). Second, ERISA requires that plan fiduciaries carry out their fiduciary duties with the standard of care of a prudent man. Id. Third, the Sixth Circuit states that "an ERISA fiduciary must 'act for the exclusive purpose' of providing benefits to plan beneficiaries." Id.

In Kuper, the Sixth Circuit considered the standard by which the actions of fiduciaries of an employee stock ownership plan should be measured. The Court finds the Kuper Court's reasoning instructive because [HN7] both ESOPs n12 and SPBs are eligible individual account plans subject to the same ERISA requirements. [HN8] The Sixth Circuit noted that Congress created two exceptions for ESOP fiduciaries from the general duties of ERISA fiduciaries. First, ESOP fiduciaries are not required to diversify the holdings [*18] of ESOPs. Second, ESOP fiduciaries are not prohibited from self-dealing, as is the general rule for ERISA fiduciaries. They can therefore invest more than 10% of ESOP assets in company stock. These exceptions were made for ESOPs to encourage employee ownership in company stock. Id. However, the Court also stated that ESOP fiduciaries are not relieved from their duty to act in accordance with the prudent man standard, the duty to act solely in the interests of, and for the exclusive benefit of, the plan participants and beneficiaries. Id. (citing Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992), cert. denied, 506 U.S. 1054, 113 S. Ct. 979, 122 L. Ed. 2d 133 (1993)).

n12 [HN9] An ESOP is an employee retirement account that invests primarily in employer securities. It serves two roles: one as a retirement fund and another as a "'technique of corporate finance' that would encourage employee ownership." Kuper, 66 F.3d at 1457 (quoting Martin, 965 F.2d at 664). Accordingly, "ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at a much greater risk than the typical individual ERISA plan." Id. (citing Moench v. Robertson, 62 F.3d 553, 568 (3d Cir.), cert. denied, 516 U.S. 1115, 116 S. Ct. 917, 133 L. Ed. 2d 847 (1996)(quoting Martin, 965 F.2d at 664)).

[*19]

In Kuper, the Court found that because ESOPs differ from most ERISA plans in that they are exempt from the diversification requirement and prohibition against self dealing, they are at more risk than most ERISA plans. The Court noted that, fiduciaries of such plans are placed in a precarious position because they must "'administer the ESOP investment consistent with the provisions of both a specific employee benefits plan and with ERISA['s

duty of prudence].'" 66 F.3d at 1458 (quoting Moench, 62 F.3d at 569 and Kuper v. Quantum Chems. Corp., 852 F. Supp. 1389, 1395 (S.D. Ohio 1994)). The Court noted that this "conflict becomes particularly evident when an employee claims that a fiduciary breached his ERISA duties by failing to diversify an ESOP." Id. It relied on the reasoning of the United States Court of Appeals for the Third Circuit that subjecting ESOP fiduciaries to a strict standard of review:

> "would render meaningless the ERISA provision excepting ESOPs from the duty to diversify." This, in turn would risk transforming ESOPs into ordinary pension plans, thus frustrating Congress's desire to encourage employee ownership and contravening [*20] the intention of the parties.
>
> The Third Circuit found that the better balance between these concerns was achieved by measuring a fiduciary's decision to continue investing in employer securities for an abuse of discretion. Thus, it held that "keeping in mind the purpose of ERISA and the nature of ESOPs themselves, . . . an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion . . . ."

66 F.3d at 1458-59 (quoting Moench, 62 F.3d at 570-71). [HN10] The Sixth Circuit adopted the Third Circuit's holding and established a presumption that an ESOP "fiduciary's decision to remain invested in employer's securities was reasonable." 66 F.3d at 1459. The presumption of reasonableness in an ESOP fiduciary's decision to remain invested in employer stock may be rebutted by a plaintiff only "by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." Id.

[HN11] As all EIAPs are exempt from the diversification [*21] requirement, the competing Congressional interest in employee ownership of company stock and the fiduciary's duty of prudence must be balanced with respect to all EIAPs. This includes the SBP under consideration. Therefore, the reasoning upon which the Sixth and Third Circuits applied the presumption of prudence to the investment decisions of ESOP fiduciaries not to diversify may equally be applied to the SBP fiduciaries.

The plaintiffs argue that the presumption is not applicable to the defendants' decision because it has not

been extended to all EIAPs and there is no authority for such a presumption with respect to a SBP. They also insist that the Court should not extend the presumption of prudence for ESOP fiduciaries to the defendants' actions with respect to the SBP because it is not an ESOP and was created only as a retirement fund and not as a means of corporate finance. However, after reviewing the reasoning of the Sixth Circuit in its decision to apply a presumption of prudence to the fiduciary duty of ESOP fiduciaries, the Court finds that the same reasoning may be applied to the SBP. Accordingly, the Court finds that the presumption of prudence applies to the decisions [*22] of the defendants to invest the SBP assets in company stock.

[HN12] In order to rebut the presumption of prudence, the plaintiff must show that "a prudent fiduciary acting under similar circumstances would have made a different investment decision." Kuper, 66 F.3d at 1459. A plaintiff must meet this burden by showing that a fiduciary "fail[ed] to investigate and evaluate the merits of his investment decisions" and that "there is a causal link between the failure to investigate and the harm suffered by the plan." Id. (citing Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 279 (2nd Cir. 1992)). A causal link can be established by demonstrating "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." Id. (citing Fink v. National Sav. & Trust Co., 249 U.S. App. D.C. 33, 772 F.2d 951, 955 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part n13)).

n13 As Justice Scalia explained in Fink:

Breach of fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee, see, e.g., Donovan v. Bierwirth, 538 F. Supp. 463, 471 (E.D.N.Y. 1981), or perhaps even to recover trustee fees paid for the investigative and evaluative services that went unperformed. But it does not sustain an action for the damages arising from losing investments. I know of no case in which a trustee who has happened-through prayer, astrology or just blind luck-to make (or hold) objectively prudent investments (e.g., an investment in a highly-regarded blue chip stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand. Similarly, I know of no case in which a trustee who has made (or held) patently unsound investments has been excused

from liability because his objectively imprudent action was preceded by careful investigation and evaluation. In short, there are two related but distinct duties imposed upon a trustee: to investigate and evaluate investments, and to invest prudently. Neither does the faithful discharge of the first satisfy the second, nor does breach of the first constitute breach of the second. To be sure, the extent of the trustee's investigation and evaluation is often the focus of inquiry in imprudent-investment suits. But that is because the determination of whether an investment was objectively imprudent is made on the basis of what the trustee *knew or should have known*; and the latter necessarily involves consideration of what facts would have come to his attention if he had fully complied with his duty to investigate and evaluate. It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee *should have known* more than he knew.

Fink, 772 F.2d at 962 (emphasis in the original).

[*23]

B. The Government's Investigation and the Committee's Response

The government's investigation of Columbia/HCA's business practices became apparent when the Federal Bureau of Investigation, the Internal Revenue Service and the Department of Health and Human Services made unannounced raids on Columbia/HCA's healthcare facilities located in El Paso, Texas, on March 19, 1997. The individual defendants contend that when these raids occurred, they were not aware that Columbia/HCA had been under a government investigation. The first notable subsequent drop in the price of Columbia/HCA stock occurred on March 21, 1997. The stock closed at $ 41.25 per share on March 20, 1997, and closed on March 21, 1997, at $ 38.50 per share.

After the raids, there were numerous newspapers that covered the events and alleged that investigations of Columbia/HCA were being conducted in other locations. Most notably, on March 28, 1997, the New York Times reported that the investigation was also being conducted in Florida, Texas, Illinois and Nevada for Medicare fraud. n14

n14 The next day, March 29, 1997, the Columbia/HCA board of directors held a special meeting to discuss the investigation, the article and its potential ramifications. At that meeting, the board decided to call meetings as needed to discuss issues related to the investigation. A second meeting of the board of directors was held on April 14, 1997. During this meeting, the board discussed additional media coverage of the investigation and issues raised by the media. The minutes reflect that, as of this meeting, Columbia/HCA had been informed that it was "the target of an investigation by the United States Attorney's office." Plaintiffs' Exhibit 150. The board created a special committee consisting exclusively of outside directors "for the purpose of reviewing, evaluating, and making recommendations to the Board of Directors regarding supervision of the Company's responses to the Investigation and any other inquiries by governmental agencies." Id. The minutes of the meeting of April 14, 1997, do not reflect that the board discussed the effect of the investigation on the assets in the SBP. Id.

[*24]

The retirement committee met a total of seven times in 1997; six times after the El Paso raids. n15 Mr. Anderson, Ms. Sharp, the administrative assistant for the retirement committee, and others testified that it was the practice of the committee to meet first as the HealthTrust 401(k) committee, to theoretically adjourn, and to reconvene as the retirement committee. As part of this practice, there were occasions on which the retirement committee would adopt the HealthTrust committee's earlier determination that the company stock was a prudent investment.

n15 The retirement committee met before the raids on March 3, 1997. The minutes to this meeting do not reflect that the committee discussed whether Columbia/HCA stock was a prudent investment for the SBP or any other retirement plan, nor that the retirement committee adopted any determination regarding prudence from an earlier meeting of the HealthTrust 401(k) committee. Plaintiffs' Exhibit 15. Columbia/HCA's stock closed on March 3, 1997, at $ 43 per share. The retirement committee did not meet again during April of 1997.

[*25]

The first meeting of the HealthTrust 401(k) committee after the raids occurred on April 16, 1997. The retirement committee did not meet that day to discuss the SBP. At this time, Columbia/HCA's stock had not closed above $ 40 per share since the investigation became public, and it closed at $ 34.25 per share on April 16, 1997. The purpose of the April 16th meeting was to discuss the response to a motion for mandatory injunction seeking the appointment of an investment advisor in HealthTrust, Inc., The Hospital Co., et. al. v. Usher. n16 The minutes of the meeting do not reflect that the HealthTrust 401(k) committee discussed the merits of the government investigation. Plaintiffs' Exhibit 29. However, the pleadings the committee reviewed and discussed concerned the actual and potential effect of the investigation on the stock price which, as Ms. Sharp testified, was the subject discussed. Transcript (Docket Entry No. 213), vol. II at 323. The investigation was considered by the committee in the overall context of deciding how to respond to the motion. The minutes state that "it was the consensus of the Committee that Columbia/HCA Healthcare Corporation stock remained a prudent [*26] investment. The Committee agreed to review the issue of stock prudency at the next meeting." Id.

n16 HealthTrust, Inc. et. al. v. Usher, No. 3-96-0486, is a class action suit filed in this Court in May, 1996, regarding the assets of the former HealthTrust employee stock ownership plan which terminated in December of 1991. HealthTrust is an affiliate of Columbia/HCA. The plaintiffs in Usher seek to interplead the funds and to have the Court declare whether former HealthTrust employees who had participated in the SBP were entitled to certain assets or whether the assets should go to present employees of the company. See transcript (Docket Entry No. 218), vol. VII at 1518. At the time the complaint was filed, the assets from the ESOP had been moved into the HealthTrust 401(k) and were invested in Columbia/HCA stock.

On April 9, 1997, two classes of defendants in the HealthTrust litigation filed a joint motion seeking to have the Court issue a mandatory injunction appointing an investment manager to determine if the assets of the HealthTrust 401(k) should be held in the stock of Columbia/HCA or diversified as a result of the government investigation. They argued that the Court should issue the injunction because of the risk that the HealthTrust 401(k) committee would not be able to meet its fiduciary duty under ERISA to act solely in the interest of the SBP participants and beneficiaries in light of the government's investigation.

[*27]

The evidence reflects that at that time, the committee sought legal advice from three attorneys who attended the April meeting by telephone. These were Mr. Allen Buckley, the retirement committee's ERISA counsel, Mr. Alan Lubel, counsel for HealthTrust in the Usher litigation and Mr. Ken Russell, who was then head of the employee benefits and pension practice group at the law office of Troutman Sanders. Mr. Buckley testified that he did not think the HealthTrust 401(k) committee discussed whether prudence would require a consideration of diversifying the assets of the SBP. He stated that the committee discussed generally whether Columbia/HCA stock was a prudent investment and voted that it was. Likewise, James Glasscock n17 testified that the committee did not discuss the investigation at this meeting.

> n17 Mr. Glasscock worked in the Columbia/HCA Treasury Department under David Anderson and handled the mechanics of the SBP's purchases and sales of company stock and was responsible for maintaining adequate liquidity in the plan so that participants seeking cash distributions on a given day could receive their vested amounts.

[*28]

Mr. Lubel testified that the investigation and recent drop in stock price was the basis for the motion and that these events were discussed at the meeting. He testified that the ERISA lawyers, Messrs. Buckley and Russell, made a presentation to the committee regarding their fiduciary duty with respect to the HealthTrust 401(k) plan. Specifically, the attorneys talked about whether the committee or the company was bound by the terms of the 401(k) that all assets be invested in Columbia/HCA stock and discussed the prudence of the investment. The committee was told that they would need to consider amending the plan or diversifing the assets of the 401(k) if they determined that the investment in Columbia/HCA stock was not prudent, despite the plan language requiring that the assets be invested in Columbia/HCA stock. Mr. Lubel further recalled that:

> there was a very strong feeling of the members of the committee that the company- that investment in company stock remained a very good, and I guess in ERISA terms, a prudent investment, that it was reasonable to remain invested in it. They seemed to feel that very strongly.

. . . .

The strongest impression I had from that [*29] and my strongest memory of it was the committee getting its backbone up, saying, if the question is, is investment in Columbia stock, whether that's a good investment, we think it is a good investment. If that's the question we have to decide here and if that's what guides our decision on this motion, then we think it is a good investment. We're a strong company and we do not want to consent to this motion to diversify.

. . . .

They just seemed to feel the basics of the company were very strong, that this investigation that was going on was a temporary thing, that there was no indication that it was going to be any bigger than it was, and that you need to look at the stock in the long-term basis.

One consideration was how well the stock had done over the preceding years. It was their feeling that the company was still the same company and that it remained a good investment, both because of its history, the history of the increase in the stock price and the ongoing strength of the company.

Transcript (Docket Entry No. 218), vol. VII at 1530-1532. He explained that "I don't recall there being detailed discussion of, you know, how many boxes got taken out in El [*30] Paso or who are the people involved. But that, again, wasn't the purpose of our meeting. Our purpose was something that was an offshoot of that." Transcript (Docket Entry No. 218) at 1565. Mr. Lubel also testified that the SBP was not discussed at this meeting.

On May 14, 1997, the committee members met both as the HealthTrust 401(k) committee and as the retirement committee. Columbia/HCA stock closed at $ 36.50 per share on this date. The minutes of the HeathTrust committee meeting state only that the committee "addressed the issue of whether the investment in Columbia/HCA stock continued to be prudent." Plaintiffs' Exhibit 30. The minutes do not indicate the committee's conclusion. Ms. Sharp testified that every time the committee members discussed whether the investment was prudent, they determined that it was. Transcript (Docket Entry No. 213) at 290.

The minutes of the retirement committee meeting do not reflect that the committee discussed whether Columbia/HCA stock was a prudent investment for the SBP in light of the government's investigation. Plaintiffs' Exhibit 16.

Between July and September of 1997, there were three significant developments in relation to the investigation. [*31] First, the government executed additional search warrants on facilities of Columbia/HCA affiliates in six states, including Florida, Tennessee, Utah, Oklahoma, North Carolina and Texas. Three mid-level employees of one hospital owned by a Columbia/HCA affiliate were indicted on charges related to a Medicare cost report.

Second, the Columbia/HCA board of directors requested that Richard Scott, the Company's CEO, and David Vanderwater, its President, resign. They did so; and Dr. Thomas Frist, Jr., the former CEO of HCA who was then acting as vice-chairman of Columbia/HCA, became the new president and CEO. Shortly thereafter, Dr. Frist put in place a 12-point action plan which caused 12 of 14 executives of the company to be replaced.

Third, on August 1, 1997, the United States Congress passed the Balanced Budget Act. The law significantly reduced the amount of reimbursements Medicare would make for certain medical expenses, including home healthcare.

On August 14, 1997, Columbia/HCA filed a form 10Q with the SEC which stated that:

> Management believes the ongoing investigation and related media coverage are having a negative effect on the Company's results of operations. It [*32] is too early to predict the outcome or effect that the ongoing investigations, the initiation of additional investigations, if any, and the related media coverage will have on the Company's financial condition or results of operations in future periods. Were the Company to be found in violation of federal or state laws relating to Medicare, Medicaid or similar programs, the Company could be subject to substantial monetary fines, civil and criminal penalties and exclusion from participation in the Medicare and Medicaid programs. Any such sanctions could have a material adverse effect on the Company's financial position and results of operations.

Plaintiffs' Exhibit 117 at 5. Dr. Thomas Frist, Jr., testified that if the government were to exclude Columbia/HCA from Medicare and Medicaid, it would be disastrous for Columbia.

The retirement committee's ERISA counsel, Mr. Buckley, sent a memo to Ms. Sharp from which he planned to read at a retirement committee meeting on August 27, 1997. See Plaintiffs' Exhibit 56. The memo indicated that Mr. Buckley was planning to advise the retirement committee of their fiduciary duty. It stated that

"the recent problems of Columbia/HCA in [*33] terms of the Federal and State Medicare and Medicaid investigations need to be analyzed in terms of potential implications to the retirement plans of Columbia/HCA" and that "the only two plans which are substantially invested in Columbia/HCA stock at the direction of the employer are the Stock Bonus Plan and the HealthTrust 401(k) Plan." Id. at TS 0018. Mr. Buckley further stated that "any decision must be made with the exclusive interest of participants in mind- can't not divest an EIAP if company stock [is] no longer a prudent investment because you feel it might hurt the company." Id.

The committee met on August 27, 1997, as both the HealthTrust 401(k) committee and as the retirement committee. This was the first time the committee formally discussed prudence and reviewed analyst recommendations for Columbia/HCA stock. The HealthTrust 401(k) committee determined that Columbia/HCA stock was a prudent investment. Their discussion was reflected in the minutes of the meeting as follows:

> The Committee then discussed the prudence of the continued investment in Columbia stock. David Anderson made several comments to the Committee. He state [sic] that the employees [*34] at HealthTrust all knew that this was a plan composed of company stock, and that this plan was originally intended to only own company stock. He stated that he did not believe that it would be prudent to sell Columbia stock in the current environment due to the low level of the stock price. He pointed out that of the ten major investment houses, seven have a buy or out-perform recommendation currently on Columbia stock. David Anderson and Jim Glasscock agreed to continue to monitor the ten major investment houses and how they rated Columbia stock. They will report back to the Committee at each Committee meeting with regard to how these investment houses are addressing Columbia stock. After further discussion on the issue, the Committee agreed that Columbia continued to be a prudent investment. The Committee agreed to continue to monitor the prudence of an investment in Columbia stock.

Plaintiffs' Exhibit 32.

The retirement committee meeting minutes indicate that, for the first time, prudence was discussed with respect to the SBP specifically. Ms. Sharp testified that it was the first retirement committee meeting that included such a discussion. Transcript (Docket Entry No. [*35] 213) at 281. The minutes show that the retirement

committee adopted its earlier determination as the HealthTrust 401(k) committee that Columbia/HCA was a prudent investment with respect to the investment of the SBP assets. Plaintiffs' Exhibit 17. The minutes state: "the prudence of Columbia/HCA stock as an investment had been discussed at the immediately preceding HealthTrust, Inc. 401(k) Committee meeting; at which meeting it was resolved by the Committee that Columbia/HCA stock continued to be a prudent investment for an EIAP. The same conclusion is applicable in this meeting." Id. On the last trading day in August, Columbia/HCA stock closed at $ 31 and 9/16 per share.

The next meeting of the HealthTrust 401(k) committee was held on September 19, 1997. By this time, the price of Columbia/HCA stock had dropped into the $ 20 range and on the previous day had closed at $ 28 and 11/16 per share. Mr. Glasscock reported to the committee that of the 23 analysts that rated the company, 14 rated it a buy and 9 gave a neutral recommendation. Defendants' Exhibit 49D. Mr. Buckley attended this meeting and testified that the committee voted unanimously that Columbia/HCA stock was a prudent [*36] investment for the 401(k) plan but he does not recall any specific discussion of the investigation.

In mid-October of 1997, the committee received reports from Marine Midland Bank and Hewitt Associates n18 regarding whether the assets of the 401(k) should be diversified. n19 The committee met as the HeathTrust 401(k) committee on October 7, 1997. Mr. Glasscock again reported to the committee that analyst reports were favorable with respect to Columbia/HCA stock.

> n18 Hewitt Associates is a human resources consulting group.

> n19 These reports were ordered by the Court in the Usher litigation. As a result of the motion for mandatory injunction, the parties reached an agreement whereby independent investment advisors would answer questions to aid the Court in determining how the disputed assets should be invested. Defendants' Exhibit 90. The Court's order states that:
> > the plaintiffs shall, within thirty (30) days of the entry of this order on the docket, retain one or more independent investment consultants or investment advisors to advise and render a report(s) to the plaintiffs on: (1) the investments of the assets of the 401(k) plans maintained by other companies which plans are similar to the plans at issue in this case; (2) whether an investment in Columbia/HCA

Healthcare Corporation stock is a prudent investment under the applicable ERISA standards for plans of this type; (3) whether the investment of all the disputed assets, as defined in the complaint in Columbia/HCA Healthcare Corporation stock is a prudent investment under the applicable ERISA standards; (4) whether, if the advisor(s) or consultant(s) had a fund of approximately $ 200 million, it would recommend diversifying that fund.
Id. Hewitt Associates was retained to answer the first question, and Marine Midland Bank was retained to answer questions two through four.

[*37]

During the month of October, 1997, the price of Columbia/HCA stock remained in the twenties. It was not until November 11, 1997, that the stock went back up to $ 30 per share. Between November, 1997, and July 28, 1998, the lowest closing price of the stock was $ 24 and 3/8 per share on February 6, 1998, and the highest closing price was $ 34 and 3/16 on April 20, 1998.

On November 25, 1997, January 6, 1998, and February 3, 1998, the committee met and received reports of investment analysts and discussed the prudence of continuing to invest in Columbia/HCA stock. On each date, the committee members concluded that the stock remained a prudent investment. In March, 1998, the Company made its annual cash contribution on behalf of the SBP and the plan purchased approximately $ 25 million in Columbia/HCA stock.

In a March 10, 1998, memo to Ms. Sharp, Mr. Scallet gave "a summary of the recommendations we made in our prior call concerning additional actions that plan fiduciaries might take in connection with Columbia/HCA stock." Defendants' Exhibit 57. Mr. Scallet's listed the following:

> 1. Draft an investment policy statement for the plans and the specific accounts . . . .

> 2. [*38] Retain an investment advisor.

> 3. Undertake a valuation of the company using traditional valuation techniques.

> 4. Do an analysis of whether fiduciaries should be looking long-term or more short-term. The analysis would include patterns of employee termination and volatility of the stock price. The idea is that, if stock price is volatile and people are leaving all of the time, there is a greater potential for treating people unfairly because of

the happenstance of when they are eligible to get their benefits. Conversely, if the actuarial trend is that people will be there a long time before they actually get paid, the fiduciaries might be less concerned about short-term fluctuation of the stock.

5. Look at comparable companies in sector and size to see whether they have stock funds (almost all do) and whether they sell when stock goes down (almost never). In other words, there is some comfort in doing just what others are doing.

6. Expand the analysts' survey to portfolio managers of pension plans. The people on there now are all Wall Street houses. Portfolio managers perspective is closer to what we have here.

7. Consider insider activity. If we do something [*39] different from what insiders are doing with their own stock, then we have problems.

Id.

The retirement committee never determined that the SBP's investment in Columbia/HCA stock was imprudent and never diversified the assets of the SBP. On September 29, 1998, the board of directors amended the SBP to allow plan participants to choose whether to diversify their assets from among ten options, including company stock.

C. Procedural Prudence

The plaintiffs assert that after conducting a reasonable investigation, a prudent fiduciary would have determined that it was not prudent to invest the assets of the SBP in company stock and would have diversified the assets in accordance with the direction from the investment policy guidelines. They insist that to reach this conclusion a prudent fiduciary would have made a more through inquiry into the merits of the government's investigation, including the steps outlined by Columbia/HCA's outside ERISA counsel, Mr. Scallet. The defendants argue that their process for determining whether Columbia/HCA stock was prudent complied with the requirements of ERISA.

In support of their position that their investigation was adequate, the [*40] defendants assert that the Court should take into account the discussions of the HealthTrust 401(k) committee on the issue of prudence and the knowledge each member had of the value of Columbia/HCA stock by virtue of his position in the company. The plaintiffs argue that the prudence standard for the HealthTrust 401(k) plan is not the same as the

prudence standard for the SBP because the HealthTrust plan strictly limited investments to company stock and the committee could only recommend diversification to the board, whereas the SBP allowed the committee to diversify the assets of the SBP.

The Court agrees that the measures the 401(k) committee would be required to take if it determined the company stock was an imprudent investment were different than the steps the committee would have to take with regard to the SBP. The HealthTrust 401(k) committee was not free to diversify the assets of the HealthTrust 401(k), and could only suggest diversification to the board. The retirement committee, on the other hand, could diversify the assets of the SBP of its own accord. Nevertheless, as both the retirement committee and the HealthTrust 401(k) committee, they were under a continuing obligation [*41] to evaluate the prudence of investing the assets of the 401(k) in company stock. See Kuper, 66 F.3d at 1458 (finding that a [HN13] plan fiduciary who is not given discretion to diversify must nevertheless act prudently). As both committees were subject to this requirement and both were made up of the same people, it was unnecessary for them to make the prudence analysis when discussing each plan. Accordingly, the Court finds that the HealthTrust 401(k) committee's determination of prudence with respect to the 401(k) may be considered in determining whether the retirement committee adequately investigated the prudence of investing in Columbia/HCA stock.

The retirement committee members, as senior executives, received periodic updates on the government investigation, and each committee member had access to general information regarding the ongoing developments. The retirement committee members did not seek independent assistance to help them determine whether it was prudent to hold almost all of the assets of the SBP in Columbia/HCA stock. Nor did the committee independently conduct its own inquiry into the merits of the government investigation regarding Columbia/HCA's billing [*42] practices. Transcript (Docket Entry No. 213) at 379. Moreover, the committee did not meet as either the HealthTrust committee or the retirement committee until almost one month after the first raid. The committee did not formally discuss prudence in relation specifically to the SBP until August, 1997. Although the committee hired an attorney to explain steps it could take to determine prudence, the retirement committee did not engage in most of these steps and only began to review analyst reports with respect to prudence in August, 1997.

The evidence also reflects that the defendants failed to review the diversification language in the investment policy guidelines. According to Mr. Shelton, the retirement committee discussed the movement of the stock price and its prudence in relation to the long-term

investment objective of the SBP as reflected in the guidelines and concluded that the underpinnings of the company were good, but that the committee did not discuss the section of the guidelines permitting diversification with respect to the SBP. Mr. Moore, the committee chairman, and Mr. Braun, both testified that they were not familiar with the guidelines. Transcript (filed June 21, 1999; [*43] Docket Entry Nos. 214 and 223), vol. III at 582 and vol. X at 2084. The plaintiffs contend that the failure to know of the investment policy guidelines and the failure to consider them each constitute a breach of fiduciary duty.

The defendants argue that it was not necessary for the committee to consider the investment policy guidelines because the diversification provision of the guidelines was mistakenly included in them. n20 David Anderson, who was responsible for the drafting of the investment policy guidelines, testified that the diversification provision was mistakenly included in relation to the SBP and that the plan document should be considered the ultimate source of guidance. The defendants further argue that the diversification provision is void because it conflicts with the directive in the plan document that the assets of the SBP shall be invested "primarily or exclusively in company stock." Defendants' Exhibit 6 at 48-49. Mr. Anderson further testified that, in conjunction with the plan language, the guidelines do not make sense and that he is not certain when the diversification provision would apply to the SBP. n21

> n20 Mr. Longfellow testified in his deposition that he did not look at the SBP document when drafting the investment policy guidelines for the SBP but used the first restatement of the HCA profit sharing plan to draft the guidelines. Transcript (Docket Entry No. 214) at 754-755.

[*44]

> n21 The Court notes that while the defendants contend that the investment policy guidelines are irrelevant to the determination of whether the defendants breached their fiduciary duty to the SBP, the defendants nevertheless cite the language in the guidelines which states that "the Committee believes that a 10 year period is appropriate in measuring its progress toward achieving [the objective of the plan]" in support of their decision to invest in company stock. Plaintiffs' Exhibit 117.

The Court finds that the SBP investment policy

guidelines are valid. Even if they were mistakenly based on the wrong authority, the guidelines were adopted by the committee. Also, the guidelines do not squarely conflict with the directive of the plan that the assets of the SBP be invested primarily or exclusively in company stock. First, the plan does not completely forbid diversification. The investment policy guidelines do not require a fiduciary to diversify the assets of the SBP at any particular time, including times when company stock is particularly volatile, in order to meet its fiduciary duty. The [*45] guidelines merely underline the committee's ability to diversify the assets and suggest the manner in which diversification should occur.

Although the SBP directive that the assets be invested "primarily or exclusively" in company stock is a binding directive to the fiduciaries, in light of the fact that ERISA states that "a fiduciary shall discharge his duties . . . in accordance with the documents and instruments governing the plan," the committee should have considered the diversification provision in the guidelines. Accordingly, the Court finds that the failure to do so constituted a procedural deficiency.

Next, the record does not reflect that the retirement committee discussed the demographics of the participants in the SBP. Mr. Anderson testified that he does not recall any discussion of the retirement committee regarding the demographics of the SBP, the number of participants approaching retirement or whether the volatility of the company stock would have an adverse effect on these employees with respect to the SBP. Ms. Yarosh, of Hewitt Associates, was responsible for keeping data on plan participants for the retirement committee. She testified that the retirement committee [*46] did not ask her to provide it with information regarding the demographics of SBP participants. Transcript (filed June 21, 1999; Docket Entry No. 219), vol. VIII at 1702.

A prudent consideration of the possibility of diversification also would have included consideration of whether high ranking Columbia/HCA executives, including committee members, were selling their personal holdings of stock shortly after the investigation became public knowledge. There is no evidence that the defendants considered this information.

In summary, the Court concludes that the procedure followed by the retirement committee to review the prudence of investing the assets of the SBP in Columbia/HCA stock was deficient.

D. Substantive Prudence

[HN14] In addition to proving that the inquiry of the committee was procedurally deficient, the plaintiffs "must show a causal link between the failure to

investigate and the harm suffered by the plan." Kuper, 66 F.3d at 1459 (citation omitted). Accordingly, the Court will also consider whether additional considerations would "have revealed to a reasonable fiduciary that the investment at issue was improvident." Id. (citations omitted).

In Kuper [*47] , the Court reached the conclusion that a reasonable fiduciary would have taken the same actions as the defendant and held the stock based only on the facts that the "stock fluctuated during this period and that several investment advisors recommended holding [company] stock." Id., 66 F.3d at 1460. The defendants in this case have presented a great deal more evidence to support their contention that a reasonable fiduciary would have continued to hold Columbia/HCA stock.

First, a reasonable fiduciary who retained an investment advisor to perform a valuation of Columbia/HCA would have determined that the investment was prudent. Columbia/HCA's summary annual reports show that on January 1, 1997, the value of the SBP's assets after liabilities was $ 1,406,757,882.00. This amount decreased by $ 531,346,715.00 to $ 875,411,167.00 as of December 31, 1997. Nevertheless, the company maintained revenues of approximately $ 18.8 billion for the years 1996, 1997, and 1998, and earned a positive net income for each year, increasing its annual income from $ 182 million in 1997 to $ 532 million in 1998. Moreover, Columbia/HCA maintained total assets of approximately $ 20 billion [*48] for each of the three years. In 1997 and 1998, Columbia/HCA generated cash from operations of approximately $ 3 billion each year and increased its net worth over $ 300 million, from $ 7.25 billion in 1997, to $ 7.58 billion by December 31, 1998.

The defendants' expert witness, Mr. Gougis, testified that at the time the plaintiffs assert that the committee should have begun diversification, the fundamentals of the company were sound. Mr. Gougis stated that even though the investigation had a more serious impact than expected and Columbia/HCA's earnings in 1997 were significantly lower than in the previous year,

> the Company still generated more dollar profits and operating cash flow (earnings before interest, taxes, depreciation and amortization) than any other hospital management company. Columbia/HCA's operating cash flow in 1998 was greater than the next three largest companies' combined results. The Company's strong cash flow, along with its noncore assets, represented sources of funds that could easily meet the $ 1.0 billion to $ 1.5 billion government fine that I believe the market had already factored into the Company's stock price.

Statement of direct testimony [*49] of Chester A. Gougis (Docket Entry No. 190) at 4.

The strength of Columbia/HCA's fundamentals at this time were also reflected in an independent evaluation of the company by Goldman Sachs on July 31, 1997, prepared in connection with Columbia/HCA's spin-off of some of its affiliates. In its analysis, Goldman Sachs concluded that Columbia/HCA had sound fundamentals and that even if the company were required to break-up it was worth more than the stock was trading at that time.

Columbia/HCA's sound fiscal state is further evidenced by the fact that it implemented and completed $ 1 billion stock buy-backs in both 1997 and 1998. These buy-backs were financed through two $ 1 billion term loans. Mr. Anderson testified that the banks were aware of the government's investigation when they approved the loans.

Late in 1997, Columbia's S&P credit rating was downgraded to BBB. However, this was still an investment grade rating. Mr. Gougis testified that the company's diminished credit rating was partly the result of the investigation and partly the company's increased debt from the stock buy-backs. The company's strong financial condition in 1997, and 1998, was also indicated by its ability [*50] to issue commercial paper, "an important source of short-term financing to which only the strongest companies have access." Id. at 7. Mr. Gougis further testified that the decline in stock price was also caused by negative events in the hospital management industry. These included the promulgation of the Balanced Budget Act by Congress, which called for a reduction in Medicare spending, and the increased power of managed care companies. The plaintiffs do not contest that these factors contributed to the drop in the stock price.

In its report, Marine Midland addressed "whether an investment in Columbia/HCA Healthcare Corporation stock is a prudent investment under the applicable ERISA standards for plans of this type." Defendants' Exhibit 90; Plaintiffs' Exhibit 159 at 1. The Marine Midland report states that "Marine has assumed that the Court's reference to 'plan of this type' is a reference to eligible individual account plans." Plaintiffs' Exhibit 159 at 2. Accordingly, the Marine Midland report would include whether Columbia/HCA stock is a prudent investment for the SBP.

Marine Midland reported that a large number of institutional investors n22 held Columbia/HCA stock and [*51] that "the majority of analysts are positive in their outlook for the stock, and even those that are not positive nevertheless rate Columbia as a stock that they expect to

do as well as the market in general." Id. at 3. However, Marine Midland also stated that the lack of sale recommendations is "not unusual, since securities firms are generally reluctant to publish sale recommendations." Id. Marine Midland further noted that the Columbia's net worth grew from $ .3 billion in 1992, to $ 8.6 billion in 1996, and that:

> In summary, Columbia has a strong balance sheet and a proven track record of profitability, is very liquid, has ample capacity to service its debt and otherwise discharge its obligations, and is able to employ the stockholders' assets profitably. The declining efficiency in asset employment is a modest danger sign, but in the overall context, it is merely an indication of an area for continued monitoring and not a significant problem in and of itself.
>
> . . . .
>
> Finally, Marine evaluated the risks to Columbia in the government investigation of its billing practices in its home health care employment, as well as its coding of patients' diagnoses for [*52] Medicare reimbursement. Clearly, this is the most significant negative factor for Columbia at present. If not for this development, it seems very likely that Columbia Stock would still be outperforming the general market indices.
>
> . . . .
>
> Marine concludes that Columbia is dealing effectively with the government investigations, and will emerge scathed but not seriously wounded. It is likely that the cost of remediation will not be significantly damaging to so profitable a company. It is not unreasonable to anticipate that Columbia is likely to be an even more successful industry leader after it has gotten beyond the current difficulties. Therefore, Marine believes that Columbia is a prudent investment in spite of the government investigations.

Id. at 6.

n22 Specifically, Marine Midland reported that 1,245 institutional investors held Columbia/HCA stock totaling 69% of outstanding shares. These institutional investors included 739 mutual funds, 345 money managers, 102 banks, and 57 insurance companies. Plaintiffs' Exhibit 159 at 3.

[*53]

Based on these facts, the Court finds that an inquiry into the fundamentals of the company would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1459.

During the trial, the defendants presented evidence of the demographics of the SBP participants in 1997, showing that the workforce was relatively young. The average employee was 40 years old. Of the 200,000 plan participants in 1997, only 24,000 were over age 54. Defendants' Exhibit 122. Accordingly, even if the retirement committee had reviewed the demographics of the SBP, because most of the participants were not near retirement age, they would have concluded that the investment objective should be long-term and that short-term volatility caused by the investigation would not have an adverse effect on most SBP participants. Short-term volatility was also of diminished importance to SBP participants because they could choose whether to take their benefits in the SBP in company stock, rather than sell the stock and take their benefits in cash. Participants could thereby potentially avoid selling their stock at a time when the share price is low. Therefore, [*54] if the retirement committee had reviewed the demographics of the SBP or retained an investment advisor to do an analysis of whether fiduciaries should be looking long-term or short-term, they would have determined that plan assets should be invested for long-term. Accordingly, the Court finds that such an analysis would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1459.

The plaintiffs did not retain an investment advisor to look at actions of comparable companies in sector and size. However, Hewitt Associates' report of September of 1997, addressed to "what extent are 401(k) and defined contribution plans of large employers invested in the employer's own securities?" Defendants' Exhibit 92. Hewitt Associates concluded that "approximately 40 percent of the total assets of large plans are invested in company stock" and that large defined contribution plans "invest a majority of the defined contribution plan assets in employer stock." Id.

Mr. David Pogue was the author of Hewitt's report. He testified that Hewitt Associates was "not addressing the stock bonus plan at that time" and that "the materials [*55] that we provided to the company and any consulting was limited simply to ESOP accounts within the HealthTrust plan." Transcript (filed June 21, 1999; Docket Entry No. 216), vol V at 987. Nevertheless, the Court finds the report to indicate that a prudent fiduciary would have allowed the SBP assets to remain invested in Columbia/HCA stock.

Further, Mr. Gougis testified that the comparable

decline in the stock price of Tenet Healthcare, the company most directly comparable to Columbia/HCA, from September, 1997, indicates that the decline was the result of industry-wide problems rather than the investigation alone. Statement of direct testimony of Chester A. Gougis (Docket Entry No. 190) at 12.

Accordingly, the Court finds that an inquiry into actions of comparable companies in sector and size would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1459.

The retirement committee did not retain an investment advisor to analyze the portfolios of pension plan managers as suggested by Mr. Scallet. The plaintiffs' expert, Ms. Elkind, reported that 17 of 24 pension plans she reviewed decreased their ownership of [*56] Columbia/HCA stock during the period in question. Mr. Gougis pointed out that this statistic is not entirely negative and shows that "several sophisticated pension plan and endowment funds actually chose to maintain and increase their ownership during this period." Id. at 13. The Court agrees that, although a significant number of pension fund managers decreased their holdings in Columbia/HCA, seven of the pension plans studied held their investment in the stock, indicating that some other fiduciaries determined that maintaining their investment was a sound decision. This is of additional importance considering that the retirement committee was operating under the plan language that the assets of the SBP should be held "primarily or exclusively" in Columbia/HCA stock. The other pension fund managers who held their investment in the stock were, presumably, not working within the confines of such plan language. Accordingly, the Court finds that an inquiry into the investments of portfolio managers of pension plans would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1459.

With respect to insider trading [*57] of company stock during this time, the evidence reflects that Mr. Anderson, who maintains more than 50% of his net worth in company stock, engaged in a cashless exercise of stock options in July, 1998. In this exercise, he sold one quantity of stock to purchase another larger quantity through stock options that were about to expire.

In August, 1996, Mr. Braun exercised an option for Columbia/HCA stock which he sold and used the proceeds to acquire company stock through the exercise of another option in the same month. Mr. Braun testified that in May, 1997, he held 28,000 shares of Columbia/HCA stock plus options, and that the stock made up 80% of his personal wealth. One of his stock options was going to expire in July, 1997, and to exercise the option, he would have had to borrow roughly $

460,000.00. Mr. Braun stated that he choose to sell the stock because he was not in a financial position to borrow that much money. Transcript (Docket Entry No. 214) at 627-28.

Mr. Hemphill exercised stock options for 18,000 shares and received cash for his shares instead of receiving the shares. He testified that he sold these shares because he was going through a divorce and had certain housing [*58] needs. Mr. Hemphill has not sold any stock since 1996, and testified that he continued to acquire stock until he changed organizations.

Mr. Moore exercised two options for cash: one on December 24, 1996, and one on June 30, 1997. He testified that he exercised these options to help pay for a home he purchased and remodeled. He further testified that he intended to sell more shares to finance these expenses but that after the price went down, he did not want to sell more shares and, instead, took on extra debt on his house. Transcript (Docket Entry No. 214) at 689.

Mr. Shelton testified that he made purchases of Columbia stock from the time of the September, 1997, raids to the second purchase of Columbia/HCA stock by the retirement committee in February, 1998.

Dr. Thomas Frist, Jr., and his family, who owned 24.4 million shares of Columbia/HCA stock in March of 1997, did not sell any shares of Columbia/HCA stock during 1997, 1998 or 1999, and acquired 2.7 million shares in 1999. Richard Scott, the former CEO of Columbia/HCA, sold 90,000 shares of company stock in February, 1997. As he held over 9 million shares in Columbia/HCA stock, this sale constituted less than one percent [*59] of his shareholdings.

The Court finds that these transactions do not indicate that the members of the retirement committee and other executives were substantially reducing their investments in company stock. As for the minimal sales that took place during this time, there is no indication that the sales were made because the executives thought the stock was an imprudent investment. Moreover, several retirement committee members purchased company stock during this time and all were participants in the SBP and held shares of company stock in their retirement account. Accordingly, the Court finds that such an investigation would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1459.

Finally, the plaintiffs have argued that the committee was required to take into consideration the SBP investment policy guidelines. The plaintiffs contend that the defendants failed to consider the directive of the guidelines they allege required the defendants to diversify

the assets of the SBP if the stock was volatile. Although not directly contrary to the investment policy guidelines, which allow for diversification, the plan [*60] language directed that the assets of the SBP "shall be utilized primarily or exclusively to purchase Company stock." Defendants' Exhibit 6 at 48. Therefore, even though the committee could have diversified the assets, there was a strong directive from the plan to maintain the assets in company stock and no directive to diversify. Accordingly, the Court finds that even if the defendants had considered the investment policy guidelines, the plaintiffs have not established that consideration of the investment policy guidelines would "have revealed to a reasonable fiduciary that the investment at issue was improvident." Id.

III.

In summary, the Court finds that the plaintiffs have not established that a reasonable fiduciary would have determined that the investment of the SBP assets in Columbia/HCA stock was imprudent, thereby rebutting the presumption of reasonableness afforded to the defendants' actions. Kuper, 66 F.3d at 1460. Accordingly, the plaintiffs have not established that the defendants breached their fiduciary duty to the SBP, and their claims against the individual defendants must fail. Id.

In light of the fact that the Court has found that the individual [*61] defendants did not breach their fiduciary duty to the SBP, the Court need not address whether the company was a co-fiduciary with respect to the investment of SBP assets. The Court finds that Columbia/HCA is not liable for breach of fiduciary duty based on its alleged failure to monitor and remove retirement committee members or the investment of the SBP assets.

At oral argument, the counterclaims (Docket Entry Nos. 64 and 69) of the defendants for attorneys' fees and costs under 29 U.S.C. § 1132(g) were withdrawn and will be dismissed.

An appropriate order shall be entered.

Thomas A. Higgins

United States District Judge

5-24-00

ORDER

In accordance with the memorandum contemporaneously entered, the Court finds in favor of the defendants and against the plaintiffs. Accordingly, the plaintiffs' action is dismissed with prejudice.

The counterclaims, having been withdrawn at oral argument on March 23, 2000, are likewise dismissed with prejudice.

The entry of this order and the orders (entered July 9, 1998 and March 21, 2000; Docket Entry Nos. 72 and 234), shall constitute the judgment in this action.

It is so ORDERED

Thomas A. Higgins

United States [*62] District Judge

5-24-00