9

LEXSEE

IN RE: MERCK & CO., INC. SECURITIES LITIGATION UNION
INVESTMENTS PRIVATFONDS GMBH, Lead Plaintiff and the Class, Appellants

No. 04-3298

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2005 U.S. App. LEXIS 27412

September 29, 2005, Argued
December 15, 2005, Filed

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the District of New Jersey. (D.C. Civil Action No. 02-cv-03185). District Judge: Honorable Stanley R. Chesler. In re Merck & Co., Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 28930 (D.N.J., July 6, 2004)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors brought a class action suit against defendants, a pharmaceutical company and its subsidiary, in the United States District Court for the District of New Jersey, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. §§ 78j(b) and 78t(a), and § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k. The district court granted defendants' motion to dismiss, and the lead plaintiff appealed.

**OVERVIEW:** The company had planned to spin off the subsidiary in an initial public offering (IPO) but cancelled the IPO after disclosures concerning the subsidiary's revenue recognition methods. The investors claimed that defendants withheld information about the subsidiary's accounting methods and made misleading statements about the subsidiary's post-IPO independence. Although the court of appeals found that the lead plaintiff had improperly retained appellate counsel without obtaining district court approval under 15 U.S.C.S. § 78u-4(a)(3)(B)(v), the appeal was allowed to proceed for the sake of efficiency. The investors failed to allege a material misstatement or omission by defendants as required under both 15 U.S.C.S. §§ 78j(b) and 77k. The company's stock price continued to rise for five days following initial disclosure of the revenue recognition policy; the test for materiality in an efficient market therefore was not met. A statement in a press release concerning the subsidiary's independence fell within the safe harbor under 15 U.S.C.S. § 78u-5. Absent an independent violation of the securities laws, the controlling person claim under 15 U.S.C.S. § 78t(a) failed as well.

**OUTCOME:** The district court's judgment was affirmed.

**CORE TERMS:** disclosure, materiality, stock, co-payment, lead counsel, stock price, misleading, billion, press release, registration statement, immaterial, causation, investor, calculation, immediately following, clubs, market share, drop, initial public offering, motion to dismiss, revenue-recognition, retention, planned, dropped, safe harbor, approve, traded, misstatement, cautionary, inventory

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Evidence > Procedural Considerations > Judicial Notice*
[HN1] A court can take judicial notice even on a motion to dismiss of facts that are not subject to reasonable dispute and are capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] An appellate court exercises plenary review of a district court's grant of a Fed. R. Civ. P. 12(b)(6) motion, and the appellate court applies the same test as the district court. In reviewing the motion to dismiss, the appellate court must accept as true all facts alleged in the complaint

and view them in the light most favorable to the plaintiff.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN3] Lead plaintiffs in securities class actions must secure court approval of their counsel.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN4] Congress passed the Private Securities Litigation Reform Act of 1995 (PSLRA) in part to reduce abusive class action litigation. To this end, the PSLRA requires courts to appoint as lead plaintiff the "most adequate plaintiff"--the plaintiff with the most money at stake. 15 U.S.C.S. § 78u-4(a)(3). The theory behind this requirement is that plaintiffs with the largest financial interests, typically institutional investors, will best represent the plaintiff class's interests and will choose the best counsel. Although Congress was confident that the lead plaintiff would select the best counsel, it relies on the courts' power to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN5] See 15 U.S.C.S. § 78u-4(a)(3)(B)(v).

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN6] The counsel approval requirement of 15 U.S.C.S. § 78u-4(a)(3)(B)(v) is not an empty requirement; courts have the power and the duty to supervise counsel selection and counsel retention.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Private Securities Litigation*
[HN7] When a challenge is not to adequacy of a lead plaintiff's counsel in a securities class action but is to a lead plaintiff's procedural failure to secure court approval, defendants do have standing to challenge the retention of lead counsel.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN8] The Private Securities Litigation Reform Act of 1995 (PSLRA) does not distinguish between lead counsel and appellate counsel; it simply requires court approval of class "counsel." 15 U.S.C.S. § 78u-4(a)(3)(B)(v). A court has a duty to consider the lead plaintiff's choice and whether it should be approved. This inquiry is limited to whether the lead plaintiff's selection and agreement with counsel are reasonable on their own terms, but it is an inquiry that must be made. All retentions of class counsel by a lead plaintiff--whether lead counsel, trial counsel, or appellate counsel--require court approval under the PSLRA.

*Civil Procedure > Appeals > Appellate Jurisdiction > Lower Court Jurisdiction*
*Securities Law > Bases for Liability > Private Securities Litigation*
[HN9] While it is generally true that district courts are divested of jurisdiction--and lose the power to act--once a notice of appeal is filed, there are exceptions to this general rule. The United States Court of Appeals for the Third Circuit has identified several, but "limited," instances in which a district court retains its power to act; a court may, for example, review attorney's fees applications, order the filing of bonds, modify or grant injunctions, issue orders regarding the record on appeal, and vacate bail bonds and order arrests. The Third Circuit limits these exceptions to avoid the "confusion and inefficiency" of having two courts dealing with the same issues. The power to approve lead plaintiffs' counsel under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, would not engender this same kind of "confusion and inefficiency"--the approval or disapproval of counsel would lie with the district court, and an appellate court typically would not need to second-guess or make this decision itself. Therefore, the Third Circuit adds this approval power to the short list of actions a district court may take during the pendency of an appeal.

*Securities Law > Bases for Liability*
[HN10] Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful" to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe. 15 U.S.C.S. § 78j(b).

*Securities Law > Bases for Liability*
[HN11] 17 C.F.R. § 240.10b-5 makes it illegal, as a manipulative or deceptive device, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

*Securities Law > Bases for Liability*
[HN12] To make out a securities fraud claim under §

10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), a plaintiff must show that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury. These requirements are heightened by the Private Securities Litigation Reform Act of 1995, which requires that the complaint state with particularity all facts on which the plaintiff's belief is formed. 15 U.S.C.S. § 78u-4(b)(1).

*Securities Law > Bases for Liability*
[HN13] Establishing materiality is the "first step" for a plaintiff with a § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), claim.

*Securities Law > Bases for Liability*
[HN14] The United States Court of Appeals for the Third Circuit, as compared to the other courts of appeals, has one of the "clearest commitments" to the efficient market hypothesis in 15 U.S.C.S. § 78j(b) actions. The Third Circuit has defined an efficient market as that in which information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices. The Oran-Burlington standard for measuring the materiality of statements in an efficient market holds that the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.

*Securities Law > Bases for Liability*
[HN15] For purposes of a 15 U.S.C.S. § 78j(b) claim, the United States Court of Appeals for the Third Circuit has resolved how "quickly and completely" public information is absorbed into a firm's stock price. The Third Circuit has decided that this absorption occurs in the period immediately following disclosure. This does not mean instantaneously, of course.

*Securities Law > Bases for Liability*
[HN16] For purposes of a 15 U.S.C.S. § 78j(b) claim, an efficient market for good news is an efficient market for bad news.

*Securities Law > Bases for Liability*
[HN17] For purposes of the 15 U.S.C.S. § 78j(b) reliance requirement, the fraud-on-the-market theory supposes that the price of a company's stock is determined by the available material information regarding the company and its business.

*Securities Law > Bases for Liability*
[HN18] For purposes of a 15 U.S.C.S. § 78j(b) claim, both post-class-period data and pre-class data can be used to confirm what a defendant should have known during the class period, and any information that sheds light on whether class period statements were false or materially misleading is relevant.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN19] Concerned about the effect of litigation's specter on corporate disclosure, Congress has created in the Private Securities Litigation Reform Act of 1995 a safe harbor for forward-looking statements. This safe harbor is designed to shield statements like those regarding revenue projections and future business plans from leading to liability. But the safe harbor does not apply to statements made in connection with an initial public offering (IPO). 15 U.S.C.S. § 78u-5(b)(2)(D). It can be assumed that statements made in a registration statement and prospectus filed for an IPO are made "in connection with" that IPO.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN20] A statement made in a press release several months before a planned initial public offering (IPO) that never subsequently happened is not "in connection with" an IPO for purposes of 15 U.S.C.S. § 78u-5(b)(2)(D).

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN21] For purposes of 15 U.S.C.S. § 78u-5(b)(2)(D), cautionary statements do not have to be in the same document as the forward-looking statements.

*Securities Law > Bases for Liability > Civil Liability*
[HN22] Section 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k, provides a private right of action to individuals who have suffered harm from misstatements in an issuer's registration statement. 15 U.S.C.S. § 77k(a).

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability*
[HN23] A § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k, claim looks to whether a registration statement contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading. 15 U.S.C.S. § 77k(a). The United States Court of Appeals for the Third Circuit has made it clear that claims under both §§ 11 and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), require a showing of a

"material" misrepresentation or omission.

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability*
[HN24] The United States Court of Appeals for the Third Circuit has adopted the United States Supreme Court's TSC materiality definition (substantial likelihood of importance to a reasonable shareholder) for both 15 U.S.C.S. §§ 77k(a) and 78j(b).

*Securities Law > Bases for Liability*
[HN25] The TSC materiality definition "ordinarily" applies to a 15 U.S.C.S. § 78j(b) claim, but in efficient markets materiality is defined as information that alters the price of the firm's stock. The United States Court of Appeals for the Third Circuit has reached this conclusion in two steps. First, "reasonable investors" are the market. Second, information important to the market will be reflected in the stock's price. Thus, information important to reasonable investors is immediately incorporated into stock prices.

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability*
[HN26] Section 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k, and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), share the materiality element and the TSC materiality definition. In the context of an efficient market, they also share the stock-price test for materiality. If a company's stock trades on an efficient market, a court measures materiality under the Burlington (as ratified in Oran) standard. Thus, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.

*Securities Law > Bases for Liability*
[HN27] Under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), plaintiffs have to plead loss causation--i.e., that the misrepresentation caused the stock price drop.

*Securities Law > Bases for Liability > Civil Liability*
[HN28] Section 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k, plaintiffs do not have to plead loss causation. Instead, it is an affirmative defense in § 11 cases; defendants can limit damages by showing that the plaintiffs' losses were caused by something other than their misrepresentations. 15 U.S.C.S. § 77k(e).

*Governments > Courts > Judicial Precedents*
[HN29] Precedential cases cannot be overruled unless by the United States Court of Appeals for the Third Circuit en banc, 3d Cir. Internal Operating P. 9.1.

*Securities Law > Bases for Liability*
[HN30] Loss causation and materiality are two separate elements of a § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), claim.

*Securities Law > Bases for Liability > Controlling Persons Liability*
[HN31] Section 20(a) of the Securities Exchange Act of 1934 provides for liability for "controlling persons." 15 U.S.C.S. § 78t(a). Section 20(a) makes controlling persons jointly and severally liable with the controlled person. 15 U.S.C.S. § 78t(a). But controlling-person liability is premised on an independent violation of the federal securities laws.

**COUNSEL:** Sanford P. Dumain, Esquire (Argued), Milberg Weiss Bershad & Schulman, New York, NY; Daniel L. Berger, Esquire, Erik J. Sandstedt, Esquire, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Counsel for Appellant.

Daniel J. Kramer, Esquire (Argued), Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY; Gregory B. Reilly, Esquire, Deborah A. Silodor, Esquire, Lowenstein Sandler, Roseland, NJ, Counsel for Appellees.

**JUDGES:** Before: ALITO, and AMBRO, Circuit Judges RESTANI,* Chief Judge.

* Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

**OPINIONBY:** AMBRO

**OPINION:**

OPINION OF THE COURT

AMBRO, Circuit Judge

Merck & Co., Inc. planned an initial public offering of its wholly owned subsidiary--Medco Health Solutions, Inc. Before the IPO was to occur, however, information about Medco's aggressive revenue-recognition policy came to light. Some details about the policy were disclosed in Merck's registration statements filed with the Securities and Exchange Commission, [*2] but a *Wall Street Journal* article reading between the lines of this disclosure precipitated a decline in Merck's stock. After

further disclosures and larger declines in Merck's stock price, the Medco IPO was canceled. Union Investments Privatfonds GmbH, as lead plaintiff for a class of Merck stockholders, claims that Merck and Medco committed securities fraud under section 10(b) of the Securities Exchange Act of 1934 and that Merck's officers made material misstatements or omissions in the registration statements in violation of section 11 of the Securities Act of 1933. Union also alleges that the Merck officers and Merck, as Medco's parent company, are jointly and severally liable as controlling persons under section 20(a) of the '34 Act. The District Court dismissed all of these claims on a motion under Federal Rule of Civil Procedure 12(b)(6). We affirm.

### I. Factual Background and Procedural History

Because we review this case at the Rule 12(b)(6) stage, we take as true the facts pled in the plaintiff's complaint. Union is the lead plaintiff for a class of investors owning stock in Merck, a global pharmaceutical company. n1 This [*3] suit stems from the actions surrounding Merck's plan to spin off Medco in a 2002 initial public offering. Union alleges that Medco engaged in improper accounting practices, which were not fully disclosed until, after several amendments, Merck filed a registration statement gaining SEC approval. Union further alleges that Merck and Medco made misleading statements about the post-IPO independence of the two entities.

> n1 The class period runs from January 26, 2000, to July 9, 2002.

Merck first announced its plans for the Medco IPO in a January 2002 press release, in which Raymond Gilmartin, Merck's Chairman and CEO, said that the two companies would pursue independent strategies for success. On April 17, 2002, Merck filed its first Form S-1 with the SEC. The SEC did not approve this S-1, and Merck kept trying, finally securing SEC approval with its fifth S-1, filed on July 9. Market reaction led Merck to drop Medco's offering price, to postpone indefinitely the IPO, and finally to drop the IPO altogether.

[*4] **A. Medco's revenue-recognition policy**

Medco is a pharmacy benefits manager (PBM). It saves its clients (plan sponsors) money by negotiating discount rates with pharmacies and influencing doctors to prescribe cheaper, but still therapeutically appropriate, medicines. When a customer buys drugs at a local pharmacy, the pharmacist checks with Medco to ensure that the customer is an approved beneficiary. Then the customer makes a co-payment--usually between $ 5 and $ 15--which goes directly to the pharmacy, not to Medco.

Although Medco did not handle these co-payments, it interpreted the accounting standards to allow it to recognize the co-payments as revenue. n2 But it did not disclose this revenue-recognition policy. In fact, Merck's 1999 SEC Form 10-K stated that Medco recognized revenue "for the amount billed to the plan sponsor." After Merck changed auditors, and before it began filings for the Medco IPO, it changed this language in its 2001 Form 10-K to state that revenues were "recognized based on the prescription drug price negotiated with the plan sponsor."

> n2 Merck apparently subtracted out these co-payments later, so its profit numbers were unaffected by this policy.

[*5]

Merck's April 17 Form S-1 disclosed for the first time that Medco had recognized as revenue the co-payments paid by consumers, but it did not disclose the total amount of co-payments recognized. The day this S-1 was filed, Merck's stock price went up $ 0.03--from $ 55.02 to $ 55.05. n3 Merck filed an amendment to its S-1 on May 21 and another on June 13.

> n3 [HN1] We can take judicial notice of Merck's stock prices even on a motion to dismiss because these facts are "not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000).

On June 21, 2002, *The Wall Street Journal* reported that Medco had been recognizing co-payments as revenue and estimated that in 2001 $ 4.6 billion in co-payments had been recognized. Barbara Martinez, *Merck Included Co-Payments Among Revenue*, Wall St. J., June 21, 2002, at C1. Later disclosures would [*6] show the actual number to be $ 5.54 billion. The market's reaction was immediate; that day Merck's stock lost $ 2.22--dropping from $ 52.20 to $ 49.98. Six days later, Merck announced the postponement of the Medco IPO and indicated that it would drop Medco's offering price.

Merck filed its fourth S-1 on July 5, 2002, finally disclosing the full amount of co-payments it had recognized as revenue. The S-1 showed that Medco had recognized over $ 12.4 billion dollars in co-payments as revenue, $ 2.838 billion in 1999, $ 4.036 billion in 2000, and $ 5.537 billion in 2001. Four days later, Merck

announced that it would postpone the Medco IPO indefinitely, even as it filed its last S-1, which was approved by the SEC.

Merck's stock continued to fall, reaching $ 45.75 on July 9, the end of the class period, and $ 43.57 on July 10.

### B. Merck's and Medco's independence

In the January 2002 press release, Gilmartin said, regarding the planned Medco IPO, "We believe the best way to enhance the success of both businesses going forward is to enable each one to pursue independently its unique and focused strategy." The independence of Merck and Medco had been and was to become a subject of [*7] some debate.

The Federal Trade Commission had launched an investigation of Medco in 1996 to determine whether it was giving preferential treatment to Merck's drugs. (The FTC also investigated some of Merck's competitors for similar reasons.) Other drug manufacturers divested their PBMs, but Merck kept Medco. In 1998 Merck entered into an FTC consent decree, which suggested, *inter alia*, that Medco had given favorable treatment to Merck's drugs.

Merck and Medco throughout the class period asserted that the two companies stayed independent. Both companies maintained policies of independence posted on their websites.

But Union produced data suggesting that Merck's market share of drugs sold by Medco was in several instances much higher than Merck's national market share. In its April 2002 S-1, Merck disclosed that post-IPO Medco would be obligated to continue this elevated level of Merck drug sales; the two companies had signed an agreement requiring Medco to sell a higher share of Merck drugs than Merck's national third-party market share. The May and June amendments to the S-1 fleshed out the terms of this agreement, which required Medco to pay Merck 50% of its lost revenue if [*8] it failed to hit the sales targets.

### C. The class action is filed

The initial complaint was filed in July 2002. Union was appointed lead plaintiff in November 2002, and it filed its corrected amended complaint in March 2003. At the time, Union's lead counsel was Bernstein Litowitz Berger & Grossman LLP. Defendants filed a motion to dismiss pursuant to Rule 12(b)(6), and the District Court granted it in July 2004. Union appealed that decision in August 2004. Only then did it hire Milberg Weiss Bershad & Schulman LLP as its counsel for this appeal.

### II. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and under 15 U.S.C. §§ 77v and 78aa. It granted a motion to dismiss under Rule 12(b)(6), so we have jurisdiction under 28 U.S.C. § 1291.

[HN2] We exercise plenary review of the District Court's grant of a Rule 12(b)(6) motion, and "we apply the same test as the district court." *Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir. 2000)*. In reviewing the motion to dismiss, we must accept as true all facts alleged in the complaint and view [*9] them in the light most favorable to Union. *Id. at 482*. Union's claims are also subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and under the Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified in scattered sections of 15 U.S.C.), pursuant to 15 U.S.C. § 78u-4(b)(1).

### III. Discussion

#### A. May Union retain Milberg Weiss to prosecute this appeal?

[HN3] Lead plaintiffs in securities class actions must secure court approval of their counsel, but Union retained Milberg Weiss as appellate counsel after the notice of appeal was filed and without any court's approval. We decide that Milberg Weiss may prosecute this appeal but that future lead plaintiffs must obtain court approval for any new counsel, including appellate counsel.

[HN4] Congress passed the PSLRA in part to reduce abusive class action litigation. S. Rep. No. 104-98, at 10-11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 689-90. To this end, the PSLRA requires courts to appoint as lead plaintiff the "most adequate plaintiff"--the plaintiff with the most [*10] money at stake. 15 U.S.C. § 78u-4(a)(3). The theory behind this requirement is that plaintiffs with the largest financial interests, typically institutional investors, will best represent the plaintiff class's interests and will choose the best counsel. Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale. L.J. 2053, 2105 (1995); *see also* S. Rep. No. 104-98, at 11 nn.32, 34, *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (citing Weiss & Beckerman, *supra*).

Although Congress was confident that the lead plaintiff would select the best counsel, it relied on the courts' power to "approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class." S. Rep. No. 104-98, at 12,

*reprinted in* 1995 U.S.C.C.A.N. 679, 691. Thus, the PSLRA provides that the [HN5] "most adequate plaintiff shall, *subject to the approval of the court*, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v) (emphasis added). [HN6] This is not an empty requirement; [*11] courts have the "power and the duty to supervise counsel selection and counsel retention." *In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001).

Union was selected lead plaintiff, and the District Court approved Bernstein Litowitz Berger & Grossman LLP as lead counsel. But as noted, after the notice of appeal was filed, Union retained Milberg Weiss as appellate counsel. Bernstein Litowitz consented to Milberg Weiss's retention, but Union neither sought nor obtained the District Court's approval of Milberg Weiss as class counsel.

In its brief, Merck challenges Milberg Weiss's ability to prosecute this appeal without court approval, and Union responds with three arguments. We deal with each in turn.

First, Union argues that Merck does not have standing to protest the choice of lead counsel. We find few cases, from our Court or others, that have addressed this issue. It could be that defendants' ability to challenge lead counsel selection is the same as their ability to challenge lead plaintiff selection. If so, the weight of authority falls against Merck. Compare *King v. Livent, Inc.*, 36 F. Supp. 2d 187, 190-91 (S.D.N.Y. 1999) (granting the [*12] defendant standing to challenge a motion to appoint a lead plaintiff and lead counsel), *with Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 127 F. Supp. 2d 572, 575 n.2 (D.N.J. 2001) (stating that the majority of courts have denied defendants the right to challenge "the adequacy of lead plaintiffs and their chosen counsel" and citing cases), *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 550 (N.D. Tex. 1997) (deciding that defendants could not challenge the appointment of a lead plaintiff), *and Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 60 (D. Mass. 1996) (same). This makes sense because defendants will rarely have the best interests of the class at heart. *See, e.g.*, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (allowing only "a member of the purported plaintiff class" to rebut the lead plaintiff presumptions); *Cendant*, 264 F.3d at 268; Weiss & Beckerman, *supra*, at 2106 n.255.

On the other hand, it may be that defendants' ability to challenge lead counsel is separate from their inability to challenge lead plaintiff's appointment. At least one court has allowed a defendant to challenge the [*13] selection of lead counsel. See *In re USEC Secs. Litig.*, 168 F. Supp. 2d 560, 568 (D. Md. 2001) ("The defendants challenge the [plaintiffs'] selection of two separate law firms as lead counsel."). [HN7] When the challenge is not to adequacy but is, as here, to a lead plaintiff's procedural failure to secure court approval, we hold that defendants do have standing to challenge the retention of lead counsel.

Second, Union claimed that the PSLRA does not prevent it from retaining unapproved appellate counsel, which it characterized as somehow different from lead counsel. Merely stating this argument lays out the span of such a stretch. [HN8] The PSLRA does not distinguish between lead counsel and appellate counsel; it simply requires court approval of class "counsel." 15 U.S.C. § 78u-4(a)(3)(B)(v). The court has a duty to consider the lead plaintiff's choice and whether it should be approved. *Cendant*, 264 F.3d at 275. This inquiry is "limited to whether the lead plaintiff's selection and agreement with counsel are reasonable on their own terms," *id. at 276*, but it is an inquiry that must be made. We hold that all retentions [*14] of class counsel by the lead plaintiff--whether lead counsel, trial counsel, or appellate counsel n4--require court approval under the PSLRA.

---

n4 We note in passing that lead plaintiffs may retain multiple firms as co-lead counsel, *cf. Miller v. Ventro Corp.*, No. 01-CV-1287, 2001 WL 34497752, at *13 (N.D. Cal. Nov. 28, 2001) ("If [plaintiffs] believe that more than one law firm is necessary, they must demonstrate to the Court's satisfaction the need for multiple lead counsel."), but court approval is still required, *cf. Martin v. Atchison Casting Corp.*, 200 F.R.D. 453, 458 (D. Kan. 2001) (requiring information about proposed new lead counsel before the court would approve the plaintiff's attempt to switch lead counsel).

---

Third, Union argues that its retention of Milberg Weiss is valid by virtue of a jurisdictional loophole: the District Court lost jurisdiction after the filing of the notice of appeal, and our Court is not in a position to make the findings required to approve [*15] new lead counsel. [HN9] While it is generally true that district courts are divested of jurisdiction--and lose the power to act--once the notice of appeal is filed, there are "exceptions to this general rule." *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1314 (3d Cir. 1994). We have identified several, but "limited," instances in which a district court retains its power to act; a court may, for example, review attorney's fees applications, order the filing of bonds, modify or grant injunctions, issue orders regarding the record on appeal, and vacate bail bonds and order arrests. *Venen v. Sweet*, 758 F.2d 117, 120 n.2 (3d Cir. 1985). We limit these exceptions to avoid the "confusion and inefficiency" of having two courts dealing with the same issues. *Id.* at

Page 7

The power to approve lead plaintiffs' counsel under the PSLRA would not engender this same kind of "confusion and inefficiency"--the approval or disapproval of counsel would lie with the district court, and we typically would not need to second-guess or make this decision ourselves. Therefore, we add this approval power to the short list of actions a district court [*16] may take during the pendency of an appeal.

That leaves this case, in which for the sake of efficiency we eschew a remand and proceed as if Milberg Weiss were approved as appellate counsel. Moreover, because we affirm the District Court's opinion, we do not require Union to secure *ex post* approval for this appeal.

**B. Does Union have a valid claim under section 10(b)?**

[HN10] Section 10(b) of the Exchange Act makes it "unlawful" to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). [HN11] Rule 10b-5 makes it illegal, as a manipulative or deceptive device, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R § 240.10b-5.

[HN12] To make out a securities fraud claim under section 10(b), a plaintiff must show that "(1) the defendant made a materially false or misleading statement or omitted to state a [*17] material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004)* (citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)*). These requirements are heightened by the PSLRA, which requires that the complaint "state with particularity all facts on which [plaintiff's] belief is formed." 15 U.S.C. § 78u-4(b)(1). At issue in this case is whether Merck's statements were material and whether Union properly alleged "false or misleading" statements by Merck and Medco.

**1. When Merck disclosed information regarding its revenue calculations, was the disclosure material?**

We have said that [HN13] establishing materiality is the "first step" for a plaintiff with a section 10(b) claim. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)*. The District Court discussed briefly the issue of materiality regarding Union's § 10(b) claim, but it did not reach the issue [*18] because it ultimately found that Union had failed sufficiently to show scienter. Union argues that Merck's statements were material, citing the fact that Merck's stock dropped significantly when *The Wall Street Journal's* article detailing Medco's accounting practices appeared. Merck claims that because its stock price rose immediately following its initial, minimal disclosure, the disclosure was immaterial as a matter of law.

[HN14] Our Court, as compared to the other courts of appeals, has one of the "clearest commitments" to the efficient market hypothesis. n5 Nathaniel Carden, Comment, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency*, 65 U. Chi. L. Rev. 879, 886 (1998). Our 1997 *Burlington* opinion created a standard for measuring the materiality of statements in an efficient market. n6 See *114 F.3d at 1425*. In 2000, we ratified the *Burlington* standard post-PSLRA in *Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000)* (citing *Burlington*). The *Oran-Burlington* standard holds that "the materiality of disclosed information may be measured post hoc by looking [*19] to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Id.*

> n5 We have defined an efficient market as that in which "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *Burlington, 114 F.3d at 1425* (citation omitted).
>
> n6 Union has alleged that Merck's stock traded on an efficient market. Compl. P212(c).

In *Oran*, information was disclosed on July 8, and the stock price rose for four days afterward. We held that the failure to disclose the information earlier was immaterial. *Id. at 283*. Similarly, in *In re NAHC, Inc. Securities Litigation*, we discerned "no negative effect" on a company's stock price "immediately following" the date of disclosure. *306 F.3d 1314, 1330 (3d Cir. 2002)*. Again, we held the disclosed information immaterial as a matter of law. *Id.*

In this case, the disclosure occurred on April 17, and there was no negative effect on Merck's [*20] stock. *The Wall Street Journal's* article, accompanied by a significant decline in Merck's stock, appeared two months later. Union claims that this June stock decline demonstrates the materiality of the information Merck disclosed. But the situation we faced in *NAHC* was similar: the company's stock price plunged 75% just three

Page 8

weeks after the disclosure was made. *Id. at 1321*. That disclosure was made on November 2, with no negative effect on the stock price, but the stock plummeted on November 26, after another disclosure. *Id. at 1321, 1330*. We held the first disclosure not material. Merck's stock did not drop after the first disclosure, and that is generally when we measure the materiality of the disclosure, not two months later.

In *Basic Inc. v. Levinson*, the Supreme Court declined to resolve "how quickly and completely publicly available information is reflected in market price." 485 U.S. 224, 248 n.28, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). Union tells us that we cannot therefore apply the *Oran-Burlington* standard. But it overlooks that [HN15] our Court has resolved how "quickly and completely" public information is absorbed into a firm's stock price. [*21] We have decided that this absorption occurs "in the period immediately following disclosure." *Oran, 226 F.3d at 282*.

This does not mean instantaneously, of course, but in this case there was no adverse effect to Merck's stock price from the disclosure "in the period immediately following disclosure." In fact, Merck's stock continued to rise from its baseline of $ 55.02, including the April 17 S-1 filing date, for five trading days after the disclosure. The five-trading-day rise was followed by a five-trading-day decline, which reached a low of $ 54.34. Then, starting on May 1, 2002, Merck's stock remained above $ 55.02 until June 4. But Union expects us to ignore this one-month increase in Merck's stock price in favor of a five-day decline of little over 1%. This we will not do.

Union also argues that the April 17 disclosure was so opaque that it should not have counted as a disclosure. Although Merck disclosed that it had recognized co-payments as revenue in April, it did not disclose the sum total of those co-payments until July. This is why, Union claims, the stock price did not drop until *The Wall Street Journal*'s reporter made public the estimated magnitude [*22] of the co-payment recognition. In effect, Union is arguing that investors and analysts stood in uncomprehending suspension for over two months until the *Journal* brought light to the market's darkness.

The *Journal* reporter arrived at an estimate of $ 4.6 billion of co-payments recognized in 2001 by using one assumption and performing one subtraction and one multiplication on the information contained in the April S-1. She determined the number of retail prescriptions filled (462 million) by subtracting home-delivery prescriptions filled (75 million) from total prescriptions filled (537 million). She then assumed an average $ 10 co-payment and multiplied that average co-payment by the number of retail prescriptions filled to get $ 4.6 billion. n7

n7 Union makes much of the difference between the estimated $ 4.6 billion and the actual $ 5.54 billion, but had the *Journal* reporter used a slightly higher average co-payment, this difference would have been smaller. She noted that "$ 10 to $ 15 is typical in the industry." *Martinez, supra*. Had she used $ 12.50, the average of $ 10 and $ 15, she would have come up with $ 5.78 billion.

[*23]

The issue is whether needing this amount of mathematical proficiency to make sense of the disclosure negates the disclosure itself. We scrutinized a disclosure requiring calculation in *Ash v. LFE Corp., 525 F.2d 215 (3d Cir. 1975)*. A proxy statement disclosed directors' current pension amounts and, in another section, their newly proposed pension amounts, but it did not disclose the increase. *Id. at 218*. We held that requiring readers to perform the subtraction themselves was immaterial because the "facts were disclosed prominently and candidly." *Id. at 219* ("We decline to hold that those responsible for the preparation of proxy solicitations must assume that stockholders cannot perform simple subtraction."). The calculation from Merck's S-1 was somewhat more complex--it required some close reading and an assumption as to the amount of the co-payment. But the added, albeit minimal, arithmetic complexity of the calculation hardly undermines faith in an efficient market.

Union points out nonetheless that Merck was followed by many analysts, including J.P. Morgan, Morgan Stanley, and Salomon Smith Barney, who "closely examine a company's [*24] revenue and revenue growth when valuing a company's stock" in Merck's industry. Compl. P9. The logical corollary of Union's argument then is the following rhetorical question: If these analysts--all focused on revenue--were unable for two months to make a handful of calculations, how can we presume an efficient market at all? Union is trying to have it both ways: the market understood all the good things that Merck said about its revenue but was not smart enough to understand the co-payment disclosure. n8 [HN16] An efficient market for good news is an efficient market for bad news. The *Journal* reporter simply did the math on June 21; the efficient market hypothesis suggests that the market made these basic calculations months earlier.

n8 Union needs the market to be efficient. With an efficient market it can use the

fraud-on-the-market theory, which allows it to meet its section 10(b) reliance requirement. *See Burlington, 114 F.3d at 1415 n.1, 1419 n.8.* [HN17] The fraud-on-the-market theory supposes that "'the price of a company's stock is determined by the available material information regarding the company and its business.'" *Basic Inc., 485 U.S. at 241, 108 S. Ct. 978, 99 L. Ed. 2d 194* (quoting *Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986)*).

[*25]

But we do not wish to reward opaqueness. We decline to decide how many mathematical calculations are too many or how strained assumptions must be, but Merck was clearly treading a fine line with this delayed, piecemeal disclosure. It should have disclosed the amount of co-payments recognized as revenue in the April S-1; it should have disclosed this revenue-recognition policy as soon as it was adopted. Sunshine is a fine disinfectant, and Merck tried for too long to stay in the shade. The facts were disclosed, though, and it is simply too much for us to say that every analyst following Merck, one of the largest companies in the world, was in the dark.

**2. Did Union properly allege that "false or misleading" statements were made by Merck and Medco?** n9

> n9 Scienter and reliance typically would come next in our analysis after materiality. *See Burlington, 114 F.3d at 1417.* But because we have decided that the initial S-1 disclosure was not materially false or misleading and did not omit sufficient facts, we do not discuss scienter here.

[*26]

i) *Were the Merck and Medco statements regarding their independence false or misleading?*

Union's complaint alleges that Medco made false statements about Merck's and Medco's independence. The District Court held that these statements were not actionable because Union's supporting evidence came mostly from dates outside the class period. Medco's website contained statements about Medco's independence policy. The website stated, among other things, that Medco would "make decisions on the therapeutic aspects of its programs without substantive influence from Merck" and would "treat Merck products no differently from those of any other manufacturer, observing the same procedures for independent clinical review as it does for drugs of any other manufacturer."

Compl. P126. Union produced data showing the extent to which Merck's market share among Medco beneficiaries was significantly higher than its nationwide market share.

The District Court discarded this market-share evidence, holding it unusable because most of it arose from outside the class period. To support its holding, the Court cited only a case from the Northern District of California, *Clearly Canadian*, which held [*27] "statements made or insider trading" done outside the class period "irrelevant to [the] plaintiffs' fraud claims." *In re Clearly Canadian Sec. Litig., 875 F. Supp. 1410, 1420 (N.D. Cal. 1995).* The *Clearly Canadian* Court, though, had just denied the defendants' motion to dismiss and was striking from the plaintiffs' complaint nearly 20 pages of allegations of statements and insider trading from outside the class period. *Id.* The Court was removing out-of-period claims because the defendants were not liable for them; it was not addressing their relevance as evidence.

Two Second Circuit cases have, however, addressed out-of-period information for the purposes of allowing inferences to be drawn. In *Novak v. Kasaks* the plaintiffs' complaint provided facts about inventory write-offs from after the expiration of the class period, and the Court held that those facts supported the plaintiffs' allegations that inventory issues existed during the class period. *216 F.3d 300, 312-13 (2d Cir. 2000).* It further held that a report showing inventory information "six months after the Class Period . . . supports the inference that inventory during the Class [*28] Period was similar." *Id. at 313.* In a 2001 case the Second Circuit reversed the District Court, holding that pre-class data was relevant to show defendants' knowledge at the start of the class period. *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).* The Court made clear that [HN18] both post-class-period data and pre-class data could be used to "confirm what a defendant should have known during the class period," noting that "any information that sheds light on whether class period statements were false or materially misleading is relevant." *Id.*

The District Court in our case found that Union could not "rely on statistical data collected prior to the commencement of the class period . . . to buttress [its] contention that the statements on Medco's website were misleading." *In re Merck & Co., Inc. Sec. Litig.*, No. 02-CV-3185 (SRC), slip op. at 34, 2004 U.S. Dist. LEXIS 28930 (D.N.J. July 6, 2004). This finding directly conflicts with the Second Circuit's holding in *Scholastic*, and the *Clearly Canadian* case is meager support. We shall follow the Second Circuit here and hold the pre-class data regarding Merck's market share relevant to showing Medco's statements [*29] to be misleading. The District Court therefore incorrectly disregarded the evidence of Medco's favoritism toward Merck products.

n10

> n10 We of course do not remand this case, because we held against Union on materiality.

ii) *Did Gilmartin's January 2002 statement fall within the "forward-looking statement" safe harbor?*

Union alleged that Gilmartin's statement in a January 2002 press release was false and misleading. As we noted, Gilmartin, discussing the planned Medco IPO, said, "We believe the best way to enhance the success of both businesses going forward is to enable each one to pursue independently its unique and focused strategy." The District Court held that this statement fell within the "forward-looking statement" safe harbor, thereby foreclosing liability for the statement. Union argues that this statement cannot meet the safe harbor's requirements because it was about a planned initial public offering.

[HN19] Concerned about the effect of litigation's specter on corporate disclosure, Congress created [*30] in the PSLRA a safe harbor for forward-looking statements. S. Rep. No. 104-98, at 16, *reprinted in* 1995 U.S.C.C.A.N. 679, 695. This safe harbor is designed to shield statements like those regarding revenue projections and future business plans from leading to liability. *Id.* at 17, *reprinted in* 1995 U.S.C.C.A.N. 679, 696.

But the safe harbor does not apply to statements "made in connection with an initial public offering." 15 U.S.C. § 78u-5(b)(2)(D). It can be assumed that statements made in a registration statement and prospectus filed for an IPO are made "in connection with" that IPO. *See, e.g., In re Ravisent Techs., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 13255, No. Civ.A. 00-CV-1014, 2004 WL 1563024, at *11 n.27 (E.D. Pa. July 13, 2004) (registration statement); *In re Musicmaker.com Sec. Litig.*, 2001 U.S. Dist. LEXIS 25118, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *13 n.7 (C.D. Cal. June 4, 2001) (registration statement and prospectus). One case has suggested that statements made at pre-IPO presentations are "in connection with" an IPO. *See In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 9962, No. 8:00CV2013T26MAP, 2001 WL 34106903, at [*31] *1, *9 (M.D. Fla. July 11, 2001).

We hold today only that [HN20] a statement made in a press release several months before a planned IPO that never subsequently happened is not "in connection with" an IPO. We do not address, however, whether statements made in registration statements and prospectuses may lead to liability if an IPO does not occur. n11

> n11 We find unpersuasive Union's arguments that the cautionary language was insufficient, that Gilmartin had actual knowledge, and that the statement was not mere puffery; therefore, we do not address them in detail. The cautionary language was sufficient because the press release incorporated by reference the cautionary statements in Merck's 2000 Form 10-K, as well as those in its periodic reports. [HN21] Cautionary statements do not have to be in the same document as the forward-looking statements. *Cf. EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 875 (3d Cir. 2000). Union could not establish Gilmartin's actual knowledge of the alleged falsity of his statement based on his position alone. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999). And his statement could also have been mere puffery, because it was a "vague and general statement of optimism," *id. at 538*.

[*32]

**C. Was the April 17 registration statement disclosure material under section 11?**

[HN22] Section 11 of the 1933 Securities Act provides a private right of action to individuals who have suffered harm from misstatements in an issuer's registration statement. 15 U.S.C. § 77k(a). Because the S-1 is a registration statement, the April 2002 disclosure regarding Medco's revenue-recognition policy can be subject to a section 11 claim as well as a section 10(b) claim. We have already decided that this disclosure was not material under section 10(b). The question we must now decide is whether it was material under section 11.

The District Court dismissed Union's section 11 claims as by law immaterial. Union claims that the market's failure to react to a disclosure is an invalid basis for dismissing a section 11 claim, and it cites a 2004 case from our Circuit, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004), for the proposition that the *Oran-Burlington* 10(b) materiality standard does not apply to section 11 claims.

[HN23] A section 11 claim looks to whether a registration statement "contains an untrue statement of a material fact [*33] or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). We have made it clear that claims under both section 11 and section 10(b) require a showing of a "material" misrepresentation or omission.

We first noted that section 11(a) and Rule 10b-5 shared the materiality element in our *Craftmatic* opinion, where [HN24] we adopted the Supreme Court's *TSC*

Page 11

materiality definition (substantial likelihood of importance to a reasonable shareholder) for both. *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 & n.18 (3d Cir. amended 1990) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)). In *Trump* we said that the "materiality requirement" was "common to" section 11 and section 10(b) claims. *In re Donald J. Trump Casino Sec. Litig.--Taj Mahal Litig.*, 7 F.3d 357, 368 n.10 (3d Cir. 1993). We also reiterated that the Supreme Court's *TSC* materiality definition applied to section 10 and section 11 actions. *Id. at 369*. In *Westinghouse* we again noted that sections 10(b) and [*34] 11 both required "that plaintiffs allege a *material* misstatement or omission." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir. 1996) (emphasis in original).

We created a test for materiality under section 10(b) in *Burlington*. [HN25] The *TSC* materiality definition "ordinarily" applies, but in efficient markets materiality is defined as "information that alters the price of the firm's stock." *Burlington*, 114 F.3d at 1425. We reached this conclusion in two steps. First, "reasonable investors" are the market. Second, information important to the market will be reflected in the stock's price. Thus, "information important to reasonable investors . . . is immediately incorporated into stock prices." *Id.*

[HN26] Sections 11 and 10(b) share the materiality element and the *TSC* materiality definition. In the context of an efficient market, they also share the stock-price test for materiality. If a company's stock trades on an efficient market, we measure materiality under the *Burlington* (as ratified in *Oran*) standard. Thus, "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately [*35] following disclosure, of the price of the firm's stock." *Oran*, 226 F.3d at 282.

Our opinion in *Adams Golf*, however, may be read by some to hold that the *Oran-Burlington* materiality inquiry did not apply to actions brought under section 11. Adams Golf is a manufacturer of specialty golf equipment, best known for its Tight Lies golf clubs. The company sold its shares in an initial public offering on July 10, 1998. *Id. at 270*. Part of its business strategy was to sell its clubs only through "authorized dealers," but before the IPO it discovered that Costco, the discount warehouse retailer, was selling its clubs. Adams Golf issued a pre-IPO press release on June 9, 1988, disclosing that an unauthorized dealer was selling Tight Lies clubs. *Id. at 271*. This "gray market" distribution of Adams Golf's clubs created a short-term revenue boost around the time of the IPO but cannibalized later sales. *Id. at 271-72*. The company therefore predicted disappointing financial performance and issued a press release to that effect on January 7, 1999. The stock price dropped 17 percent after this press release with an increase in trading volume from 58,000 to [*36] 1.2 million. *Id. at 277 n.11*.

[HN27] Under section 10(b), plaintiffs have to plead loss causation--*i.e.*, that the misrepresentation caused the stock price drop. *Id. at 277*. [HN28] Section 11 plaintiffs do not have to plead loss causation. *Id.* Instead, it is an affirmative defense in section 11 cases; defendants can limit damages by showing that the plaintiffs' losses were caused by something other than their misrepresentations. 15 U.S.C. § 77k(e). The defendants in *Adams Golf* were contesting materiality under *Burlington* by pointing to the absence of a stock-price decline after the press release (although the stock dropped 17 percent, it only dropped from $ 4.63 to $ 3.88, *Adams Golf*, 381 F.3d at 277). The *Adams Golf* Court interpreted the defendants' argument as an attempt to make an affirmative loss-causation defense, and it declined to apply *Burlington*. *Id.* It reasoned that, because *Burlington* was a Rule 10b-5 case with a loss-causation requirement plaintiffs must meet, it did not apply to a section 11 case with no loss-causation requirement. *Id.*

With that backdrop, we do not read *Adams Golf* as altering the [*37] *Oran-Burlington* materiality standard for section 11 claims. First, because our Court in *Adams Golf* both knew of and referred to *Westinghouse*, *Trump*, and *Craftmatic*, and inasmuch as [HN29] precedential cases cannot be overruled unless by the Circuit *en banc*, Third Circuit Internal Operating Procedure 9.1, it is obvious that *Adams Golf* did not intend to conflict with the three earlier decisions equating section 11's materiality element with section 10(b)'s.

Second, the *Oran-Burlington* standard applies only to "efficient markets," *Burlington*, 114 F.3d at 1425; *see also Oran*, 226 F.3d at 282, a key ingredient missing in *Adams Golf*. In *Burlington*, the plaintiffs alleged that Burlington's stock traded on an efficient market. 114 F.3d at 1425. Plaintiffs in *Oran* did likewise. 226 F.3d at 283 n.3. While the plaintiffs in *Adams Golf* noted that the company's stock traded on the NASDAQ, they did not allege that the stock traded on an efficient market. Consolidated and Amended Class Action Complaint P8, *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216 (D. Del. 2001) [*38] (No. 99-371-RRM). Indeed, our Court noted that the company's shares did not trade on an efficient market pre-IPO. *Adams Golf*, 381 F.3d at 276 n.10. Without an efficient market, the *Oran-Burlington* standard would not apply. Here, Union has alleged that Merck's stock was traded on an efficient market. Compl. P212(c).

Third, the language in *Adams Golf* at issue likely was *dicta*. The defendants would have lost on appeal even had the Court found *Oran-Burlington* directly applicable. That is, the *Adams Golf* panel held that Costco's

unauthorized, out-of-network selling of 5,000 Tight Lies clubs was not "unquestionably immaterial to a reasonable investor." *Adams Golf,* 381 F.3d at 276. We reversed the District Court's conclusion that the disclosure was immaterial as a matter of law because of the nature and magnitude of the unauthorized sales. In addition, the company's stock price did decline following the disclosure; it dropped 17% along with a twentyfold increase in trading volume. *Id.* at 277 n.11. Under the *Oran-Burlington* standard this decline would have been material. The Court's refusal to apply that [*39] standard was irrelevant to its decision, and the language about its refusal was in essence *dicta*.

Fourth, reading materiality and loss causation in *Adams Golf* to be synonymous is incorrect. They are different concepts. In *Burlington* we did not even mention the phrase "loss causation." Rather, our creation of the stock-price rule was explicitly to determine whether information was material. *Burlington,* 114 F.3d at 1425 ("In this case, plaintiffs have represented to us that the July 29 release of information had no effect on BCF's stock price. This is, in effect, a representation that the information was not *material.*" (emphasis added)). Also, [HN30] loss causation and materiality are two separate elements of a section 10(b) claim. Discussing a 10b-5 claim in 2001, we listed loss causation as an element separate from materiality. See *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 174 (3d Cir. 2001). To leave no doubt, the Supreme Court this year also described loss causation as a separate element in section 10(b) and Rule 10b-5 actions. *Dura Pharm., Inc. v. Broudo,* 161 L. Ed. 2d 577, U.S. , 125 S. Ct. 1627, 1631 (2005). The bottom line is this: the *Adams Golf* Court did not explicitly claim to change the structure of 10b-5 actions, so we must not read it to do so.

Merck's disclosure was not material under the *Oran-Burlington* standard. This standard is applicable to section 11 as well as to section 10(b). Thus, because Union must show materiality to succeed on its section 11 claim, that claim fails as well.

### D. Is there controlling-person liability?

[HN31] Section 20(a) of the Exchange Act provides for liability for "controlling persons." 15 U.S.C. § 78t. Section 20(a) makes controlling persons jointly and severally liable with the controlled person. *Id.* But controlling-person liability is "premised on an independent violation of the federal securities laws." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 211 (3d Cir. 2002); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 279 (3d Cir. amended 1992).

Because the District Court found that Union had not sufficiently alleged a securities violation, the Court dismissed its section 20(a) claims. n12 Union, of course, [*41] argues that the Court erred in dismissing its section 10(b) and section 11 claims; it therefore claims that its section 20(a) claims were also incorrectly dismissed.

> n12 The District Court mistakenly cited a case discussing section 20A--not section 20(a). *In re Merck,* slip op. at 46 (citing *Advanta,* 180 F.3d at 541). But the standards for the two sections lead to the same result here.

Because the District Court was correct in dismissing Union's other claims, leaving Union with no valid section 20(a) claim, we agree as well with the District Court's conclusion as to that claim.

### IV. Conclusion

Union failed to establish a material statement or omission by Merck, so Union did not sufficiently plead a section 10(b) violation or a section 11 violation. Because of this, Union also fails to [*42] make a valid section 20(a) claim. We therefore affirm the District Court's decision.