## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SALLY CANNON, CHRISTIAN FONDEUR, and RALPH KUNES, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MBNA CORPORATION, PENSION AND 401(K) PLAN COMMITTEE of MBNA CORPORATION, BRUCE L. HAMMONDS, KENNETH F. BOEHL, CHARLES C. KRULAK, TERRI C. MURPHY, JOHN W. SCHEFLEN, KENNETH A. VECCHIONE, LANCE L. WEAVER, and THOMAS D. WREN,<br><br>Defendants. | **CASE NO. 05-429 (GMS)** |

## COMPENDIUM OF UNREPORTED DECISIONS TO
## PLAINTIFFS' ANSWERING BRIEF IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jeffrey S. Goddess (No. 630)
**ROSENTHAL, MONHAIT, GROSS &**
  **GODDESS, P.A.**
Suite 1401, 919 Market Street
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433

*Attorney for Plaintiffs Sally Cannon, Christian Fondeur,*
*and Ralph Kunes*

Date:   March 10, 2006

## TABLE OF CONTENTS

**CASES:**                                                                      **TAB:**

*Beam v. HSBC Bank USA*,                                                           A
    2003 WL 22087589 (W.D.N.Y. August 19, 2003)

*In re JDS Uniphase*,                                                             B
    2005 WL 1662131

*Kolupa v. Roselle Park District*,                                               C
    2006 WL 306955 (7th Cir. Feb. 10, 2006)

*Landgraff v. Columbia/HCA Healthcare Corp. of Am.*,                             D
    2000 WL 33726564 (M.D.Tenn. May 24, 2000)

*Nelson v. Brinson Partners, Inc.*,                                              E
    2004 WL 178180 (N.D.Ill. Jan. 16, 2004)

*Pa. Fed'n v. Norfolk S. Corp. Thoroughbred Ret. Inv. Plan*,                     F
    2004 WL 228685 (E.D.Pa. Feb. 4, 2004)

*Pietrangelo v. NUI Corp.*,                                                      G
    2005 WL 1703200 (D.N.J. July 20, 2005)

*Rogers v. Baxter Int'l Inc.*,                                                   H
    2006 U.S. Dist. LEXIS 7542 (N.D.Ill. Feb. 22, 2006)

*In re Sears, Roebuck & Co. ERISA Litigation*,                                   I
    2004 WL 407007 (N.D.Ill. March 3, 2004)

*In re Westar Energy, Inc. ERISA Litig.*,                                        J
    2005 U.S. Dist. LEXIS 28585 (D.Kan. Sept. 29, 2005)

*In re WorldCom, Inc. ERISA Litig.*,                                             K
    2004 WL 370288 (S.D.N.Y. Jan. 16, 2004)

i

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

(Cite as: 2003 WL 22087589 (W.D.N.Y.))

**Motions, Pleadings and Filings**

United States District Court,
W.D. New York.
Carl BEAM, Vincent Lomonaco, Richard Dimmick,
George Pitman, Individually and
on Behalf of All Others Similarly Situated,
Plaintiffs,
v.
HSBC BANK USA, Azon Corporation Employee
Stock Ownership Plan, William L.
Bordages, Janet S. Bordages, John Bordages,
Nicole Bordages, James G. Bannon,
William Bannon, Judith Ballew, Robert W. Allen,
Robert Livingston, Tony Panto
and James L. Donovan, Defendants.
**No. 02-CV-0682E(F).**

Aug. 19, 2003.

Former and present employees brought class action
against, inter alia, corporation's outside directors
and trustee for corporation's employee stock
ownership plan, alleging breaches of fiduciary duty
in violation of Employee Retirement Income
Security Act (ERISA). On motions for summary
judgment, the District Court, Elfvin, J., held that:
(1) factual issues precluded summary judgment for
trustee; (2) factual issues precluded summary
judgment for outside directors; and (3) outside
directors were fiduciaries under ERISA.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure ☞2497.1**
170Ak2497.1 Most Cited Cases
Material issues of fact existed as to whether
directions that were given to bank by named
fiduciary of employee stock ownership plan to

complete challenged stock sale from corporation's
insiders to plan was contrary to ERISA, and
whether bank was aware that purchase of stock was
imprudent or that named fiduciary had undertaken
inadequate investigation, precluding summary
judgment for bank on employees' ERISA claims for
alleged breaches of fiduciary duty, even assuming,
as claimed, that bank was directed trustee for plan.
Employee Retirement Income Security Act of 1974,
§§ 403(a)(1), 405(a), 29 U.S.C.A. §§ 1103(a)(1),
1105(a).

**[2] Federal Civil Procedure ☞2497.1**
170Ak2497.1 Most Cited Cases
Material issues of fact existed as to extent, if any, of
fiduciary status of corporation's outside directors
under ERISA and what directors knew or believed
when they appointed named fiduciary and trustee of
corporation's employee stock ownership plan,
precluding summary judgment for outside directors
on employees' claims for breaches of fiduciary duty
under ERISA arising from sale of stock to plan by
corporation's insiders. Employee Retirement
Income Security Act of 1974, §§ 3(21)(A), 405(a),
29 U.S.C.A. §§ 1002(21)(A), 1105(a).

**[3] Labor and Employment ☞463**
231Hk463 Most Cited Cases
(Formerly 296k44)
Corporation's outside directors were "fiduciaries"
under ERISA with respect to challenged sale of
stock to corporation's employee stock ownership
plan by corporation's insiders, given that trust
agreement required corporation to consent in
writing for trustee to borrow money, such that board
members, including outside directors, authorized
disposition of plan assets by authorizing trustee to
borrow funds required for plan to enter into stock
sale, and given that outside directors had fiduciary
duties with respect to appointment, monitoring, and
removal of trustee and named fiduciary. Employee
Retirement Income Security Act of 1974, §§
3(21)(A), 405(a), 29 U.S.C.A. §§ 1002(21)(A),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00429-GMS   Document 35   Filed 03/10/2006   Page 5 of 51


Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

1105(a).

R. Joseph Barton, Esq., Cohen, Milstein, Hausfeld & Toll, Washington, DC, Feyi O. Gaji, Esq., Law Office of Feyi Gaji, Binghamton, NY, for plaintiffs.

Gary F. Kotaska, Esq., Phillips Lytle Hitchcock Blaine & Huber, Daniel C. Oliverio, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, Michael McGee, Esq., McGee & Gelman, Buffalo, NY, Paul J. Yesawich, III, Esq., Harris, Beach & Wilcox, Kenneth A. Payment, Esq., Harter, Secrest and Emery LLP, Rochester, NY, for defendant.

### MEMORANDUM and ORDER [FN1]

> FN1. This decision may be cited in whole or in any part.

ELFVIN, J.

*1 HSBC filed a motion for summary judgment March 6, 2003. [FN2] Oral argument was heard and this matter was submitted May 30. For the reasons set forth below, HSBC's motion will be denied. Defendants Allen, Livingston and Panto (collectively "Outside Directors") filed a motion for summary judgment on June 4. On July 3 plaintiffs filed a motion for partial summary judgment seeking a declaration that the Outside Directors are fiduciaries. Oral argument was heard and these motions were submitted August 1. For the reasons set forth below, the Outside Directors' motion for summary judgment will be denied and plaintiffs' motion for partial summary judgment will be granted. On July 3 plaintiffs filed a motion seeking to strike various portions of affidavits submitted by the Outside Directors in support of their motion for summary judgment. Although oral argument has not yet been heard on plaintiffs' motion, it will be denied as moot in light of the denial of the Outside Directors' motion for summary judgment.

> FN2. HSBC seeks summary judgment on the ground that, *inter alia*, it was a directed trustee that was required to follow the instructions given by the named fiduciary with respect to the transaction in issue unless such violated pertinent law. HSBC

contends that, after appropriate inquiry, it determined that the transaction did not violate any such law and it therefore acted as directed by the named fiduciary.

Azon Corp. insiders sold $25 million of their Azon stock to the Azon Employee Stock Ownership Plan ("AESOP") in a transaction dated September 21, 1999 (the "Stock Sale"). To effectuate the Stock Sale, Azon borrowed $25 million from the Manufacturers and Traders Trust Company. Azon loaned this money to AESOP, which used it to purchase shares from the Azon insiders. [FN3] Pursuant to an agreement dated September 20, 1999, HSBC allegedly served as a directed trustee during the Stock Sale when it purchased and held the Azon shares for AESOP. HSBC received direction from a named AESOP fiduciary, James L. Donovan, who directed HSBC to close the transaction on September 21, 1999.

> FN3. *See generally Benefits Comm. of Saint-Gobain Corp.,* 313 F.3d 919, 925 (6th Cir.2003) (discussing leveraged employee stock ownership plan transactions).

Plaintiffs claim that the Azon insiders obtained an excessive price in the Stock Sale and that in so doing, they burdened Azon with more debt than it could carry. Plaintiffs further claim that this debt burden destroyed the value of the Azon stock AESOP acquired in the Stock Sale as well as its previously held Azon stock. With respect to HSBC, plaintiffs essentially allege that it violated its fiduciary duty by permitting the Stock Sale to close without having conducted an adequate investigation.

Plaintiffs filed suit September 20, 2002 against the Azon insiders and the AESOP Trustee, HSBC, for alleged breaches of defendants' fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). On April 22, 2003 a class was certified consisting of current and former Azon employees who were damaged when the Azon stock held by AESOP became practically worthless when Azon filed for bankruptcy on July 24, 2002.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

Rule 56(c) of the Federal Rules of Civil Procedure ("FRCvP") states that summary judgment may be granted only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In other words, after discovery and upon a motion, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is thus appropriate where there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [FN4]

> FN4. Of course, the moving party bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). If the moving party makes such a showing, the non-moving party must then come forward with evidence of specific facts sufficient to support a jury verdict in order to survive the summary judgment motion. *Ibid.;* FRCvP 56(e).

**\*2** With respect to the first prong of *Anderson,* a genuine issue of material fact exists if the evidence in the record "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* at 248. [FN5] Stated another way, there is "no genuine issue as to any material fact" where there is a "complete failure of proof concerning an essential element of the nonmoving party's case * * *." *Celotex,* at 323. Under the second prong of *Anderson,* the disputed fact must be material, which is to say that it "might affect the outcome of the suit under the governing law * * *." *Anderson,* at 248.

> FN5. *See also Anderson,* at 252 ("The mere existence of a scintilla of evidence in

support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant].")

Furthermore, "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the district court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000) (citing *Anderson,* at 255). Nonetheless, mere conclusions, conjecture, unsubstantiated allegations or surmise on the part of the non-moving party are insufficient to defeat a well-grounded motion for summary judgment. *Goenaga,* at 18. [FN6]

> FN6. *See* footnote 4.

[1] Even assuming *arguendo* that HSBC was a directed trustee, HSBC's summary judgment motion must be denied at this time. First, no discovery has taken place. [FN7] There exist genuine issues of material fact whether, *inter alia,* Donovan's direction to HSBC to complete the Stock Sale was contrary to ERISA. *See Koch v. Dwyer,* 1999 WL 528181, at \*9-11 (S.D.N.Y.1999) (denying directed trustee's motion to dismiss because it would have acted contrary to ERISA if it was "aware that the direction to invest in JWP common stock was imprudent or that the fiduciaries' direction to make that investment was based on an inadequate investigation"). Likewise, if HSBC had been aware that it was imprudent to purchase Azon stock - in light of, *inter alia,* the declining value and fortunes of the company - or that Donovan had undertaken an inadequate investigation, HSBC could then be liable for knowingly acting contrary to ERISA. *See* 29 U.S.C. § 1103(a)(1) (1999); *In re Worldcom, Inc.,* 263 F.Supp.2d 745, 761 (S.D.N.Y.2003) (holding that a directed trustee is obligated "to follow only 'proper' directions of the [named fiduciary], directions which were made in accordance with the terms of the [Plan] and which were not 'contrary to' the ERISA statute"); *id.* at 762 ("To the extent, therefore, that [the directed trustee] is alleged to have followed instructions to invest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

employee funds in WorldCom stock when a prudent trustee would know that WorldCom's decision to continue to offer its own stock to its employees as an investment option was imprudent, or otherwise in violation of WorldCom's obligations under ERISA, then [the directed trustee] may be liable as an ERISA fiduciary."). [FN8] Indeed, it would be inappropriate to grant HSBC's motion for summary judgment before plaintiffs have had an opportunity to discover, *inter alia,* what HSBC knew and when concerning the prudence of the Stock Sale and whether such was contrary to ERISA. [FN9] HSBC contends that, "after appropriate inquiry, [it] found no violation of ERISA." Def.'s Mem of Law, at 2. It is, however, premature to decide whether HSBC engaged in "appropriate" inquiry or whether HSBC considered the Stock Sale to be violative of ERISA.

> FN7. *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.2003) (setting forth the showing that must be made in a FRCvP 56(f) affidavit when a party resists a summary judgment motion on the ground that discovery is needed in order to respond). Upon reviewing the affidavit of R. Joseph Barton, Esq., this Court finds that plaintiffs have substantially complied with the requirements set forth by FRCvP 56(f). *See ibid.* Indeed, HSBC's knowledge is an issue inherently within HSBC's control and one that plaintiffs cannot adequately address without discovery.

> FN8. *See also Kling v. Fidelity Mgt. Trust Co.,* 2003 WL 21554070, at *10 (D.Mass.2003) (exempting directed trustee from fiduciary status but denying motion to dismiss because it held that the directed trustee "may still be found liable if a jury determines that [the directed trustee] followed directions that were contrary to the Plan or ERISA"); *ibid.* (holding that, to find a directed trustee liable, a direction does not have to be facially contrary to the Plan or ERISA); *Koch,* at *9-10 (holding that the proper inquiry for a directed trustee is "whether a given direction is

contrary to ERISA * * * [and that] [a]n imprudent investment undertaken without adequate investigation constitutes a breach of fiduciary duty and is contrary to ERISA."); *cf. Maniace v. Commerce Bank of Kansas City, N.A.,* 40 F.3d 264, 267-268 (8th Cir.1994) (finding that plaintiffs "failed to establish that Commerce's handling of the ESOP was contrary to Plan directives or contrary to ERISA"), *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 854 (1995); *Ershick v. United Missouri Bank,* 948 F.2d 660, 668-669 (10th Cir.1991) (finding that district court's ruling that directed trustee had not violated ERISA was not clearly erroneous). *But see Grindstaff v. Green,* 133 F.3d 416, 425-426 (6th Cir.1998) (holding that directed trustee had no duty to investigate the merits of directives given by a named fiduciary); *LaLonde v. Textron, Inc.,* 2003 WL 21517334, at *6 (D.R.I.2003) (granting directed trustee's motion to dismiss because "[d]irected trustees * * * cannot be held liable for following the investment instructions provided by a plan's named fiduciaries"); *Beauchem v. Rockford Prods.,* 2003 WL 1562561, at *2 (N.D.Ill.2003) (granting directed trustee's motion to dismiss because the directed trustee was a non-fiduciary that lacked "any discretionary authority concerning matters related to RP stock held by the ESOP"). *Maniace* is distinguishable because plaintiffs herein have had no discovery; they have thus lacked the opportunity to establish that HSBC acted contrary to ERISA. *Ershick* is likewise distinguishable because judgment was rendered in favor of the directed trustee *after trial.* Moreover, " *Maniace* does not * * * require a finding that a directed trustee can never be a fiduciary." *Worldcom,* at 762 (noting that *Maniace* held that directed trustees are subject to the prudent person standard of care). Inasmuch as plaintiffs allege "facts including the rapid decline in stock value

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

over several years coupled with continued investment in the declining stock," this case is akin to *Koch* and is distinguishable from *In re McKesson HBOC, Inc. ERISA Litig.*, 2002 WL 31431588, at *11-12 (N.D.Cal.2002).

FN9. *Miller, supra* note 7, at 303 (holding that "summary judgment should only be granted if *'after discovery,'* the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which it has the burden of proof * * * [and that] [o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.' ") (citation omitted).

*3 Second, plaintiffs have adequately alleged that HSBC may be liable as a co-fiduciary if it either participated in or knew or should have known that Donovan was breaching his fiduciary duty but failed to remedy such violation. *See* 29 U.S.C. § 1105(a) (1999). [FN10] Moreover, as noted above, this Court will not grant HSBC's summary judgment before plaintiffs have had the benefit of discovery.

FN10. *Maniace, supra* note 8, at 268 (holding that a claim for co-fiduciary liability would require plaintiffs to establish (1) a co-fiduciary's underlying violation and (2) that the directed trustee either participated in such or knew but failed to remedy such violation). As noted in *Firstier Bank, N.A. v. Zeller,* 16 F.3d 907, 911 (8th Cir.1994), section 1103(a) modifies but does not eliminate "the trustee's fiduciary duty when handling plan assets." Indeed, when a directed trustee receives direction from a named fiduciary, "the law of trusts does not excuse a compliant trustee from all fiduciary responsibility:

"[W]here the holder of the power [to direct the trustee] holds it as a fiduciary, the trustee is not justified in complying with his directions if the trustee knows or ought

to know that the holder of the power is violating his duty to the beneficiaries as fiduciary in giving the directions." *Ibid.*
Accordingly, *Firstier* holds that
"an ERISA trustee who deals with plan assets in accordance with proper directions of another fiduciary is not relieved of its fiduciary duties to conform to the prudent man standard of care, *see* 29 U.S.C. § 1104(a); to attempt to remedy known breaches of duty by other fiduciaries, *see* 29 U.S.C. § 1105(a); and to avoid prohibited transactions, *see* 29 U.S.C. § 1106." *Ibid.*

[2] With respect to the Outside Directors' motion for summary judgment, denial is appropriate at this time for several reasons. First, there has been no discovery. Summary judgment is thus inappropriate at this time for the reasons discussed above. [FN11] Second, genuine issues of material fact remain. For example, the extent, if any, of the Outside Directors' fiduciary status remains to be determined. Indeed, a person is an ERISA fiduciary to the extent that, *inter alia,* he "exercises *any authority* or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A) (1999) (emphasis added). Moreover, Allen and Panto contend that "it is clear that * * * [they based their] decision to appoint Mr. Donovan and HSBC on the advice of independent and outside professionals and on the information they were provided by others." Defs.' Mem. of Law, at 12. What Allen and Panto knew or thought when they appointed Donovan and HSBC is best determined after discovery. [FN12] Indeed, it would be odd to dismiss a defendant from a case at this early stage based solely on a self-serving affidavit that says "I am innocent." Accordingly, the Outside Directors' motion for summary judgment will be denied.

FN11. *See Miller, supra* note 7, at 303. Indeed, the cases cited by the Outside Directors stand for the proposition that a district court has discretion to deny *additional* discovery - as opposed to the proposition that *no* discovery be allowed. *See e.g., Paddington Partners v. Bouchard,*

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

34 F.3d 1132, 1138 (2d Cir.1994); *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 725 F.Supp. 669, 680 (N.D.N.Y.1989).

FN12. Likewise, a determination as to the Outside Directors' knowledge concerning events that could give rise to liability under section 1105(a) is best made after discovery.

Inasmuch as the Outside Directors' motion for summary judgment will be denied, plaintiff's motion to strike the Outside Directors' affidavits in support of such will be denied as moot.

[3] With respect to plaintiffs' motion for partial summary judgment, such will be granted. Section 6.01 of the Trust Agreement requires Azon to consent in writing in order for the Trustee to borrow money. Consequently, the Board members, including the Outside Directors, were fiduciaries because they authorized the disposition of AESOP assets where the Board authorized the Trustee to borrow the funds required for AESOP to enter into the Stock Sale. *See* 29 U.S.C. § 1002(21)(A) (providing that a person is an ERISA fiduciary to the extent that, *inter alia,* he "exercises *any authority* or control respecting management or *disposition of its assets."* ) (emphasis added). [FN13] Moreover - and as they concede to some extent - the Outside Directors had fiduciary duties with respect to the appointment, monitoring and removal of the trustee and the named fiduciary. [FN14] Nonetheless, the Court finds it premature - to wit, before any discovery has been taken - to make a determination as to the *scope* of the Outside Directors' fiduciary status. Indeed, as plaintiffs have noted, the scope of such status is a fact-intensive inquiry. [FN15] Accordingly, plaintiffs' summary judgment motion will be granted. [FN16]

FN13. *See also Keach v. U.S. Trust Co., N.A.,* 234 F.Supp.2d 872, 882-883 (C.D.Cal.2002) (holding that outside directors were fiduciaries because they, *inter alia,* "adopted a resolution approving

the concept of the proposed ESOP transaction and authorizing [the company's officers] to take all steps necessary to complete the transaction * * * "); *cf. Mohler v. Unger,* 1994 WL 1860578, at *16 (S.D.Ohio 1994) (holding that an inside director was a fiduciary based on her "discretionary control of the plan through her actions in approving the ESOP Loan and leveraged buyout * * * "); *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 404 (7th Cir.2000) (permitting case to go to trial against several outside directors who were accused of permitting ESOP to sell its shares to the company at an insufficient price), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001).

FN14. *See e.g.,* Defs.' Reply Mem. of Law, at 7; *Liss v. Smith,* 991 F.Supp. 278, 310 (S.D.N.Y.1998) ("It is well-established that the power to appoint plan trustees confers fiduciary status."); *id.* at 311 ("The power to appoint and remove trustees carries with it the concomitant duty to monitor those trustees' performance."); *Keach, supra* note 13, at 882- 883 (holding that outside directors who had selected trustee were unquestionably fiduciaries).

FN15. *See* Pls.' Mem. of Law, at 20 ("The Extent of Defendants' Fiduciary Status Is A Factual Issue Requiring Discovery"); *Keach, supra* note 13, at 882 ("ERISA ties fiduciary responsibilities to a person's actual authority, and therefore, that person is a fiduciary only 'to the extent' that he or she exercises control or authority over the plan.").

FN16. The Court, however, will not determine the scope of the Outside Directors' fiduciary status at this time.

*4 Accordingly, it is hereby *ORDERED* that HSBC's motion for summary judgment is denied, that the Outside Directors' motion for summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7

Not Reported in F.Supp.2d, 2003 WL 22087589 (W.D.N.Y.), 31 Employee Benefits Cas. 1257

**(Cite as: 2003 WL 22087589 (W.D.N.Y.))**

judgment is denied, that plaintiffs' motion for partial
summary judgment is granted and that plaintiffs'
motion to strike is denied as moot. [FN17]

> FN17. The parties are strongly encouraged
> to explore settlement at this time.

**Motions, Pleadings and Filings (Back to top)**

• 1:02cv00682 (Docket) (Sep. 20, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Case 1:05-cv-00429-GMS   Document 35   Filed 03/10/2006   Page 12 of 51

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

(Cite as: 2005 WL 1662131 (N.D.Cal.))

**Motions, Pleadings and Filings**

United States District Court,
N.D. California.
In re JDS UNIPHASE CORP. ERISA
LITIGATION
No. C 03-04743 CW (WWS).

July 14, 2005.

Alan R. Plutzik, Kathryn Schofield, Bramson,
Baskin, Plutzik & Birkhaeuser Llp, Walnut Creek,
CA, Andrew M. Schatz, Barbara F. Wolf, Robert A.
Izard, Todd A. Higgins, Wayne T. Boulton, Schatz
& Nobel, P.C., Hartford, CT, Joseph H. Meltzer,
Edward Chang, Edward W. Ciolko, Richard S.
Schiffrin, Schiffrin & Barroway, Llp, Bala Cynwyd,
PA, Robert S. Green, Robert A. Jigarjian, Green
Welling Llp, San Francisco, CA, for Plaintiffs.

Raymond M. Hasu, Morrison & Foerster Llp, San
Francisco, CA, Defendants.

MEMORANDUM OF OPINION AND ORDER

SCHWARZER, Senior J.

*1 THIS DOCUMENT RELATES TO: ALL
ACTIONS

This is a class action brought by and on behalf of
employees and former employees of JDS
UNIPHASE Corp. ("JDSU") who participated in
JDSU's 401(k) Plan between February 4, 2000, and
the filing of this action. The class also includes
certain former employees of Optical Coating
Laboratories, Inc. ("OCLI") who participated in
OCLI's 401(k) Plan between the date JDSU
acquired OCLI (February 4, 2000) and the date on
which the OCLI Plan was merged with the JDSU
Plan (July 1, 2001) (collectively, the "Plans").
JDSU manufactures products for fiber optic

communications and for industrial, commercial and
consumer applications.

The consolidated complaint names forty-six
defendants, in four categories: JDSU, fourteen
current and former directors of JDSU ("Director
Defendants"), eight current and former members of
the JDSU Benefits Committee ("Committee
Defendants"), [FN1] and twenty-three individual
defendants who engaged in some Plan-related
activities ("Individual Defendants"). It alleges that
the defendants were fiduciaries and violated their
fiduciary duties under the Employee Retirement
Income Security Act, 29 U.S.C. §§ 1001-1461
("ERISA"), by having the Plans make imprudent
investments in JDSU stock and by negligently
misrepresenting and failing to disclose material
information to participants. As a result, the Plans
suffered losses when the stock fell from $145 to $5
per share. ¶¶ 4-7.

> FN1. The complaint names as members of
> the Benefits Committee Michael Burkhard,
> Danny Karst, Angela Kupps, Joe
> Passarello, Andrew Pollack, Dena Regan,
> Garry Ronco, and Steve Sapers. None is
> alleged to have been a director of JDSU.

All defendants have jointly moved to dismiss under
Rule 12(b)(6).

I. STANDARD OF REVIEW

A complaint should not be dismissed for failure to
state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief. *Conley v.
Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957). Pleadings are construed liberally in favor
of the pleader, and in challenging the sufficiency of
a complaint all of the material allegations are taken
as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421,
89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

standard under Federal Rule of Civil Procedure 8 contains a powerful presumption against rejecting pleadings for failure to state a claim. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) . "The Supreme Court has explained that it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Id.* at 249 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (internal citation and quotation marks omitted)). However, "conclusory allegations without more are insufficient to defeat a motion to dismiss." *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988).

## II.   DEFENDANTS'   FIDUCIARY   STATUS UNDER ERISA

The defendants do not contest the sufficiency of plaintiffs' allegations with regard to the ERISA fiduciary status of JDSU or the Committee Defendants. [FN2] However, the defendants argue that the complaint fails to set forth nonconclusory allegations that the Director Defendants and the Individual Defendants are ERISA fiduciaries with regard to the counts alleged in the complaint.

> FN2. The complaint alleges that JDSU and the Benefits Committee have responsibility for administering the Plans, determining the investment options available under the Plans, and that these defendants are ERISA fiduciaries with respect to the alleged fiduciary breaches.

**\*2** Plaintiffs set forth four counts alleging various fiduciary breaches against the various defendants. Count I alleges failure to prudently and loyally manage the Plans' assets against all defendants; Count II alleges failure to monitor against JDSU and the Director Defendants; Count III alleges failure to provide complete and accurate information to Plan participants and beneficiaries against all defendants; Count IV alleges breach of duty to avoid conflicts against all defendants, with certain allegations directed toward specific defendants.

### A. ERISA Fiduciary Status

To establish personal liability under ERISA § 409, 29 U.S.C. § 1109(a), "an individual or entity must be a fiduciary." *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1093-94 (9th Cir.2004). Section 3(21)(A) provides in pertinent part that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or ... (iii) has any discretionary authority or discretionary control responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii). Fiduciary status under ERISA is defined "in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Arizona State Carpenters Pension Trust Fund v. Citibank,* 125 F.3d 715, 720 (9th Cir.1997); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.,* 284 F.Supp.2d 511, 544 (S.D.Tex.2003). Fiduciary status under ERISA is not an "all-or-nothing concept," and "a court must ask whether a person is a fiduciary *with respect to the particular activity at issue." Cotton v. Massachusetts Mut. Life Ins. Co.,* 402 F.3d 1267, 2005 WL 604905 \*1, \*5 (11th Cir.2005) (emphasis added) (citing *Coleman v. Nationwide Ins. Co.,* 969 F.2d 54, 61 (4th Cir.1992)); *see also Maniace v. Commerce Bank,* 40 F.3d 263, 267 (8th Cir.1994) (same). "[F]iduciary status is to be determined by looking at the *actual* authority or power demonstrated, as well as the formal title and duties of the party at issue." *Landry v. Airline Pilots Ass'n Int'l AFL-CIO,* 901 F.2d 404, 418 (5th Cir.), *cert. denied* 408 U.S. 895 (1990).

### B. Sufficiency of the Pleadings

Throughout the complaint, the allegations of fiduciary status against the Director Defendants and the Individual Defendants are cast in the statutory language that they "exercis[ed] discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets." Lacking any facts, such conclusory allegations are insufficient to afford defendants adequate notice of the grounds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

(Cite as: 2005 WL 1662131 (N.D.Cal.))

underlying the claims against them. *See Cotton,* 402 F.3d 1267, 2005 WL 604905 at *6 (holding that simple allegations that a defendant falls within the statutory definition of fiduciary are conclusory assertions, not well-pleaded factual allegations); *Conley,* 355 U.S. at 47 (stating that Federal Rule of Civil Procedure 8 requires a plaintiff to provide a short and plain statement of the claim so that the opposing party receives "fair notice of what the plaintiff's claim is and the ground upon which it rests"). Plaintiffs' boilerplate statutory allegations are therefore meaningless. To determine whether plaintiffs have sufficiently alleged defendants' status as ERISA fiduciaries, the court must discern from other portions of the complaint the functions that the various defendants allegedly performed, *see Custer v. Sweeney,* 89 F.3d 1156, 1162 (4th Cir.1996), and decide whether performance of those functions caused the defendants to become fiduciaries as to the claims asserted, *see Coleman,* 969 F.2d at 61.

1. Allegations regarding the Director and Individual Defendants

\*3 As stated, the defendants do not dispute the fiduciary status of JDSU and the Committee Defendants. Regarding the liability of the Director Defendants and the Individual Defendants, the complaint alleges: (1) that the Board of Directors acted as the "primary executive arm" of JDSU, wielded the company's ultimate power to modify the Plans, possessed authority for deciding whether to make matching contributions under the Plans, and reviewed and evaluated information received from the status of the Plans from Compensation Committee reports, ¶¶ 79-81; and (2) that the Individual Defendants were named as fiduciaries and/or signed certain documents or were otherwise involved in the administration of the Plans, thus making them fiduciaries. ¶¶ 45-46.

2. Count I

Plaintiffs allege that the Director Defendants and the Individual Defendants are ERISA fiduciaries regarding the failure to prudently and loyally manage the Plans' assets. However, the allegations

indicate that only the Benefits Committee is responsible for the actual management of the stock fund. It states that the Benefits Committee "shall be *solely* responsible for directing the Trustee as to the investment and disposition of the Trust Fund and shall have responsibility for the overall diversification of the Trust Fund." ¶ 88 (emphasis added). The Benefits Committee is also charged with selecting and monitoring all investment options available to participants under the Plans. The allegations regarding the Director Defendants' general oversight or the Individual Defendants' ministerial actions regarding the Plans fail to show that these groups of defendants had any discretionary control over the managing of the Plans' assets. *See Cotton,* 402 F.3d 1267, 2005 WL 604905 at *5 ("[A] court must ask whether a person is a fiduciary with respect to the particular activity at issue.").

a. Director Defendants

Although a company may act *through* its directors, the Director Defendants are only fiduciaries to the extent that they exercise discretionary authority with respect to the particular activity at issue. *Coleman,* 969 F.2d at 61; *Cotton,* 402 F.3d 1267, 2005 WL 604905 at *5; *see also* 29 C.F.R. § 2509.75-8, D-4 (1993) (Department of Labor) (stating that directors' liability and responsibility as fiduciaries is limited to the extent of the functions they perform). The Director Defendants are not fiduciaries merely because the corporation is a fiduciary. *See In re Calpine Corp. ERISA Litig.,* C-03-1685 (N.D.Cal.2005), slip op. at 5. Here, plaintiffs allege breaches of fiduciary duty involving the JDSU stock fund, but allege no facts that show how the Director Defendants had any discretionary authority over the management of the stock fund.

b. Individual Defendants

Plaintiffs allege that the Individual Defendants were identified as fiduciaries in a letter to plaintiffs from counsel for JDSU. ¶ 46. This letter, identifying generic Plan fiduciaries, was provided pursuant to a stipulation and order consolidating the ERISA actions in this case. However, the definition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

of fiduciary under ERISA is a functional one that looks to the actual authority and control performed by a defendant. *Mertens,* 508 U.S. at 262. A person or entity may be a fiduciary for one function but not for another. *Hansen v. North Trident Reg. Hosp.,* 60 F.Supp.2d 523, 526 (D.S.C.1999). Fiduciary status under ERISA is not an all-or-nothing concept, and the important inquiry is whether the person is a fiduciary with respect to the activity at issue. *Coleman,* 969 F.2d at 61. Here, the allegations fail to set forth any facts demonstrating authority or control over the stock fund by the Individual Defendants. Plaintiffs' only specific allegation is that the Individual Defendants signed certain documents under certain titles, but this does not make an individual an ERISA fiduciary. *See In re WorldCom, Inc. ERISA Litig.,* 263 F.Supp.2d 745, 766 (S.D.N.Y.2003) ("Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts."); *Kayes v. Pac. Lumber Co.,* 51 F.3d 1449, 1460 (9th Cir.1995) (holding that ERISA fiduciary status depends on an individual's functional role rather than title). The preparation of government reports required by government agencies is a ministerial function, and those performing such functions are not fiduciaries. 29 C.F.R. § 2509.78-5 at D-2. Absent any specific allegations that the Individual Defendants exercised discretionary control or authority regarding the management of the stock fund, there is no basis for finding ERISA fiduciary status. *IT Corp. v. Gen. Am. Life Ins. Co.,* 107 F.3d 1415, 1420 (9th Cir.1997) (" 'Persons who have no power to make any decisions as to plan policy, interpretation, practices or procedures' are not fiduciaries.") (citing 29 C.F.R. § 2509.75-8 at D-2). [FN3]

> FN3. Plaintiffs argue that "it is likely" that some of the Individual Defendants were members of the Administrative Committee, but that this cannot be verified without further discovery. However, the plaintiffs fail to allege that the Administrative Committee had any discretionary control or authority over the management of the stock fund. The allegations state that the Administrative Committee had the power to construe and interpret Plan documents,

appoint advisors, provide Plan participants with financial reports, and appoint other persons to carry out certain duties under the Plan. The fact that some Individual Defendants may have been members of such a committee falls short of providing specific nonconclusory allegations that such individuals exercised discretionary control or authority over the management of the stock fund.

3. Count II

*4 Plaintiffs allege that the Director Defendants are ERISA fiduciaries with regard to failing to monitor the Benefits Committee, the Administrative Committee, and the Individual Defendants, and provide them with accurate information.

a. OCLI Plan

Plaintiffs allege that OCLI was acquired by JDSU on February 4, 2000, that JDSU maintained the OCLI Plan from February 4, 2000, through July 21, 2001, and that JDSU was the direct successor of the former entity which administered the OCLI Plan. Plaintiffs allege that JDSU, as that successor, was given explicit responsibility under the OCLI Plan to appoint and monitor the Administrative Committee, the Plan administrator, and set the parameters of their responsibilities under the Plan. The issue of whether and when JDSU became the successor to OCLI by acquiring OCLI, and whether the Board of Directors therefore had discretionary authority to appoint fiduciaries under the OCLI Plan, as it did under the JDSU Plan, requires factual development that makes the issue inappropriate for dismissal at this stage.

b. Fiduciary status of the Director Defendants

As to both Plans, plaintiffs allege that "JDSU, through its Board of Directors or otherwise, had the authority and discretion to hire and terminate [its] officers and employees" and "to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plans." ¶ 17. Accepting as true plaintiffs' allegation that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

JDSU had the discretionary control and authority to appoint fiduciaries under the Plans, there arises a duty to monitor such fiduciaries. Where the discretionary authority to select or appoint fiduciaries exists, a director's duty to monitor those appointees also exists. 29 C.F.R. § 2509.75-8, DR-4 ("[T]he board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise 'discretionary authority or discretionary control respecting management of such plan.' "); *see also Batchelor v. Oak Hill Med. Group,* 870 F.2d 1446, 1448-49 (9th Cir.1989) (citing 29 C.F.R. § 2509.75-8, DR-4); *Leigh v. Engle,* 727 F.2d 113, 133-34 (7th Cir.1984) (same); *Calpine,* C-03-1685 at 10. [FN4] Plaintiffs have sufficiently alleged fiduciary status of the Director Defendants with regard to a duty to monitor their appointees.

> FN4. Defendants argue that plaintiffs must specifically allege not only that defendants had authority to appoint or select fiduciaries, but that they retained control of monitoring those fiduciaries. This is not supported by the case law or federal regulations as explained by the Department of Labor. *Coyne & Delaney Co. v. Selman,* 98 F.3d 1457, 1465-66 (4th Cir.1996) (citing 29 C.F.R. § 2509.75-8 at FR-17, and stating that "the *power* ... to appoint, retain, and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan") (emphasis added).

4. Count III

Plaintiffs allege that the Director Defendants and the Individual Defendants are ERISA fiduciaries with respect to the failure to provide complete and accurate information to Plan participants and beneficiaries. ¶ 179. Again, fiduciary status under ERISA is not an all-or-nothing concept, and the defendants are only liable to the extent that they have discretionary authority or control over the activity at issue. *Coleman,* 969 F.2d at 61. For the same reasons that plaintiffs have failed to allege facts showing that the Director Defendants or the

Individual Defendants exercised any authority or control over the management of the trust fund, they have also failed to allege that either group of defendants possessed any responsibility for providing information to the Plan participants.

*5 In fact, the complaint specifically alleges that the Benefits Committee and the Administrative Committee--not the Director Defendants or the Individual Defendants--had the responsibility to provide prospectuses and other information to the Plan participants. ¶¶ 92, 95. Such allegations are noticeably absent from any statement describing the duties of the Director Defendants and the Individual Defendants. Alleging that the Director Defendants exercised a general "executive" oversight over all things regarding the Plan is insufficient to allege their status as ERISA fiduciaries with regard to this claim for the reasons discussed previously.

5. Count IV

Count IV alleges breach of the duty to avoid conflicts of interest against all defendants and contains a disorganized grab bag of charges unsupported by factual allegations from which it cannot be determined against what defendants the charges are directed or their factual basis.

Counts I and III will be dismissed, with leave to amend, as to the Director Defendants and the Individual Defendants, for failure to sufficiently allege fiduciary status under ERISA, and Count IV will be dismissed, with leave to amend, as to all defendants.

III. COUNT I--FAILURE TO PRUDENTLY MANAGE THE PLANS' ASSETS

*A. Sufficiency of the Pleadings*

Defendants contend that plaintiffs' claim for breach of the ERISA duty of prudence fails as a matter of law because the complaint does not plead facts that if proven would establish that any defendant had actual or imputed knowledge of the alleged slowdown in demand or of accounting entries that plaintiffs contend made JDSU an imprudent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

investment. Defendants rely on two cases. In *Haber v. Brown,* 774 F.Supp. 877 (S.D.N.Y.1991), the court granted a motion to dismiss a fiduciary claim against the defendant Washington National Life Insurance Company because the complaint consisted only of recitals of the statutory language and alleged "no facts to prove grounds for the claim that Washington National knowingly participated in Brown's fiduciary breaches." *Id.* at 878. The case is not apposite in view of the detailed factual allegations of the instant complaint. In *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222 (W.D.N.Y.2002), the court found the allegations of the complaint deficient in various respects, including the allegations that the members of the Committee "should have known that the Plan should not have invested in Company stock." *Id.* at 230. The case is not persuasive for the proposition urged by defendants, that the instant complaint should be dismissed because it alleges that the fiduciary defendants "should have known that the [JDSU] Fund was not a prudent investment." ¶¶ 124, 125. Allegations that defendants should have known that investing in company stock was imprudent were held sufficient in *Kelley v. Household International, Inc.,* 2004 WL 723843 (N.D.Ill.2004), and in *Enron,* 284 F.Supp.2d at 656-57. The allegation simply defines the defendants' fiduciary duty to determine whether the Fund was a prudent investment. It is sufficient to give defendants notice of the breach of fiduciary duty claim, based on the factual allegations of the complaint. Dismissal is inappropriate because it does not appear beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley,* 355 U.S. at 45-46.

*B. Application of the Section 404(a)(2) Exemption*

**\*6** Plaintiffs contend that defendants breached their fiduciary duties by offering the JDSU Stock Fund as an investment option under the Plans, by permitting the Plans to purchase and hold shares in the Fund when it was imprudent to do so, and by continuing to make available company matching contributions in JDSU stock. ¶ 166. Defendants contend that this claim fails under *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090 (9th Cir.2004).

Section 404(a)(1)(B) provides that "a fiduciary shall discharge his duties ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

The Plans at issue here were so-called Eligible Individual Account Plans ('EIAP'). 29 U.S.C. § 1002(34); ¶ 48. The investments available to participants included numerous mutual funds with differing investment policies and risk profiles, in addition to the JDSU common stock fund. ¶¶ 53, 61. The Plans provided for employer matching contributions to participants who made elective contributions. ¶ 54.

Section 404(a)(2) provides:

> In the case of an eligible individual account plan ... the diversification requirement of paragraph (1)(C) and prudence requirement (only to the extent it requires diversification) of paragraph 1(B) is not violated by acquisition or holding of qualifying employer ... securities.

Citing *Wright,* defendants argue that plaintiffs' prudence claim is barred as falling squarely within the duty to diversify. In *Wright,* plaintiffs alleged a violation of ERISA's prudence requirement under section 404(a)(1)(B) based on an ESOP's failure to sell the company's stock when a substantial premium could have been realized as the result of a merger and later to investigate whether to sell the stock when its value declined. *Id.* at 1097. The court affirmed the dismissal of the complaint under Rule 12(b)(6).

*Wright* does not hold that section 404(a)(2) bars a claim against an EIAP fiduciary based on that fiduciary's investment decisions respecting the company's stock. It acknowledged that despite the section 404(a)(2) exemption, other courts have held that ERISA's prudence requirement continues to apply to EIAP fiduciaries. *Id.* at 1097 (citing *Moench v. Robertson,* 62 F.3d 553 (3d Cir.1985)); *see also Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir.1995) (adopting a standard under which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

(Cite as: 2005 WL 1662131 (N.D.Cal.))

investment in the company's stock is presumptively prudent unless fiduciary abused its discretion). At the same time, it recognized that "[i]interpreting ERISA's prudence requirement to subject EIAPs to an albeit tempered duty to diversify arguably threatens to eviscerate congressional intent and the guiding rationale behind EIAPs themselves." *Wright,* 360 F.3d at 1097.

Because the facts of the case made it unnecessary, the court declined to "decide whether the duty to diversify survives the statutory text of § 1104(a)(2) ." *Id.* at 1097-98. The court found that even if the *Moench* standard applied, plaintiff loses, stating, "[u]nlike *Moench,* this case does not present a situation where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing." *Id.* at 1098. It observed that published accounts showed the company to be profitable and paying substantial dividends during the period. *Id.* at 1098-99.

\*7 The instant complaint presents a different case. Plaintiffs allege that defendants breached their fiduciary duties because JDSU stock was--itself--an imprudent investment, not because defendants breached a duty to diversify. ¶¶ 108-41. Although an EIAP fiduciary may be exempt from the duty to diversify and the duty of prudence *to the extent that it requires diversification,* the duty of prudence otherwise applies to EIAP fiduciaries. *Id.* at 1097; 29 U.S.C. § 1104(a)(2). Defendants argue that plaintiffs' claim of imprudence is, in reality, a claim for failure to diversify, yet plaintiffs make no such diversification claim. Contrary to what defendants appear to argue, plaintiffs' claim is not transformed into a diversification claim merely because plaintiffs argue that investment in JDSU was imprudent and that it logically follows from such an argument that defendants therefore should have invested in other stocks.

The purpose of the duty to diversify is to minimize the risk of large losses. 29 U.S.C. § 1104(a)(1)(C). Normally this duty requires investment of plan assets in such a manner that the assets are not invested predominantly in a single stock, such as company stock. 29 U.S.C. § 1107(a)(2) (prohibiting

investment of over ten percent of plan assets in employer stock). Because of the section 404(a)(2) exemption from the duty to diversify, defendants did not breach any fiduciary duty merely by investing a large portion of Plan assets in JDSU stock. 29 U.S.C. § 1104(a)(2). But plaintiffs do not claim that defendants breached their duty by putting a certain percentage of the funds in JDSU stock, or that defendants should have invested certain percentages of Plan assets in various alternative investments. Rather, plaintiffs allege that *any* investment in JDSU stock was imprudent in light of what the defendants knew about JDSU and the risk of investing in JDSU stock. ¶¶ 108-41. Plaintiffs' claim is therefore not a diversification claim, and the section 404(a)(2) exemption and *Wright* do not resolve this issue.

Even if plaintiffs' claim could be construed as a diversification claim, the court in *Wright* expressly declined to decide whether any duty to diversify survives the statutory text of section 404(a)(2), and held that the plaintiffs' claim in that case failed under the *Moench* standard. *Wright,* 360 F.3d at 1098. Under the *Moench* standard, a fiduciary's presumption of reasonableness may be overcome where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing. 62 F.3d at 572; *Wright,* 260 F.3d at 1098. In this case, plaintiffs have alleged sufficient facts to overcome such a presumption.

Plaintiffs allege, among other things, that at the beginning of the class period in early 2000 demand for the company's product fell off and orders were cancelled. ¶ 111. The company prematurely recorded revenues, ¶ 112; shipped products not ordered or for which orders had been cancelled, ¶ 113; accelerated revenue, ¶¶ 115-16; accumulated excessive inventories, ¶¶ 117-18; overstated goodwill in the E-TEK acquisition, which it had to write off the next year in the amount of $13 billion, ¶¶ 119-22; and failed to disclose material information to participants and the public, ¶¶ 123-32, and the magnitude of JDSU's problems, ¶¶ 135-37. In July 2001 the company announced that sales had collapsed, that it had lost $51 billion in the past 12 months and written off

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

$44.8 billion, and that it had laid off 9000 people and would cut 7000 more. ¶¶ 138-39. Its stock price had fallen from $100 in 2000 to $3 in August 2004. ¶ 140.

*8 In addition, the complaint alleges conflicts of interest affecting at least some of the defendants and corporate insiders. It alleges, among other things, that at the start of the class period when the stock was at an all time high, insiders possessing inside information concerning the downturn of the company's business, sold over $500 million of stock, ¶¶ 148-49; and that the compensation of high-ranking officers of the company was tied to the price of the stock, ¶¶ 144-45.

*Lalonde v. Textron, Inc.,* 369 F.3d 1 (1st Cir.2004), is the most recent appellate decision on the issue presented here. Plaintiffs, participants in Textron's ESOP plan, claimed that Textron and the Textron executives who administered the plan, breached their fiduciary duty under ERISA by continuing to direct 50% of employee contributions and 100% of employer matching contributions in Textron stock when they knew or had reason to know that Textron faced troubles that were certain to cause a decline in the value of its stock. The complaint alleged, among other things, that Textron artificially inflated the price of its stock by concealing internal problems that led to lost earnings and a securities action brought by shareholders. "Despite this bleak scenario and in dereliction of their duties, plaintiffs say, defendants continued to fund the Textron stock fund and prohibited the class from diversifying its retirement accounts." *Id.* at 3. The district court granted the motion to dismiss and the court of appeals reversed. The court held that the allegations that Textron artificially inflated its stock price by concealing Textron's problems and their adverse effect on Textron which are the subject of a securities act lawsuit by shareholders against Textron and its officers and directors satisfied Federal Rule of Civil Procedure 8(a) and the notice requirement under *Conley,* 355 U.S. at 47. With respect to the application of the *Moench/Kuper/Wright* line of cases, the court said:

Because the important and complex area of law implicated by plaintiffs' claims is neither mature

nor uniform ... we believe that we would run a very high risk of error were we to lay down a hard-and-fast rule ... based only on the statute's text and history, the sparse pleadings and the few and discordant judicial decisions discussing the issue we face. Under the circumstances, further record development-and particularly input from those with expertise in the arcane area of the law where ERISA's ESOP provisions intersect with its fiduciary duty requirements-seems to us essential to a reasoned elaboration of that which constitutes a breach of fiduciary duty in this context.

*Id.* at 6.

The court's reasoning is persuasive. Whether on a full development of the record the evidence will sustain plaintiffs' allegations remains to be seen, but on this motion to dismiss we must accept the well-pleaded allegations of the complaint as true. Those allegations are sufficient to state a claim for violation of the prudence requirement. [FN5]

> FN5. Compare *Calpine,* where the record before the court disclosed that Calpine had steady revenue and profit, showing that it was a viable concern and not in the sort of deteriorating financial circumstances that must be pled to rebut the presumption of prudence.

*C. Violation of Insider Trading Rules & Loss Causation*

*9 Defendants contend that plaintiffs are unable to show loss causation because their losses were unavoidable. They argue that had defendants forced participants to divest JDSU stock, JDSU would first have had to disclose that the Plan was selling its JDSU stock and the reason for doing so. The value of the stock would immediately have declined in response to that disclosure. Plaintiffs' pleading leaves much to be desired in terms of clarity and organization. However, their claim appears not to be limited to failure to divest but extends to the making of imprudent investments in the Fund in JDSU stock, as well as failing to eliminate JDSU as an investment vehicle. ¶ 196. *In re McKesson*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

*HBOC, Inc. ERISA Litigation,* 2002 WL 31431588 (N.D.Cal.), on which defendants rely, supports their position only to the extent that plaintiffs assert a divestment claim. *Id.* at *6. But it specifically recognizes a potentially valid claim of breach of fiduciary duties based on allegations that the continued contribution in the form of company stock after the fiduciaries became aware the stock was an imprudent investment. *Id.* at * 8.

Moreover, courts generally have rejected the notion that the securities laws immunize ERISA fiduciaries against liability for imprudent investments, including failing to disclose information to participants. *See, e.g., Enron,* 284 F.Supp.2d at 565 (stating that "the statutes should be construed to require, as they do, disclosure by ... plan fiduciaries of [the company's] concealed, material financial status to the investing public generally, including plan participants, whether 'impractical' or not, because continued silence and deceit would only encourage the alleged fraud and increase the extent of injury"); *WorldCom,* 263 F.Supp.2d at 765-67 (same).

Finally the argument that plaintiffs' losses were unavoidable will not support dismissal. It would be premature to determine the measure of damages on a motion to dismiss the complaint, but presumptively, it would be determined with reference to what the value of the Plan would have been had its assets been prudently invested. *See Harris Trust and Sav. Bank v. John Hancock Mut.,* 302 F.3d 18, 34 (2d Cir.2002).

## II. COUNT II--BREACH OF DUTY TO MONITOR

Plaintiffs allege that JDSU and the Director Defendants failed to monitor the Benefits Committee, the Administrative Committee, and the Individual Defendants, and provide them with accurate information. ¶¶ 173-74.

*A. OCLI Plan*

With respect to the OCLI Plan, defendants contend that JDSU was not the employer under the OCLI

plan and therefore owed no duty to monitor. However, plaintiffs allege that the OCLI plan was sponsored and administered by JDSU from February 4, 2001, until the plans were formally merged on July 1, 2001, and that JDSU exercised fiduciary oversight of the plan during that period. ¶ 16, 41. Moreover, under the OCLI plan, JDSU became the employer with the sole responsibility to appoint and monitor the Administrative Committee, the plan administrator, and set the parameters of their responsibilities under the plan. ¶ 76. These allegations are sufficient to state a claim.

*B. Duty to Monitor*

*10 With respect to both Plans, defendants contend that the claim fails because, first, under the Plan, the fiduciary duties of JDSU and the Director Defendants were limited to appointment of the Benefits Committee and, second, the complaint contains only conclusory allegations which are insufficient.

Plaintiffs allege that JDSU, through its Board of Directors, had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plans. ¶ 17. Where, as here, the Directors are alleged to have the power to select and appoint plan fiduciaries, they exercise discretionary authority or discretionary control respecting management of such a plan. 29 C.F.R. § 2509.75-8, D-4; *Batchelor v. Oak Hill Med. Group,* 870 F.2d 1446, 1448-49 (9th Cir.1989); *Leigh v. Engle,* 727 F.2d 113, 135 (7th Cir.1984). This duty is, however, limited to the selection and retention of such fiduciaries. 29 C.F.R. § 2509.75-8; *Leigh,* 727 F.2d 113, 135 (holding that those responsible for appointing fiduciaries "were not obliged to examine every action taken by [the administrators] but ... [they] were obliged to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations"); *Coyne,* 98 F.3d 1457, 1465-66 (quoting Department of Labor Bulletin, 29 C.F.R. § 2509.75-8 at FR-17, which defines the ongoing responsibility of an appointing fiduciary to review the performance of such fiduciaries at reasonable intervals to ensure

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

compliance with the terms of the plan and statutory standards).

Count II alleges in substance that Defendants breached their fiduciary duty by failing to provide the Benefits and Administrative Committees with information about JDSU's business problems and ensure that the Committees appreciated the risk of investment by employees in the stock fund. Courts have held that whether a defendant's duty to monitor included the duty to provide information to his appointees requires a fact intensive analysis that is inappropriate at this stage of the proceeding. *In re Syncor Litig.*, 351 F.Supp.2d 970, 986 (C.D.Cal.2004); *In re Electronic Data Sys. Corp. ERISA Litig.*, 305 F.Supp.2d 658, 671 (E.D.Tex.2004); *In re Sprint Corp. ERISA Litig.*, 2004 WL 1179371 (D.Kan.2004) (unpublished) (citing 29 C.F.R. § 2509.75-8 at FR-17, and stating that the procedure for monitoring appointees may vary in accordance with the nature of the plan and other facts and circumstances).

The allegations, which identify the Directors' power to appoint fiduciaries, suffice to invoke the duty to monitor those appointees and, thus, provide defendants with adequate notice. *See Electronic Data,* 305 F.Supp.2d at 671 (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512-14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (discussing the simplified notice pleading standard under Fed. R. Civ. Proc. 8 )). The precise scope of the duty to monitor, including which Directors appointed which fiduciaries, what the resulting duty to monitor entailed, and whether plaintiffs are entitled to relief on this claim, require factual determinations that make the issue inappropriate for dismissal on this motion.

III.  COUNT  III--BREACH  OF  DUTY  TO DISCLOSE

*A. Disclosure Claim*

**\*11** In Count III, plaintiffs allege in substance that defendants breached their fiduciary duty by failing to provide complete and accurate information regarding investment in JDSU stock and by

conveying inaccurate information regarding the soundness of JDSU stock and the prudence of investing retirement contributions in it, thus, fundamentally deceiving plaintiffs about the prudence of making and maintaining investments in JDSU stock. ¶¶ 179-83. Defendants, by narrowly interpreting the allegations, contend that the claim fails. However, at this stage, the allegations are sufficient to implicate ERISA fiduciary duties.

In *Bins v. Exxon Co. USA,* 220 F.3d 1042, 1053 (9th Cir.2000), the Ninth Circuit held that, absent employee inquiry, an ERISA fiduciary does not have an affirmative duty to volunteer information regarding plan changes or amendments. However, the court in *Bins* also stated that "we do not question the existence of other 'affirmative' disclosure duties of an employer-fiduciary under circumstances not present here." 220 F.3d 1042, 1053 n. 10 (citing *Acosta v. Pacific Enter.,* 950 F.2d 611, 619 (9th Cir.1991)). In *Acosta* the Ninth Circuit held that:

[A]n ERISA fiduciary's duty to disclose information to beneficiaries is not limited to the dissemination of the documents and notices specified in [the Act] but may in some circumstances extend to additional disclosures where the interests of the beneficiaries so require.... Thus, an ERISA fiduciary has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits.

950 F.2d at 618-19. Circumstances that give rise to such an affirmative duty to disclose information to plan participants, as indicated by the cases cited in *Acosta,* include an employer's failure to contribute to a fund as required, or when an ineligible person contributes to a fund and the employer knows that person is ineligible. *Eddy v. Colonia Life Ins. Co. of Am.,* 919 F.2d 747, 750-51 (D.C.Cir.1990); *Rosen v. Hotel & Rest. Employees Union,* 637 F.2d 592, 599-600 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *Aitken v. IP & GCU-Employer Retirement Fund,* 604 F.2d 1261, 1270 (9th Cir.1979). The allegations in this case--that the defendants should have known that investing in JDSU stock was imprudent and that the defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

failed to inform plan beneficiaries of such imprudent investments-- are more similar to the instances of employer prejudice that "threaten the funding of benefits" cited in *Acosta*, than to a business decision to make changes to a plan, as was at issue in *Bins*. While factual development and further briefing may establish that no affirmative duty to disclose information existed in this case, the Court cannot say at this stage that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. at 45-46. The allegations that the fiduciary defendants failed to give complete and accurate information regarding the investment of plaintiffs' retirement contributions state a claim.

**\*12** Plaintiffs further allege that the defendants breached their duty to inform by misrepresentations in JDSU's SEC filings incorporated by reference in the Plan Prospectus. ¶ 180. Courts have held that dismissal at this stage is inappropriate where SEC filings are incorporated by reference into documents provided to plan participants. *In re AEP Litig.,* 327 F.Supp.2d 812, 825 (S.D.Ohio 2004) (citing *Vivien v. Worldcom, Inc.,* 2002 WL 31640557 \*1, \*7 (N.D.Cal.)); *Dynegy,* 309 F.Supp.2d at 888. Defendants argue that plaintiffs failed to sufficiently allege that SEC filings were incorporated into plan communications. However, the federal securities laws require corporations that sponsor a 401(k) plan offering an employer's securities to file a Form S-8 registration statement with the SEC, and Part I of the Form S-8 is the Section 10(a) prospectus that must be disseminated to employees under the Securities Act. *See In re Worldcom, Inc., ERISA Litig.,* 263 F.Supp.2d 745, 766 n. 14 (citing Securities Act, Rule 428, 15 U.S.C § 77j; 17 C.F.R. § 230.428). The securities laws require other SEC filings to be attached to a Section 10(a) prospectus. *Id.* The plaintiffs allege that the Committee Defendants and JDSU are liable for providing prospectuses and other financial information to the plan participants. Therefore, these defendants are fiduciaries in that regard and have a duty to convey truthful information and not to make material misrepresentations. *See Mathews v. Chevron Corp.,* 362 F.3d 1172, 1180 (9th Cir.2004). Plaintiffs have sufficiently pleaded this count. [FN6]

FN6. Plaintiffs also allege that statements in the media also included misrepresentations or omitted material information. Defendants argue that such statements are not actionable because they were not made by fiduciaries in their fiduciary capacity to plan participants. The defendants' argument has merit. The statements made in press releases were made in the context of discussing JDSU's long-term prospects. The Supreme Court has rejected the idea that a defendant acts as a fiduciary merely because it makes statements about its expected financial condition. *Varity Corp. v. Howe,* 516 U.S. 489, 505, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

### B. Plan-wide Relief

Defendants argue further that this claim fails because ERISA § 502(a)(2) limits standing to recover money damages to the plan. 29 U.S.C. § 1132(a)(2). This claim, they contend, seeks recovery for individual losses and thus requires proof of individual reliance which has not been alleged.

The complaint seeks relief under §§ 502(a)(2) and 409. 29 U.S.C. §§ 1132(a)(2), 1109. ¶ 185. It asks to have defendants "restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count." *See also* Prayer for Relief, ¶ C, seeking an order "to make good to the Plans all losses to the Plans resulting from the Defendants' breaches of their fiduciary duties." Plaintiffs also seek to have the losses to the Plans allocated among participants' individual accounts in proportion to their accounts' losses, ¶ G, but this is an accounting adjustment that does not alter the fact that the relief sought is plan-wide.

Defendants insist that the claims, rather than being for plan-wide relief, are for recovery of individual losses. They rely principally on *Schering-Plough Corp. ERISA Litigation,* 2004 WL 1774760 (D.N.J.) , in which the court dismissed a complaint in many respects similar to plaintiffs' here. However, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

court found a "critical distinction" between the pleading before it and other cases finding such pleadings sufficient based on the fact that Schering-Plough did not make contributions to the plan in the form of company stock, stating that "the only contributions were those made by employees, which remained in individual accounts and never become assets of the ... Plan." Id. at *7. Here, plaintiffs allege that matching employer contributions to the Plan, in addition to employee contributions, were invested in JDSU stock. [FN7] Therefore, all Plan participants were affected, and the relief sought is plan-wide. *See In re Syncor ERISA Litig.,* 351 F.Supp.2d 970, 990 (C.D.Cal.2004) (holding that plaintiffs sought relief for entire plan, not just individual losses, stating "[h]ere, the company did invest in company stock in the form of matching contributions. Therefore, all plan participants were impacted by Syncor stock"). [FN8]

> FN7. Plaintiffs allege that, during the relevant time period, they all held JDSU stock. They further allege that the plan provided for employer matching contributions, and that those matching contributions were invested in the same manner as the participants directed their own contributions to be invested. The SPD indicates that as of September 1, 2001, only employer matching contributions could be invested in company stock.

> FN8. Additionally, according to Department of Labor regulations, contributions to an ERISA plan are assets of the plan, not assets of the employer or the individual participants. 29 C.F.R. 2510.3-102(a).

*13 Defendants' further argument that reliance is an essential element of the claim rests on confusion between individual claims under § 502(a)(1)(B) for benefits due a participant and claims under § 502(a)(2) for relief under § 409 (i.e., for losses to the plan). *See Roth v. Sawyer-Cleator Lumber Co.,* 16 F.3d 915, 920 n. 4 (8th Cir.1994) (stating that "a breach of fiduciary duty claim puts money back in

the plan"). The cases cited by defendants are not on point because they do not involve claims under § 502(a)(2). Rather, the cited cases involve claims seeking individual benefits or injunctive relief under § 502(a)(1) or § 502(a)(3), or turn on class certification issues. *See, e.g., Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365 (3d Cir.2003); *In re Unisys Corp. Retiree Med. Benefits Litig.,* 2003 WL 252106 *1 (E.D.Pa. Feb.4, 2003). Plaintiffs argue that they need not show detrimental reliance or, if they do, that it is presumed in this case because once plaintiffs have established a breach of fiduciary duty and a loss to the plan, the burden shifts to the defendants to prove that the loss was not caused by the breach of duty. *See Roth,* 16 F.3d at 917.

Defendants argue that because each individual plaintiff exercised authority over whether to invest in JDSU stock, individual reliance must be shown. However, given that all plaintiffs are alleged to have held JDSU stock and that defendants owed the same fiduciary duty to all plan participants—and allegedly breached that duty through plan-wide communications—the court declines to dismiss this claim at this stage. Plaintiffs allege that where a breach of duty includes misrepresentations and omissions material to a decision by plan participants, which results in harm to the participants, the participants are presumed to have relied on such misrepresentations or omissions to their detriment. ¶ 182. Other courts have found such allegations adequate to prevent dismissal at this stage. *See, e.g., AEP,* 327 F.Supp.2d at 833 (noting that other courts have found such allegations sufficient to prevent dismissal even under heightened pleading requirements). Again, whether factual development of the claim and further briefing will support plaintiffs' claim remains to be seen, but Plaintiffs' allegations are sufficient to state a claim.

## IV. CO-FIDUCIARY LIABILITY

In Counts I, II and III, plaintiffs allege co-fiduciary liability against all the defendants. ERISA § 405(a) provides the statutory basis for co-fiduciary liability

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

as follows:

> In addition to any liability which he [or she] may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he [or she] participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> *14 (2) if, by his [or her] failure to comply with section 1104(a)(1) of this title in the administration of his [or her] specific responsibilities which give rise to his [or her] status as a fiduciary, he [or she] has enabled such other fiduciary to commit a breach; or
>
> (3) if he [or she] has knowledge of a breach by such other fiduciary, unless he [or she] makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

Because ERISA fiduciary status is a prerequisite to a finding of co-fiduciary liability, plaintiffs' failure to sufficiently allege the fiduciary status of the Director Defendants and the Individual Defendants causes the claims against those defendants based on co-fiduciary liability to fail as well. *See Calpine,* at 12. However, as to Counts I and III, plaintiffs have successfully stated a claim for breach of fiduciary duty under ERISA against JDSU and the Committee Defendants; and as to Count II, plaintiffs have successfully stated a claim against JDSU and the Director Defendants. Therefore, because the court declines to dismiss the claims against these defendants on these counts, the court also declines to dismiss the accompanying co-fiduciary claims at this juncture. *In re AEP,* 327 F.Supp.2d at 833; *CMS Energy,* 312 F.Supp.2d at 916-17.

## V. COUNT IV--BREACH OF DUTY TO AVOID CONFLICTS

As discussed, Count IV alleges breach of the duty to avoid conflicts. Count IV appears to allege a general breach of duty against all defendants for

failure to notify participants and agencies that JDSU was an unsuitable investment. However, the caption and much of the text indicates that the count alleges a specific breach of duty against "certain defendants" by failing to act in the best interest of participants when the defendants sold their shares. While plaintiffs do not identify these defendants in Count IV, they assert in their brief that the individuals are identified in ¶¶ 148-49 of the complaint. Only one of the fourteen individuals mentioned in those paragraphs--Jozef Straus--is named as a defendant in this case. This count is not well pleaded and must be dismissed for failing to give adequate notice regarding what duties were allegedly breached and which defendants allegedly breached those duties. *Conley,* 355 U.S. at 47.

## VI. MOTION FOR STAY

Defendants have moved for a stay of this action pending resolution of the JDSU securities litigation. The motion is not well taken. The respective plaintiffs' classes are disparate, both in terms of membership and the class periods. Moreover, the issues raised by the two actions are distinctly different. Although there is some overlap in the corporate fraud allegations, the dispositive issues in this action turn on alleged breaches of fiduciary duties under ERISA while the issues in the securities litigation turn on alleged violations of the securities acts.

## CONCLUSION

For the reasons stated, the Court:

*15 1. GRANTS defendants' motion to dismiss Count I as to the Director Defendants and the Individual Defendants, but not as to JDSU or the Committee Defendants;

2. DENIES defendants' motion to dismiss Count II;

3. GRANTS defendants' motion to dismiss Count III as to the Director Defendants and the Individual Defendants, but not as to JDSU or the Committee Defendants;

4. GRANTS defendants' motion to dismiss Count

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**(Cite as: 2005 WL 1662131 (N.D.Cal.))**

IV;

5. GRANTS defendants' motion to dismiss the co-fiduciary claims in Counts I and III as to the Director Defendants and the Individual Defendants, but not the claims in Counts I and III as to JDSU and the Committee Defendants, or the claim in Count II as to JDSU and the Director Defendants; and

6. DENIES the motion to stay.

Defendants shall have twenty days to file an amended complaint.

Counsel are advised that this ruling is on the sufficiency of the pleadings and is not to be taken as a determination of the merits of any of the claims.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1662131 (N.D.Cal.), 36 Employee Benefits Cas. 1140

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3142977 (Trial Pleading) First Amended Consolidated Complaint for Violations of Erisa (Oct. 31, 2005)

• 2004 WL 2160753 (Trial Pleading) Consolidated Complaint for Violations of Erisa (Sep. 02, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

2006 WL 306955                                                                                                Page 1

--- F.3d ----, 2006 WL 306955 (7th Cir.(Ill.))

**(Cite as: 2006 WL 306955 (7th Cir.(Ill.)))**

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Seventh Circuit.
Christopher KOLUPA, Plaintiff-Appellant,
v.
ROSELLE PARK DISTRICT, Defendant-Appellee.
**No. 05-2925.**

Argued Jan. 19, 2006.
Decided Feb. 10, 2006.

**Background:** Former employee brought Title VII
action against former employer alleging he was
fired because of his religion. The United States
District Court for the Northern District of Illinois,
Harry D. Leinenweber, J., 2005 WL 1563099,
dismissed the action for failure to state a claim.
Employee appealed.

**Holdings:** The Court of Appeals, Easterbrook,
Circuit Judge, held that:
(1) employee stated a Title VII religious
discrimination claim against employer, and
(2) claims of failure to accommodate or promote
and retaliation were not exhausted.
Affirmed in part, reversed in part, and remanded.

**[1] Civil Rights** ☞1532

78k1532 Most Cited Cases
Former public employee stated a Title VII religious
discrimination claim against former employer by
alleging that he was fired because of his religion.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.; Fed.Rules Civ.Proc.Rules 8(a),
12(b)(6), 28 U.S.C.A.

**[2] Civil Rights** ☞1532
78k1532 Most Cited Cases

All a complaint alleging religious discrimination in
federal court need do to state a claim for relief is
recite that the employer has caused some concrete
injury by holding the worker's religion against him.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.; Fed.Rules Civ.Proc.Rules 8(a),
12(b)(6), 28 U.S.C.A.

**[3] Civil Rights** ☞1532
78k1532 Most Cited Cases
The prima facie case under *McDonnell Douglas* is
an evidentiary standard, not a pleading requirement.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.; Fed.Rules Civ.Proc.Rules 8(a),
12(b)(6), 28 U.S.C.A.

**[4] Federal Civil Procedure** ☞673
170Ak673 Most Cited Cases
A plaintiff pleads himself out of court when it
would be necessary to contradict the complaint in
order to prevail on the merits.

**[5] Civil Rights** ☞1516
78k1516 Most Cited Cases
Former employee's claims in Title VII complaint
that former employer failed to accommodate his
religious beliefs, failed to promote him, and
retaliated against him when he tried to protect his
rights were not reasonably related to allegations in
original administrative charge, which claimed
religious discrimination related to discharge, thus,
those claims were not exhausted and could not be
asserted in lawsuit. Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

Jason R. Craddock (argued), Sauk Village, IL, for
Plaintiff-Appellant.

Devlin J. Schoop (argued), Laner, Muchin,
Dombrow, Becker, Levin & Tominberg, Chicago,
IL, for Defendant-Appellee.

Christopher Kolupa, Roselle, IL, pro se.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before EASTERBROOK, MANION, and KANNE
, Circuit Judges.

EASTERBROOK, Circuit Judge.

**\*1** [1] Christopher Kolupa contends that the
Roselle Park District fired him because of his
religion. If that's so, then it violated Title VII of the
Civil Rights Act of 1964. See 42 U.S.C. §
2000e-2(a)(1). Yet the district judge dismissed his
complaint under Fed.R.Civ.P. 12(b)(6), ruling that
he had not stated a claim on which relief may be
granted. 2005 WL 1563099, 2005 U.S. Dist. LEXIS
13599 (N.D.Ill. Apr. 28, 2005). That disposition
reflects a misunderstanding of what a complaint
must contain.

[2] Religious discrimination in employment is
prohibited by federal law. Accordingly, all a
complaint in federal court need do to state a claim
for relief is recite that the employer has caused
some concrete injury by holding the worker's
religion against him. See *Bennett v. Schmidt,* 153
F.3d 516 (7th Cir.1998). Federal complaints plead
*claims* rather than facts. The appendix to the Rules
of Civil Procedure contains models that illustrate
the short and simple allegations that Fed.R.Civ.P.
8(a) calls for. It is enough to name the plaintiff and
the defendant, state the nature of the grievance, and
give a few tidbits (such as the date) that will let the
defendant investigate. A full narrative is
unnecessary. See, e.g., *Swierkiewicz v. Sorema N.A.,*
534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)
; *McDonald v. Household International, Inc.,* 425
F.3d 424, 427-28 (7th Cir.2005); *Bartholet v.
Reishauer A.G. (Zürich),* 953 F.2d 1073, 1077-78
(7th Cir.1992). Details come later, usually after
discovery--though occasionally sooner if, as the
rules allow, either side seeks summary judgment in
advance of discovery, or the district court orders the
plaintiff to supply a more definite statement. See
Fed.R.Civ.P. 12(e).

What the district judge demanded, by contrast, is
that the complaint allege facts corresponding to
each aspect of a "prima facie case" under Title VII.
The judge summarized what plaintiffs must prove to
make out a prima facie case of religious

discrimination and then faulted the complaint for
omitting some points. One aspect of a prima facie
case is that the employer treated differently persons
who are similarly situated except with respect to the
protected attribute (race, sex, religion, and so on).
See *McDonnell Douglas Corp. v. Green,* 411 U.S.
792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
The district judge wrote that this complaint is
defective because, although Kolupa "attempts to
describe several situations where other Roselle Park
District employees allegedly were treated more
favorably than [Kolupa], he fails to allege that the
employees were similarly situated in their conduct
or that any of the [other] employees were [sic]
outside of his protected class." The judge did not
explain why a complaint must include such
allegations (let alone why a plaintiff must use the
indirect *McDonnell Douglas* method even though
direct proof may be available).

[3] "Any district judge (for that matter, any
defendant) tempted to write 'this complaint is
deficient because it does not contain...' should stop
and think: What rule of law *requires* a complaint to
contain that allegation?" *Doe v. Smith,* 429 F.3d
706, 708 (7th Cir.2005) (emphasis in original). The
question presented in *Swierkiewicz* was whether the
complaint in a Title VII case must include factual
allegations corresponding to each aspect of a prima
facie case; the Court held that it need not, writing
that "[t]he prima facie case under *McDonnell
Douglas* ... is an evidentiary standard, not a
pleading requirement." 534 U.S. at 510, 122 S.Ct.
992. Yet the district court dismissed Kolupa's
complaint on the same ground that *Swierkiewicz*
had disapproved. The Court held, and we reiterate,
that complaints need not plead facts and need not
narrate events that correspond to each aspect of the
applicable legal rule. Any decision declaring "this
complaint is deficient because it does not allege X"
is a candidate for summary reversal, unless X is on
the list in Fed.R.Civ.P. 9(b).

**\*2** According to the Park District, the complaint
contains too much rather than too little, and Kolupa
has pleaded himself out of court. The complaint
attributes most of the allegedly discriminatory
conduct to Jim Bassett, the Park District's Interim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Director during 2003. But the decision to discharge Kolupa was made by Tom Kruse, who took over as Director late in 2003 and fired Kolupa that December. By omitting any allegation that Kruse was motivated by animosity toward his religion, the argument goes, Kolupa conceded the absence of such an improper motive by the decision-maker and thus foreclosed relief. If the complaint *actually* conceded that Kruse was neutral with respect to Kolupa's religion, then it would indeed foreclose relief, see *Venturelli v. ARC Community Services, Inc.,* 350 F.3d 592, 600 (7th Cir.2003), but silence is not a concession.

[4] Silence is just silence and does not justify dismissal unless Rule 9(b) requires details. Arguments that rest on negative implications from silence are poorly disguised demands for fact pleading. A plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits. See, e.g., *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Walker v. Thompson,* 288 F.3d 1005 (7th Cir.2002). Kolupa would not need to contradict any allegation in order to demonstrate that he would have remained on the payroll had he held different religious views. Even if Kruse is indifferent to employees' religious beliefs and activities, his decision may have been influenced by Bassett's recommendation.

Nor is the complaint deficient because it does not allege that the four warnings Bassett put in Kolupa's file amount to "adverse employment actions." See *Dunn v. Washington County Hospital,* 429 F.3d 689 (7th Cir.2005). The judge assumed that warnings are harmless. When dealing with complaints, however, judges must assume in the plaintiff's favor everything that could be shown consistent with the allegations, and it is not hard to imagine proof that would make the claim viable. Warnings may have been accompanied by suspensions or contributed to a paper record that led to suspension or discharge later. See *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 613 (7th Cir.2001). Whether any given step is an adverse employment

action (alone or in combination with some other act) goes to the merits; these details may be explored in discovery, on motion for summary judgment, and if necessary at trial, but need not be included in complaints.

[5] Kolupa also contends that the Park District failed to accommodate his religious beliefs, failed to promote him, and retaliated against him when he tried to protect his rights. The district judge dismissed the accommodation and failure-to-promote theories because Kolupa omitted them from his administrative charge of discrimination. (He dismissed the retaliation charge on other grounds, but it is equally open to this objection, which the Park District has urged in support of the favorable judgment.) The charge is part of the record, and the district judge should have treated the Park District's motion as one for summary judgment, see Fed.R.Civ.P. 12(b) (final sentence), but Kolupa does not contend that the use of Rule 56's procedures would have made any practical difference.

*3 The administrative charge covers less than half a typed page. Kolupa complained about his discharge, the four written warnings, and one of Barrett's oral comments. He did not mention promotion, accommodation, or retaliation, and he did not check the box that the form provided for people who wish to complain about retaliation. The charge does not hint at any activity that could have been the basis of retaliation; it does not say, for example, that Kolupa had made a prior complaint (or supported another employee's complaint) and that a campaign of discrimination then commenced. It does not mention any promotion that Kolupa sought but did not receive. Nor does it hint at what "accommodation" Kolupa wanted; even on appeal he does not tell us what he asked the Park District to do, other than disregard his religion. He kept a Bible on his desk and contends that the Park District was obliged to treat him no worse than someone who had Plato's *Republic* or Nozick's *Anarchy, State, and Utopia* in view; that's a request for neutrality, not accommodation. The promotion, accommodation, and retaliation theories therefore are beyond the scope of the charge. See *Cheek v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 306955 (7th Cir.(Ill.))

**(Cite as: 2006 WL 306955 (7th Cir.(Ill.)))**

*Western & Southern Life Insurance Co.,* 31 F.3d 497, 500 (7th Cir.1994).

The parties' briefs debate the question whether the district court erred in striking documents that Kolupa had attached to his complaint. The judge did not give any reason for this decision, and it is hard to see one; the documents are not alleged to be "redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The district judge seems to have assumed that papers attached to a complaint must satisfy the requirements for evidence at the summary-judgment stage. Indeed, the whole course of proceedings in the district court suggests that the judge confused Rule 12(b) with Rule 56. But no matter. The materials are not essential to the complaint's sufficiency. If a motion for summary judgment should be made, then these materials may be re-submitted (should they be relevant) with appropriate authentication and affidavits evincing personal knowledge.

The judgment is affirmed to the extent that it concerns promotion, accommodation, and retaliation but otherwise is reversed, and the case is remanded for proceedings consistent with this opinion.

--- F.3d ----, 2006 WL 306955 (7th Cir.(Ill.))

**Briefs and Other Related Documents (Back to top)**

• 2005 WL 3738518 (Appellate Brief) Brief of Appellant (Sep. 09, 2005)Original Image of this Document (PDF)

• 05-2925 (Docket) (Jul. 01, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Only the Westlaw citation is currently available.

United States District Court, M.D. Tennessee,
Nashville Division.
Ann M. LANDGRAFF, et al.
v.
COLUMBIA/HCA HEALTHCARE
CORPORATION of AMERICA, et al.
**No. 3-98-0090.**

May 24, 2000.

*MEMORANDUM*

HIGGINS, J.

\*1 The plaintiffs, Ann M. Landgraff and Gina
Magarian, were employees of Columbia/HCA in
1997, [FN1] and participated in the company's
Stock Bonus Plan. They filed this action for breach
of fiduciary duty under the Employment Retirement
Securities Act of 1974, Title 29 U.S.C. § 1001, *et
seq.* on behalf of the SBP. As "participants" in the
SBP, the plaintiffs have standing to file this action
on behalf of the SBP under 29 U.S.C. § 1132(a)(2).

> FN1. Ms. Landgraff worked for West
> Paces Ferry Hospital in Atlanta, Georgia,
> from 1983 to 1997, as a registered nurse.
> HCA and later Columbia/HCA owned
> West Paces Ferry Hospital. Ms. Magarian
> worked for Gulf Coast Community
> Hospital, now Columbia Gulf Coast
> Community Hospital, from 1977 to 1997,
> as a registration coordinator. The hospital
> was owned by HCA and later
> Columbia/HCA throughout her tenure
> there.

The defendant, Columbia/HCA, is a healthcare
management company which, at the time in
question, owned and operated approximately 300

hospitals throughout the United States and
employed nearly 300,000 individuals.

During the time in question, the individual
defendants, Stephen T. Braun, David Anderson,
Neil D. Hemphill, Bruce A. Moore and James D.
Shelton, were executives of Columbia/HCA and
served as members of Columbia's retirement
committee. [FN2] Mr. Braun was a senior
vice-president and general counsel of
Columbia/HCA. Mr. Anderson was the treasurer
and vice-president of finance. Mr. Hemphill was
senior vice-president of human resources and
served on the retirement committee from 1995, to
November, 1998. Mr. Moore, at the time in
question, was vice-president of benefits and is now
vice-president of operations administration. He
became a member of the retirement committee in
1996. Since that time, he has been the committee
chairman. Finally, Mr. Shelton, the president of the
Central Group of Columbia/HCA, served on the
retirement committee from May, 1996, to August,
1997.

> FN2. In 1997, and 1998, Richard Bracken,
> president of the Columbia/HCA's western
> group division, and John M. Franck, II, the
> corporate secretary, also served on the
> retirement committee. Both were originally
> named as defendants in this action. *See,*
> second amended complaint (filed April 27,
> 1998; Docket Entry No. 38). The plaintiffs
> filed a notice of voluntary dismissal
> without prejudice with respect to these
> defendants on July 8, 1998 (Docket Entry
> No. 70) and on July 9, 1998, the Court
> entered an order (Docket Entry No. 72)
> dismissing these defendants without
> prejudice.

As members of the retirement committee, the
individual defendants were charged by the company
with administering the SBP. They exercised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

discretionary authority with respect to the management and disposition of the SBP's assets and were therefore fiduciaries with respect to the SBP within the meaning of ERISA. 29 U.S.C. § 1002(21)(A)(i). [FN3]

> FN3. Under 29 U.S.C. § 1002(21)(A) "a person is a fiduciary with respect to a plan to the extent that (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

The SBP, is a retirement fund sponsored by Columbia/HCA and is an "employee pension benefit plan" under ERISA, Title 29 U.S.C. § 1002(2)(A)(i). [FN4] Specifically, the SBP was an "eligible individual account plan," or EIAP, as defined under 29 U.S.C. § 1107(d)(3)(A). [FN5] Accordingly, the SBP was exempt from ERISA's general requirements that retirement plans hold no more than 10% of their assets in employer's securities and that plan assets be diversified. [FN6] At all times relevant to this action, the SBP held nearly 100% of its assets in the stock of Columbia/HCA. [FN7] In January, 1997, the SBP was valued at approximately $1.4 billion.

> FN4. Title 29 U.S.C. § 1002(2)(A) defines an "employee pension benefit plan" as
> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program--(i) provides retirement income to employees ... regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

> FN5. Title 29 U.S.C. § 1107(d)(3) states that "(A) The term 'eligible individual account plan' means an individual account plan which is (i) a ... stock bonus ... plan. .; (ii) an employee stock ownership plan; ... which was in existence on September 2, 1974, and which on such date invested primarily in qualifying employer securities" and "(B) Notwithstanding subparagraph (A), a plan shall be treated as an eligible individual account plan with respect to the acquisition or holding of qualifying employer ... securities only if such plan explicitly provides for acquisition and holding of qualifying employer securities."

> FN6. *See,* 29 U.S.C. §§ 1107(b) and 1104(a)(2).

> FN7. Once an employee's SBP vests, the employee may choose whether to take his or her share in stock or in cash. The record reflects that a portion of the SBP's assets were not invested in Columbia securities so that SBP could pay employees who were eligible to receive their benefits as they requested them.

In 1997, or earlier, the federal government began an investigation of Columbia/HCA for alleged illegal billing and coding practices. The investigation became public knowledge in March, 1997, and the price of Columbia/HCA stock fell significantly. The plaintiffs contend that the individual defendants subsequently breached their fiduciary duty to the SBP as set forth under ERISA, 29 U.S.C. § 1104, by failing to investigate and consider whether the assets of the SBP should be diversified as the result of the government's investigation of Columbia/HCA and by maintaining and increasing the amount of company stock owned by the SBP. The individual defendants dispute that they acted imprudently (1) in their consideration of the effects of the investigation, (2) in deciding not to diversify the assets of the SBP and (3) in the purchase of additional company stock. The defendants also argue that even if their procedure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

for administering the assets of the SBP was deficient under ERISA, the plaintiffs should not prevail because they have not established that "a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper v. Iovenko,* 66 F.3d 1447, 1459 (6th Cir.1995).

**\*2** Next, the plaintiffs claim that Columbia/HCA is a cofiduciary to the SBP and breached its fiduciary duty in two respects. First, the plaintiffs contend that Columbia/HCA breached its duty by authorizing two purchases on behalf of the SBP of approximately $25 million each in Columbia/HCA stock. Second, the plaintiffs assert that the company breached its duty by failing to monitor the decisions of the retirement committee and remove any member not meeting his fiduciary duty to the SBP.

Columbia/HCA disputes that it had discretionary authority with respect to the management of the SBP or the disposition of its assets and asserts it was not involved in the decision to buy or sell stock. Therefore, the company contends that it was not a fiduciary of the SBP under 29 U.S.C. § 1002(21)(A) with respect to the investment of the SBP assets. Columbia/HCA admits that it was a fiduciary only for the limited purpose of appointing, removing and monitoring the performance of the retirement committee members. It further insists that because the members of the retirement committee did not breach their fiduciary duty with respect to the SBP assets, it did not breach its fiduciary duty with respect to its duty to appoint, remove and monitor the retirement committee members.

The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(f) and venue is proper in this district under 29 U.S.C. § 1132(e).

A trial without the intervention of a jury was held before the Court on June 8-10, 14, 16-18, 29-30, and July 1, 1999. The Court heard oral argument on March 23, 2000. For the reasons set forth below, the Court finds in favor of the defendants with respect to the plaintiffs' claims of breach of fiduciary duty. At oral argument, the counterclaims

of the defendants were withdrawn and will be dismissed.

I.

At the time in question, Columbia/HCA sponsored three employee pension benefit plans governed by ERISA: a money purchase pension plan, [FN8] a salary deferral plan, called the HealthTrust 401(k) [FN9] and the SBP. The SBP was entirely funded by Columbia/HCA. The company contributed .5% of each employee's salary to the SBP through cash contributions to the SBP and the SBP purchased Columbia/HCA stock accordingly.

> FN8. Columbia/HCA made contributions to the money purchase pension plan based on the salary of the employee. The plan was diversified and it did not hold any company stock.

> FN9. The HealthTrust 401(k) is funded primarily by the employee, with some company matching. It came into existence in 1991, when the HealthTrust ESOP, was terminated and the funds transferred into the 401(k) plan. In 1995, HealthTrust and Columbia/HCA merged and the HealthTrust 401(k) plan was frozen. No new contributions were made to the plan after that date and the assets of the former HealthTrust ESOP were converted from HealthTrust stock to Columbia/HCA stock.

In accordance with the SBP document, which states that Columbia/HCA, through its board of directors, "shall appoint a committee to perform the duties of the Plan Administrator in connection with administration of this Plan and such committee shall give instructions to the Trustee," the Columbia/HCA board of directors appointed the members of the retirement committee to administer the SBP. Defendants' Exhibit 6 at 62. The members of the retirement committee also made up the HealthTrust 401(k) committee and administered the 401(k).

The SBP document states that:
  For purposes of Part 4 of Title I of ERISA, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

Plan Sponsor, the Trustee, and the committee shall each be Fiduciaries and shall each discharge their respective duties hereunder with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*3 *Id.* at 69.

The plan document section titled "Purpose" states that:

This plan is adopted voluntarily by Columbia/HCA Healthcare Corporation and is intended to qualify under Section 401(a) of the Internal Revenue Code as a stock bonus plan. All assets acquired under this Plan ... are to be held and administered for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the plan.

*Id.* at 11. Section 401(a) of the Internal Revenue Code states that a stock bonus plan is one that is "established and maintained by an employer ... [whose] benefits are distributable in stock of the employer company." 26 C.F.R. § 1.401-1(b)(1)(iii).

The plan also states that the assets of the SBP shall be primarily or exclusively invested in company stock but that it may also invest in other securities, as follows:

All Employer contributions in cash and any other cash received by the Trust ... *shall be utilized primarily or exclusively to purchase Company Stock from holders of outstanding stock or stock issued by the Company.* ... The Trustee may invest Trust Funds which are in excess of current outstanding obligations in Company Stock, savings accounts, and if the Trustee is a bank, savings accounts in the Trustee's banking department, bank certificates of deposit, including those issued by the Trustee's banking department, short-term securities, stock, bonds, futures, options, foreign securities (to the extent that such securities satisfy the requirements of ERISA), the participation in any common trust fund or commingled fund for the investment of qualified retirement plan assets which may be

established from time to time by the Trustee's banking department, or other investments deemed by the Trustee to be desirable for the Trust, or such funds may be held temporarily in cash, including a demand account in the Trustee's banking department. The Plan Administrator [FN10] may direct the Trustee to invest up to one hundred percent (100%) of the Trust Assets in Company Stock. *It is the intent of the Plan Sponsor that Trust assets be invested primarily or exclusively in Company Stock.*

> FN10. According to the SBP plan document, the plan sponsor is Columbia/HCA and the plan administrator is also the plan sponsor. Defendants' Exhibit 6 at 25-26.

Defendants' Exhibit 6 at 48-49 (emphasis added). [FN11]

> FN11. As of September 29, 1998, the SBP plan document was amended to permit plan participants to decide how to allocate the assets in their SBP account among ten investment options, including company stock.

In addition to the SBP plan document, on July 24, 1994, the retirement committee approved and adopted the Columbia/HCA Investment Policy and Guidelines pertaining to the investment of the assets of the SBP.

The investment policy guidelines state that "the overall objective of the Plan's assets is to achieve a minimum real rate of return (in excess of inflation) of 7% annualized. The Committee believes that a 10 year period is appropriate in measuring its progress toward achieving this objective." Plaintiffs' Exhibit 117 at 23. The guidelines also provide for the committee's ability to diversify the assets in the SBP, as follows:

The Committee believes that at certain times additional assets may be added to the portfolio to dampen the volatility of Employer Common Stock without severely damaging the Employee's ability to participate in the growth of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

Employer Common Stock.
**\*4 III.** *Stock Bonus Plan Portfolio Structure and Overall Fund Guidelines*
The Committee is charged with the responsibility of determining the structure of the Plan's portfolio that offers the highest probability of achieving its investment objectives. Moreover, it may update and revise this structure as the financial needs of the Plan and/or the outlook for the capital markets change.
A. The ranges for the asset allocation of the Plan are designed to allow flexibility of the fund over a time horizon. The ranges are given so the Committee can adjust for any of the following:
1.    The    Committee's    assessment    of    the intermediate term outlook for different types of securities.
2. Recent divergences in the performance of different classes of securities.
....
4. The allocation of cash flows.
The    Committee    has    established    maximum exposures on the asset classes being employed by the Stock Bonus Plan. They are:
Columbia/HCA Common Stock Maximum 100%
Minimum 50%
Domestic Equities Maximum 50%
Minimum 0%
International Equities Maximum 20%
Minimum 0%
Other Investments Maximum 25%
Minimum 0%
Domestic Fixed Maximum 25%
Minimum 0%
International Fixed Maximum 25%
Minimum 0%
Short Term Investments Maximum 30%
Minimum 3%
B. The target asset allocation mix recommended and approved by the Committee to achieve the long term financial objectives of the Stock Bonus Plan is as follows:

Equities

Columbia/HCA Common Stock 95%
Domestic 0%

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
International 0%
95%

Other Investments 0%

Fixed Income
Domestic 0%
International 0%
0%

Cash and Short Term Investments 5%

Total Plan        100%
              --------------
```

*Id.* at 23-24.

## II.

### A. *Fiduciary Duty Under ERISA*

ERISA sets forth the following standard of fiduciary duty:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan,

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

29 U.S.C. § 1104(a)(1).

The United States Court of Appeals for the Sixth Circuit has interpreted the general duty of an ERISA fiduciary as threefold. *Kuper,* 66 F.3d at 1458. First, ERISA fiduciaries have a duty of loyalty requiring that the fiduciary make any decisions regarding an ERISA plan " 'with an eye single to the interests of the participants and beneficiaries." ' *Id.* (quoting *Berlin v. Michigan Bell Tele. Co.,* 858 F.2d 1154, 1162 (6th Cir.1988) and *Donnovan v. Bierwirth,* 680 F.2d 263, 271 (2nd Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488,

74 L.Ed.2d 631 (1982)). Second, ERISA requires that plan fiduciaries carry out their fiduciary duties with the standard of care of a prudent man. *Id.* Third, the Sixth Circuit states that "an ERISA fiduciary must 'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Id.*

\*5 In *Kuper,* the Sixth Circuit considered the standard by which the actions of fiduciaries of an employee stock ownership plan should be measured. The Court finds the *Kuper* Court's reasoning instructive because both ESOPs [FN12] and SPBs are eligible individual account plans subject to the same ERISA requirements. The Sixth Circuit noted that Congress created two exceptions for ESOP fiduciaries from the general duties of ERISA fiduciaries. First, ESOP fiduciaries are not required to diversify the holdings of ESOPs. Second, ESOP fiduciaries are not prohibited from self-dealing, as is the general rule for ERISA fiduciaries. They can therefore invest more than 10% of ESOP assets in company stock. These exceptions were made for ESOPs to encourage employee ownership in company stock. *Id.* However, the Court also stated that ESOP fiduciaries are not relieved from their duty to act in accordance with the prudent man standard, the duty to act solely in the interests of, and for the exclusive benefit of, the plan participants and beneficiaries. *Id.* (citing *Martin v. Feilen,* 965 F.2d 660, 664 (8th Cir.1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed .2d 133 (1993)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

FN12. An ESOP is an employee retirement account that invests in employer securities. It serves two roles: one as a retirement fund and another as a " 'technique of corporate finance' that would encourage employee ownership." *Kuper* at 1457 (quoting *Martin,* 965 F.2d at 664). Accordingly, "ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at a much greater risk than the typical diversified ERISA plan." *Id.* (citing *Moench v. Robertson,* 62 F.3d 552, 568 (3rd Cir.), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 113 L.Ed.2d 847 (1996) (quoting *Martin,* 965 F.2d at 664)).

In *Kuper,* the Court found that because ESOPs differ from most ERISA plans in that they are exempt from the diversification requirement and prohibition against self dealing, they are at more risk than most ERISA plans. The Court noted that, fiduciaries of such plans are placed in a precarious position because they must " 'administer the ESOP investment consistent with the provisions of both a specific employee benefits plan and with ERISA['s duty of prudence]." ' *Id.* at 1458 (quoting *Moench,* 62 F.3d at 569 and *Kuper v. Quantum Chem,* 852 F.Supp. 1389, 1395 (S.D.Ohio 1994)). The Court noted that this "conflict becomes particularly evident when an employee claims that a fiduciary breached his ERISA duties by failing to diversify an ESOP." *Id.* It relied on the reasoning of the United States Court of Appeals for the Third Circuit that subjecting ESOP fiduciaries to a strict standard of review:

"would render meaningless the ERISA provision excepting ESOPs from the duty to diversify." This, in turn would risk transforming ESOPs into ordinary pension plans, thus frustrating Congress's desire to encourage employee ownership and contravening the intention of the parties.

The Third Circuit found that the better balance between these concerns was achieved by measuring a fiduciary's decision to invest or not invest in employer securities for an abuse of discretion. Thus, it held that "keeping in mind the

purpose of ERISA and the nature of ESOPs themselves, ... an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion...."

**\*6** *Id.* at 1458-59 (quoting *Moench,* 62 F.3d at 570-71). The Sixth Circuit adopted the Third Circuit's holding and established a presumption that an ESOP "fiduciary's decision to remain invested in employer's securities was reasonable." *Id.* at 1459. The presumption of reasonableness in an ESOP fiduciary's decision to remain invested in employer stock may be rebutted by a plaintiff only "by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Id.*

As all EIAPs are exempt from the diversification requirement, the competing Congressional interest in employee ownership of company stock and the fiduciary's duty of prudence must be balanced with respect to all EIAPs. This includes the SBP under consideration. Therefore, the reasoning upon which the Sixth and Third Circuits applied the presumption of prudence to the investment decisions of ESOP fiduciaries not to diversify may equally be applied to the SBP fiduciaries.

The plaintiffs argue that the presumption is not applicable to the defendants' decision because it has not been extended to all EIAPs and there is no authority for such a presumption with respect to a SBP. They also insist that the Court should not extend the presumption of prudence for ESOP fiduciaries to the defendants' actions with respect to the SBP because it is not an ESOP and was created only as a retirement fund and not as a means of corporate finance. However, after reviewing the reasoning of the Sixth Circuit in its decision to apply a presumption of prudence to the fiduciary duty of ESOP fiduciaries, the Court finds that the same reasoning may be applied to the SBP. Accordingly, the Court finds that the presumption of prudence applies to the decisions of the defendants to invest the SBP assets in company stock.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

In order to rebut the presumption of prudence, the plaintiff must show that "a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper,* 66 F.3d at 1459. A plaintiff must meet this burden by showing that a fiduciary "fail[ed] to investigate and evaluate the merits of his investment decisions" and that "there is a causal link between the failure to investigate and the harm suffered by the plan." *Id.* (citing *Diduck v. Kasycki & Sons Contractors, Inc.,* 974 F.2d 270, 279 (2nd Cir.1992)). A causal link can be established by demonstrating "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* (citing *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 955 (D.C.Cir.1985) (Scalia, J., concurring in part and dissenting in part [FN13])).

> FN13. As Justice Scalia explained in *Fink:*
> Breach of fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee, *see, e.g., Donnovan v. Bierwirth,* 538 F.Supp. 463, 471 (E.D.N.Y.1981), or perhaps even to recover trustee fees paid for the investigative and evaluative services that went unperformed. But it does not sustain an action for the damages arising from losing investments. I know of no case in which a trustee who has happened-through prayer, astrology or just blind luck-to make (or hold) objectively prudent investments ( *e.g.,* an investment in a highly-regarded blue chip stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand. Similarly, I know of no case in which a trustee who has made (or hold) patently unsound investments has been excused from liability because his objectively imprudent action was preceded by careful investigation and evaluation. In short, there are two related but distinct duties imposed upon a trustee: to investigate and evaluate investments, and to invest prudently. Neither does the faithful discharge of the first satisfy the

> second, not does breach of the first constitute breach of the second. To be sure, the extent of the trustee's investigation and evaluation is often the focus of inquiry in imprudent-investment suits. But that is because the determination of whether an investment was objectively imprudent is made on the basis of what the trustee *knew or should have known;* and the latter necessarily involves consideration of what facts would have come to his attention if he had fully complied with his duty to investigate and evaluate. It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee *should have known* more than he knew.
> *Fink,* 772 F.2d at 962 (emphasis in the original).

### B. *The Government's Investigation and the Committee's Response*

The government's investigation of Columbia/HCA's business practices became apparent when the Federal Bureau of Investigation, the Internal Revenue Service and the Department of Health and Human Services made unannounced raids on Columbia/HCA's healthcare facilities located in El Paso, Texas, on March 19, 1997. The individual defendants contend that when these raids occurred, they were not aware that Columbia/HCA had been under a government investigation. The first notable subsequent drop in the price of Columbia/HCA stock occurred on March 21, 1997. The stock closed at $41.25 per share on March 20, 1997, and closed on March 21, 1997, at $38.50 per share.

*7 After the raids, there were numerous newspapers that covered the events and alleged that investigations of Columbia/HCA were being conducted in other locations. Most notably, on March 28, 1997, the *New York Times* reported that the investigation was also being conducted in Florida, Texas, Illinois and Nevada for Medicare fraud. [FN14]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

FN14. The next day, March 29, 1997, the Columbia/HCA board of directors held a special meeting to discuss the investigation, the article and its potential ramifications. At that meeting, the board decided to call meetings as needed to discuss issues related to the investigation. A second meeting of the board of directors was held on April 14, 1997. During this meeting, the board discussed additional media coverage of the investigation and issues raised by the media. The minutes reflect that, as of this meeting, Columbia/HCA had been informed that it was "the target of an investigation by the United States Attorney's office." Plaintiffs' Exhibit 150. The board created a special committee consisting exclusively of outside directors "for the purpose of reviewing, evaluating, and making recommendations to the Board of Directors regarding supervision of the Company's responses to the Investigation and any other inquiries by governmental agencies." *Id.* The minutes of the meeting of April 14, 1997, do not reflect that the board discussed the effect of the investigation on the assets in the SBP. *Id.*

The retirement committee met a total of seven times in 1997; six times after the El Paso raids. [FN15] Mr. Anderson, Ms. Sharp, the administrative assistant for the retirement committee, and others testified that it was the practice of the committee to meet first as the HealthTrust 401(k) committee, to theoretically adjourn, and to reconvene as the retirement committee. As part of this practice, there were occasions on which the retirement committee would adopt the HealthTrust committee's earlier determination that the company stock was a prudent investment.

FN15. The retirement committee met before the raids on March 3, 1997. The minutes to this meeting do not reflect that the committee discussed whether Columbia/HCA stock was a prudent

investment for the SBP or any other retirement plan, nor that the retirement committee adopted any determination regarding prudence from an earlier meeting of the HealthTrust 401(k) committee. Plaintiffs' Exhibit 15. Columbia/HCA's stock closed on March 3, 1997, at $43 per share. The retirement committee did not meet again during April of 1997.

The first meeting of the HealthTrust 401(k) committee after the raids occurred on April 16, 1997. The retirement committee did not meet that day to discuss the SBP. At this time, Columbia/HCA's stock had not closed above $40 per share since the investigation became public, and it closed at $34.25 per share on April 16, 1997. The purpose of the April 16th meeting was to discuss the response to a motion for mandatory injunction seeking the appointment of an investment advisor in *HealthTrust, Inc., The Hospital Co., et. al. v. Usher.* [FN16] The minutes of the meeting do not reflect that the HealthTrust 401(k) committee discussed the merits of the government investigation. Plaintiffs' Exhibit 29. However, the pleadings the committee reviewed and discussed concerned the actual and potential effect of the investigation on the stock price which, as Ms. Sharp testified, was the subject discussed. Transcript (Docket Entry No. 213), vol. II at 323. The investigation was considered by the committee in the overall context of deciding how to respond to the motion. The minutes state that "[i]t was the consensus of the Committee that Columbia/HCA Healthcare Corporation stock remained a prudent investment. The Committee agreed to review the issue of stock prudency at the next meeting." *Id.*

FN16. *HealthTrust, Inc. et. al. v. Usher,* No. 3-96-0486, is a class action suit filed in this Court in May, 1996, regarding the assets of the former HealthTrust employee stock ownership plan which terminated in December of 1991. HealthTrust is an affiliate of Columbia/HCA. The plaintiffs in *Usher* seek to interplead the funds and to have the Court declare whether former

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

HealthTrust employees who had participated in the SBP were entitled to certain assets or whether the assets should go to present employees of the company. *See* transcript (Docket Entry No. 218), vol. VII at 1518. At the time the complaint was filed, the assets from the ESOP had been moved into the HealthTrust 401(k) and were invested in Columbia/HCA stock.

On April 9, 1997, two classes of defendants in the *HealthTrust* litigation filed a joint motion seeking to have the Court issue a mandatory injunction appointing an investment manager to determine if the assets of the HealthTrust 401(k) should be held in the stock of Columbia/HCA or diversified as a result of the government investigation. They argued that the Court should issue the injunction because of the risk that the HealthTrust 401(k) committee would not be able to meet its fiduciary duty under ERISA to act solely in the interest of the SBP participants and beneficiaries in light of the government's investigation.

The evidence reflects that at that time, the committee sought legal advice from three attorneys who attended the April meeting by telephone. These were Mr. Allen Buckley, the retirement committee's ERISA counsel, Mr. Alan Lubel, counsel for HealthTrust in the *Usher* litigation and Mr. Ken Russell, who was then head of the employee benefits and pension practice group at the law office of Troutman Sanders. Mr. Buckley testified that he did not think the HealthTrust 401(k) committee discussed whether prudence would require a consideration of diversifying the assets of the SBP. He stated that the committee discussed generally whether Columbia/HCA stock was a prudent investment and voted that it was. Likewise, James Glasscock [FN17] testified that the committee did not discuss the investigation at this meeting.

> FN17. Mr. Glasscock worked in the Columbia/HCA Treasury Department under David Anderson and handled the mechanics of the SBP's purchases and

sales of company stock and was responsible for maintaining adequate liquidity in the plan so that participants seeking cash distributions on a given day could receive their vested amounts.

\*8 Mr. Lubel testified that the investigation and recent drop in stock price was the basis for the motion and that these events were discussed at the meeting. He testified that the ERISA lawyers, Messrs. Buckley and Russell, made a presentation to the committee regarding their fiduciary duty with respect to the HealthTrust 401(k) plan. Specifically, the attorneys talked about whether the committee or the company was bound by the terms of the 401(k) that all assets be invested in Columbia/HCA stock and discussed the prudence of the investment. The committee was told that they would need to consider amending the plan or diversifing the assets of the 401(k) if they determined that the investment in Columbia/HCA stock was not prudent, despite the plan language requiring that the assets be invested in Columbia/HCA stock. Mr. Lubel further recalled that:

[t]here was a very strong feeling of the members of the committee that the companythat investment in company stock remained a very good, and I guess in ERISA terms, a prudent investment, that it was reasonable to remain invested in it. They seemed to feel that very strongly.

....

The strongest impression I had from that and my strongest memory of it was the committee getting its backbone up, saying, if the question is, is investment in Columbia stock, whether that's a good investment, we think it is a good investment. If that's the question we have to decide here and if that's what guides our decision on this motion, then we think it is a good investment. We're a strong company and we do not want to consent to this motion to diversify.

....

They just seemed to feel the basics of the company were very strong, that this investigation that was going on was a temporary thing, that there was no indication that it was going to be any bigger than it was, and that you need to look at the stock in the long-term basis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

One consideration was how well the stock had done over the preceding years. It was their feeling that the company was still the same company and that it remained a good investment, both because of its history, the history of the increase in the stock price and the ongoing strength of the company.

Transcript (Docket Entry No. 218), vol. VII at 1530-1532. He explained that "I don't recall there being detailed discussion of, you know, how many boxes got taken out in El Paso or who are the people involved. But that, again, wasn't the purpose of our meeting. Our purpose was something that was an offshoot of that." Transcript (Docket Entry No. 218) at 1565. Mr. Lubel also testified that the SBP was not discussed at this meeting.

On May 14, 1997, the committee members met both as the HealthTrust 401(k) committee and as the retirement committee. Columbia/HCA stock closed at $36.50 per share on this date. The minutes of the HealthTrust committee meeting state only that the committee "addressed the issue of whether the investment in Columbia/HCA stock continued to be prudent." Plaintiffs' Exhibit 30. The minutes do not indicate the committee's conclusion. Ms. Sharp testified that every time the committee members discussed whether the investment was prudent, they determined that it was. Transcript (Docket Entry No. 213) at 290.

\*9 The minutes of the retirement committee meeting do not reflect that the committee discussed whether Columbia/HCA stock was a prudent investment for the SBP in light of the government's investigation. Plaintiffs' Exhibit 16.

Between July and September of 1997, there were three significant developments in relation to the investigation. First, the government executed additional search warrants on facilities of Columbia/HCA affiliates in six states, including Florida, Tennessee, Utah, Oklahoma, North Carolina and Texas. Three mid-level employees of one hospital owned by a Columbia/HCA affiliate were indicted on charges related to a Medicare cost report.

Second, the Columbia/HCA board of directors requested that Richard Scott, the Company's CEO, and David Vanderwater, its President, resign. They did so; and Dr. Thomas Frist, Jr., the former CEO of HCA who was then acting as vice-chairman of Columbia/HCA, became the new president and CEO. Shortly thereafter, Dr. Frist put in place a 12-point action plan which caused 12 of 14 executives of the company to be replaced.

Third, on August 1, 1997, the United States Congress passed the Balanced Budget Act. The law significantly reduced the amount of reimbursements Medicare would make for certain medical expenses, including home healthcare.

On August 14, 1997, Columbia/HCA filed a form 10Q with the SEC which stated that:

Management believes the ongoing investigation and related media coverage are having a negative effect on the Company's results of operations. It is too early to predict the outcome or effect that the ongoing investigations, the initiation of additional investigations, if any, and the related media coverage will have on the Company's financial condition or results of operations in future periods. Were the Company to be found in violation of federal or state laws relating to Medicare, Medicaid or similar programs, the Company could be subject to substantial monetary fines, civil and criminal penalties and exclusion from participation in the Medicare and Medicaid programs. Any such sanctions could have a material adverse effect on the Company's financial position and results of operations.

Plaintiffs' Exhibit 117 at 5. Dr. Thomas Frist, Jr., testified that if the government were to exclude Columbia/HCA from Medicare and Medicaid, it would be disastrous for Columbia.

The retirement committee's ERISA counsel, Mr. Buckley, sent a memo to Ms. Sharp from which he planned to read at a retirement committee meeting on August 27, 1997. *See* Plaintiffs' Exhibit 56. The memo indicated that Mr. Buckley was planning to advise the retirement committee of their fiduciary duty. It stated that "[t]he recent problems of Columbia/HCA in terms of the Federal and State

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Medicare and Medicaid investigations need to be analyzed in terms of potential implications to the retirement plans of Columbia/HCA" and that "the only two plans which are substantially invested in Columbia/HCA stock at the direction of the employer are the Stock Bonus Plan and the HealthTrust 401(k) Plan." *Id.* at TS 0018. Mr. Buckley further stated that "[a]ny decision must be made with the exclusive interest of participants in mindcan't not divest an EIAP if company stock [is] no longer a prudent investment because you feel it might hurt the company." *Id.*

**\*10** The committee met on August 27, 1997, as both the HealthTrust 401(k) committee and as the retirement committee. This was the first time the committee formally discussed prudence and reviewed analyst recommendations for Columbia/HCA stock. The HealthTrust 401(k) committee determined that Columbia/HCA stock was a prudent investment. Their discussion was reflected in the minutes of the meeting as follows:

The Committee then discussed the prudence of the continued investment in Columbia stock. David Anderson made several comments to the Committee. He state [sic] that the employees at HealthTrust all knew that this was a plan composed of company stock, and that this plan was originally intended to only own company stock. He stated that he did not believe that it would be prudent to sell Columbia stock in the current environment due to the low level of the stock price. He pointed out that of the ten major investment houses, seven have a buy or out-perform recommendation currently on Columbia stock. David Anderson and Jim Glasscock agreed to continue to monitor the ten major investment houses and how they rated Columbia stock. They will report back to the Committee at each Committee meeting with regard to how these investment houses are addressing Columbia stock. After further discussion on the issue, the Committee agreed that Columbia continued to be a prudent investment. The Committee agreed to continue to monitor the prudence of an investment in Columbia stock.

Plaintiffs' Exhibit 32.

The retirement committee meeting minutes indicate that, for the first time, prudence was discussed with respect to the SBP specifically. Ms. Sharp testified that it was the first retirement committee meeting that included such a discussion. Transcript (Docket Entry No. 213) at 281. The minutes show that the retirement committee adopted its earlier determination as the HealthTrust 401(k) committee that Columbia/HCA was a prudent investment with respect to the investment of the SBP assets. Plaintiffs' Exhibit 17. The minutes state: "[t]he prudence of Columbia/HCA stock as an investment had been discussed at the immediately preceding HealthTrust, Inc. 401(k) Committee meeting; at which meeting it was resolved by the Committee that Columbia/HCA stock continued to be a prudent investment for an EIAP. The same conclusion is applicable in this meeting." *Id.* On the last trading day in August, Columbia/HCA stock closed at \$31 and 9/16 per share.

The next meeting of the HealthTrust 401(k) committee was held on September 19, 1997. By this time, the price of Columbia/HCA stock had dropped into the \$20 range and on the previous day had closed at \$28 and 11/16 per share. Mr. Glasscock reported to the committee that of the 23 analysts that rated the company, 14 rated it a buy and 9 gave a neutral recommendation. Defendants' Exhibit 49D. Mr. Buckley attended this meeting and testified that the committee voted unanimously that Columbia/HCA stock was a prudent investment for the 401(k) plan but he does not recall any specific discussion of the investigation.

**\*11** In mid-October of 1997, the committee received reports from Marine Midland Bank and Hewitt Associates [FN18] regarding whether the assets of the 401(k) should be diversified. [FN19] The committee met as the HeathTrust 401(k) committee on October 7, 1997. Mr. Glasscock again reported to the committee that analyst reports were favorable with respect to Columbia/HCA stock.

> FN18. Hewitt Associates is a human resources consulting group.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

FN19. These reports were ordered by the Court in the *Usher* litigation. As a result of the motion for mandatory injunction, the parties reached an agreement whereby independent investment advisors would answer questions to aid the Court in determining how the disputed assets should be invested. Defendants' Exhibit 90. The Court's order states that:

the plaintiffs shall, within thirty (30) days of the entry of this order on the docket, retain one or more independent investment consultants or investment advisors to advise and render a report(s) to the plaintiffs on: (1) the investments of the assets of the 401(k) plans maintained by other companies which plans are similar to the plans at issue in this case; (2) whether an investment in Columbia/HCA Healthcare Corporation stock is a prudent investment under the applicable ERISA standards for plans of this type; (3) whether the investment of all the disputed assets, as defined in the complaint in Columbia/HCA Healthcare Corporation stock is a prudent investment under the applicable ERISA standards; (4) whether, if the advisor(s) or consultant(s) had a fund of approximately $200 million, it would recommend diversifying that fund.

*Id.* Hewitt Associates was retained to answer the first question, and Marine Midland Bank was retained to answer questions two through four.

During the month of October, 1997, the price of Columbia/HCA stock remained in the twenties. It was not until November 11, 1997, that the stock went back up to $30 per share. Between November, 1997, and July 28, 1998, the lowest closing price of the stock was $24 and 3/8 per share on February 6, 1998, and the highest closing price was $34 and 3/16 on April 20, 1998.

On November 25, 1997, January 6, 1998, and February 3, 1998, the committee met and received reports of investment analysts and discussed the prudence of continuing to invest in Columbia/HCA

stock. On each date, the committee members concluded that the stock remained a prudent investment. In March, 1998, the Company made its annual cash contribution on behalf of the SBP and the plan purchased approximately $25 million in Columbia/HCA stock.

In a March 10, 1998, memo to Ms. Sharp, Mr. Scallet gave "a summary of the recommendations we made in our prior call concerning additional actions that plan fiduciaries might take in connection with Columbia/HCA stock." Defendants' Exhibit 57. Mr. Scallet's listed the following:

1. Draft an investment policy statement for the plans and the specific accounts....

2. Retain an investment advisor.

3. Undertake a valuation of the company using traditional valuation techniques.

4. Do an analysis of whether fiduciaries should be looking long-term or more short-term. The analysis would include patterns of employee termination and volatility of the stock price. The idea is that, if stock price is volatile and people are leaving all of the time, there is a greater potential for treating people unfairly because of the happenstance of when they are eligible to get their benefits. Conversely, if the actuarial trend is that people will be there a long time before they actually get paid, the fiduciaries might be less concerned about short-term fluctuation of the stock.

5. Look at comparable companies in sector and size to see whether they have stock funds (almost all do) and whether they sell when stock goes down (almost never). In other words, there is some comfort in doing just what others are doing.

6. Expand the analysts' survey to portfolio managers of pension plans. The people on there now are all Wall Street houses. Portfolio managers perspective is closer to what we have here.

7. Consider insider activity. If we do something different from what insiders are doing with their own stock, then we have problems.

*Id.*

The retirement committee never determined that the SBP's investment in Columbia/HCA stock was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

imprudent and never diversified the assets of the SBP. On September 29, 1998, the board of directors amended the SBP to allow plan participants to choose whether to diversify their assets from among ten options, including company stock.

#### C. *Procedural Prudence*

**\*12** The plaintiffs assert that after conducting a reasonable investigation, a prudent fiduciary would have determined that it was not prudent to invest the assets of the SBP in company stock and would have diversified the assets in accordance with the direction from the investment policy guidelines. They insist that to reach this conclusion a prudent fiduciary would have made a more through inquiry into the merits of the government's investigation, including the steps outlined by Columbia/HCA's outside ERISA counsel, Mr. Scallet. The defendants argue that their process for determining whether Columbia/HCA stock was prudent complied with the requirements of ERISA.

In support of their position that their investigation was adequate, the defendants assert that the Court should take into account the discussions of the HealthTrust 401(k) committee on the issue of prudence and the knowledge each member had of the value of Columbia/HCA stock by virtue of his position in the company. The plaintiffs argue that the prudence standard for the HealthTrust 401(k) plan is not the same as the prudence standard for the SBP because the HealthTrust plan strictly limited investments to company stock and the committee could only recommend diversification to the board, whereas the SBP allowed the committee to diversify the assets of the SBP.

The Court agrees that the measures the 401(k) committee would be required to take if it determined the company stock was an imprudent investment were different than the steps the committee would have to take with regard to the SBP. The HealthTrust 401(k) committee was not free to diversify the assets of the HealthTrust 401(k), and could only suggest diversification to the board. The retirement committee, on the other hand, could diversify the assets of the SBP of its own accord. Nevertheless, as both the retirement

committee and the HealthTrust 401(k) committee, they were under a continuing obligation to evaluate the prudence of investing the assets of the 401(k) in company stock. *See Kuper,* 66 F.3d at 1458 (finding that a plan fiduciary who is not given discretion to diversify must nevertheless act prudently). As both committees were subject to this requirement and both were made up of the same people, it was unnecessary for them to make the prudence analysis when discussing each plan. Accordingly, the Court finds that the HealthTrust 401(k) committee's determination of prudence with respect to the 401(k) may be considered in determining whether the retirement committee adequately investigated the prudence of investing in Columbia/HCA stock.

The retirement committee members, as senior executives, received periodic updates on the government investigation, and each committee member had access to general information regarding the ongoing developments. The retirement committee members did not seek independent assistance to help them determine whether it was prudent to hold almost all of the assets of the SBP in Columbia/HCA stock. Nor did the committee independently conduct its own inquiry into the merits of the government investigation regarding Columbia/HCA's billing practices. Transcript (Docket Entry No. 213) at 379. Moreover, the committee did not meet as either the HealthTrust committee or the retirement committee until almost one month after the first raid. The committee did not formally discuss prudence in relation specifically to the SBP until August, 1997. Although the committee hired an attorney to explain steps it could take to determine prudence, the retirement committee did not engage in most of these steps and only began to review analyst reports with respect to prudence in August, 1997.

**\*13** The evidence also reflects that the defendants failed to review the diversification language in the investment policy guidelines. According to Mr. Shelton, the retirement committee discussed the movement of the stock price and its prudence in relation to the long-term investment objective of the SBP as reflected in the guidelines and concluded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the underpinnings of the company were good, but that the committee did not discuss the section of the guidelines permitting diversification with respect to the SBP. Mr. Moore, the committee chairman, and Mr. Braun, both testified that they were not familiar with the guidelines. Transcript (filed June 21, 1999; Docket Entry Nos. 214 and 223), vol. III at 582 and vol. X at 2084. The plaintiffs contend that the failure to know of the investment policy guidelines and the failure to consider them each constitute a breach of fiduciary duty.

The defendants argue that it was not necessary for the committee to consider the investment policy guidelines because the diversification provision of the guidelines was mistakenly included in them. [FN20] David Anderson, who was responsible for the drafting of the investment policy guidelines, testified that the diversification provision was mistakenly included in relation to the SBP and that the plan document should be considered the ultimate source of guidance. The defendants further argue that the diversification provision is void because it conflicts with the directive in the plan document that the assets of the SBP shall be invested "primarily or exclusively in company stock." Defendants' Exhibit 6 at 48-49. Mr. Anderson further testified that, in conjunction with the plan language, the guidelines do not make sense and that he is not certain when the diversification provision would apply to the SBP. [FN21]

> FN20. Mr. Longfellow testified in his deposition that he did not look at the SBP document when drafting the investment policy guidelines for the SBP but used the first restatement of the HCA profit sharing plan to draft the guidelines. Transcript (Docket Entry No. 214) at 754-755.

> FN21. The Court notes that while the defendants contend that the investment policy guidelines are irrelevant to the determination of whether the defendants breached their fiduciary duty to the SBP, the defendants nevertheless cite the language in the guidelines which states that

> "[t]he Committee believes that a 10 year period is appropriate in measuring its progress toward achieving [the objective of the plan]" in support of their decision to invest in company stock. Plaintiffs' Exhibit 117.

The Court finds that the SBP investment policy guidelines are valid. Even if they were mistakenly based on the wrong authority, the guidelines were adopted by the committee. Also, the guidelines do not squarely conflict with the directive of the plan that the assets of the SBP be invested primarily or exclusively in company stock. First, the plan does not completely forbid diversification. The investment policy guidelines do not require a fiduciary to diversify the assets of the SBP at any particular time, including times when company stock is particularly volatile, in order to meet its fiduciary duty. The guidelines merely underline the committee's ability to diversify the assets and suggest the manner in which diversification should occur.

Although the SBP directive that the assets be invested "primarily or exclusively" in company stock is a binding directive to the fiduciaries, in light of the fact that ERISA states that "a fiduciary shall discharge his duties ... in accordance with the documents and instruments governing the plan," the committee should have considered the diversification provision in the guidelines. Accordingly, the Court finds that the failure to do so constituted a procedural deficiency.

\*14 Next, the record does not reflect that the retirement committee discussed the demographics of the participants in the SBP. Mr. Anderson testified that he does not recall any discussion of the retirement committee regarding the demographics of the SBP, the number of participants approaching retirement or whether the volatility of the company stock would have an adverse effect on these employees with respect to the SBP. Ms. Yarosh, of Hewitt Associates, was responsible for keeping data on plan participants for the retirement committee. She testified that the retirement committee did not ask her to provide it with information regarding the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demographics of SBP participants. Transcript (filed June 21, 1999; Docket Entry No. 219), vol. VIII at 1702.

A prudent consideration of the possibility of diversification also would have included consideration of whether high ranking Columbia/HCA executives, including committee members, were selling their personal holdings of stock shortly after the investigation became public knowledge. There is no evidence that the defendants considered this information.

In summary, the Court concludes that the procedure followed by the retirement committee to review the prudence of investing the assets of the SBP in Columbia/HCA stock was deficient.

### D. *Substantive Prudence*

In addition to proving that the inquiry of the committee was procedurally deficient, the plaintiffs "must show a causal link between the failure to investigate and the harm suffered by the plan ." *Kuper,* 66 F.3d at 1459 (citation omitted). Accordingly, the Court will also consider whether additional considerations would "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* (citations omitted).

In *Kuper,* the Court reached the conclusion that a reasonable fiduciary would have taken the same actions as the defendant and held the stock based only on the facts that the "stock fluctuated during this period and that several investment advisors recommended holding [company] stock." *Id.,* 66 F.3d at 1460. The defendants in this case have presented a great deal more evidence to support their contention that a reasonable fiduciary would have continued to hold Columbia/HCA stock.

First, a reasonable fiduciary who retained an investment advisor to perform a valuation of Columbia/HCA would have determined that the investment was prudent. Columbia/HCA's summary annual reports show that on January 1, 1997, the value of the SBP's assets after liabilities was $1,406,757,882.00. This amount decreased by $531,346,715.00 to $875,411,167.00 as of

December 31, 1997. Nevertheless, the company maintained revenues of approximately $18.8 billion for the years 1996, 1997, and 1998, and earned a positive net income for each year, increasing its annual income from $182 million in 1997 to $532 million in 1998. Moreover, Columbia/HCA maintained total assets of approximately $20 billion for each of the three years. In 1997 and 1998, Columbia/HCA generated cash from operations of approximately $3 billion each year and increased its net worth over $300 million, from $7.25 billion in 1997, to $7.58 billion by December 31, 1998.

**\*15** The defendants' expert witness, Mr. Gougis, testified that at the time the plaintiffs assert that the committee should have begun diversification, the fundamentals of the company were sound. Mr. Gougis stated that even though the investigation had a more serious impact than expected and Columbia/HCA's earnings in 1997 were significantly lower than in the previous year,

> the Company still generated more dollar profits and operating cash flow (earnings before interest, taxes, depreciation and amortization) than any other hospital management company. Columbia/HCA's operating cash flow in 1998 was greater than the next three largest companies' combined results. The Company's strong cash flow, along with its noncore assets, represented sources of funds that could easily meet the $1.0 billion to $1.5 billion government fine that I believe the market had already factored into the Company's stock price.

Statement of direct testimony of Chester A. Gougis (Docket Entry No. 190) at 4.

The strength of Columbia/HCA's fundamentals at this time were also reflected in an independent evaluation of the company by Goldman Sachs on July 31, 1997, prepared in connection with Columbia/HCA's spin-off of some of its affiliates. In its analysis, Goldman Sachs concluded that Columbia/HCA had sound fundamentals and that even if the company were required to break-up it was worth more than the stock was trading at that time.

Columbia/HCA's sound fiscal state is further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidenced by the fact that it implemented and completed $1 billion stock buy-backs in both 1997 and 1998. These buy-backs were financed through two $1 billion term loans. Mr. Anderson testified that the banks were aware of the government's investigation when they approved the loans.

Late in 1997, Columbia's S & P credit rating was downgraded to BBB. However, this was still an investment grade rating. Mr. Gougis testified that the company's diminished credit rating was partly the result of the investigation and partly the company's increased debt from the stock buy-backs. The company's strong financial condition in 1997, and 1998, was also indicated by its ability to issue commercial paper, "an important source of short-term financing to which only the strongest companies have access." *Id.* at 7. Mr. Gougis further testified that the decline in stock price was also caused by negative events in the hospital management industry. These included the promulgation of the Balanced Budget Act by Congress, which called for a reduction in Medicare spending, and the increased power of managed care companies. The plaintiffs do not contest that these factors contributed to the drop in the stock price.

In its report, Marine Midland addressed "whether an investment in Columbia/HCA Healthcare Corporation stock is a prudent investment under the applicable ERISA standards for plans of this type." Defendants' Exhibit 90; Plaintiffs' Exhibit 159 at 1. The Marine Midland report states that "Marine has assumed that the Court's reference to 'plan of this type' is a reference to eligible individual account plans." Plaintiffs' Exhibit 159 at 2. Accordingly, the Marine Midland report would include whether Columbia/HCA stock is a prudent investment for the SBP.

**\*16** Marine Midland reported that a large number of institutional investors [FN22] held Columbia/HCA stock and that "the majority of analysts are positive in their outlook for the stock, and even those that are not positive nevertheless rate Columbia as a stock that they expect to do as well as the market in general." *Id.* at 3. However, Marine Midland also stated that the lack of sale

recommendations is "not unusual, since securities firms are generally reluctant to publish sale recommendations." *Id.* Marine Midland further noted that the Columbia's net worth grew from $.3 billion in 1992, to $8.6 billion in 1996, and that:

> FN22. Specifically, Marine Midland reported that 1,245 institutional investors held Columbia/HCA stock totaling 69% of outstanding shares. These institutional investors included 739 mutual funds, 345 money managers, 102 banks, and 57 insurance companies. Plaintiffs' Exhibit 159 at 3.

In summary, Columbia has a strong balance sheet and a proven track record of profitability, is very liquid, has ample capacity to service its debt and otherwise discharge its obligations, and is able to employ the stockholders' assets profitably. The declining efficiency in asset employment is a modest danger sign, but in the overall context, it is merely an indication of an area for continued monitoring and not a significant problem in and of itself.

....

Finally, Marine evaluated the risks to Columbia in the government investigation of its billing practices in its home health care division, as well as its coding of patients' diagnoses for Medicare reimbursement. Clearly, this is the most significant negative factor for Columbia at present. If not for this development, it seems very likely that Columbia Stock would still be outperforming the general market indices.

....

Marine concludes that Columbia is dealing effectively with the government investigations, and will emerge scathed but not seriously wounded. It is likely that the cost of remediation will not be significantly damaging to so profitable a company. It is not unreasonable to anticipate that Columbia is likely to be an even more successful industry leader after it has gotten beyond the current difficulties. Therefore, Marine believes that Columbia is a prudent investment in spite of the government investigations.
*Id.* at 6.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Based on these facts, the Court finds that an inquiry into the fundamentals of the company would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Kuper,* 66 F.3d at 1459.

During the trial, the defendants presented evidence of the demographics of the SBP participants in 1997, showing that the workforce was relatively young. The average employee was 40 years old. Of the 200,000 plan participants in 1997, only 24,000 were over age 54. Defendants' Exhibit 122. Accordingly, even if the retirement committee had reviewed the demographics of the SBP, because most of the participants were not near retirement age, they would have concluded that the investment objective should be long-term and that short-term volatility caused by the investigation would not have an adverse effect on most SBP participants. Short-term volatility was also of diminished importance to SBP participants because they could choose whether to take their benefits in the SBP in company stock, rather than sell the stock and take their benefits in cash. Participants could thereby potentially avoid selling their stock at a time when the share price is low. Therefore, if the retirement committee had reviewed the demographics of the SBP or retained an investment advisor to do an analysis of whether fiduciaries should be looking long-term or short-term, they would have determined that plan assets should be invested for long-term. Accordingly, the Court finds that such an analysis would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Kuper,* 66 F.3d at 1459.

**\*17** The plaintiffs did not retain an investment advisor to look at actions of comparable companies in sector and size. However, Hewitt Associates' report of September of 1997, addressed to "what extent are 401(k) and defined contribution plans of large employers invested in the employer's own securities?" Defendants' Exhibit 92. Hewitt Associates concluded that "approximately 40 percent of the total assets of large plans are invested in company stock" and that large defined contribution plans "invest a majority of the defined contribution plan assets in employer stock." *Id.*

Mr. David Pogue was the author of Hewitt's report. He testified that Hewitt Associates was "not addressing the stock bonus plan at that time" and that "[t]he materials that we provided to the company and any consulting was limited simply to ESOP accounts within the HealthTrust plan." Transcript (filed June 21, 1999; Docket Entry No. 216), vol V at 987. Nevertheless, the Court finds the report to indicate that a prudent fiduciary would have allowed the SBP assets to remain invested in Columbia/HCA stock.

Further, Mr. Gougis testified that the comparable decline in the stock price of Tenet Healthcare, the company most directly comparable to Columbia/HCA, from September, 1997, indicates that the decline was the result of industry-wide problems rather than the investigation alone. Statement of direct testimony of Chester A. Gougis (Docket Entry No. 190) at 12.

Accordingly, the Court finds that an inquiry into actions of comparable companies in sector and size would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Kuper,* 66 F.3d at 1459.

The retirement committee did not retain an investment advisor to analyze the portfolios of pension plan managers as suggested by Mr. Scallet. The plaintiffs' expert, Ms. Elkind, reported that 17 of 24 pension plans she reviewed decreased their ownership of Columbia/HCA stock during the period in question. Mr. Gougis pointed out that this statistic is not entirely negative and shows that "several sophisticated pension plan and endowment funds actually chose to maintain and increase their ownership during this period." *Id.* at 13. The Court agrees that, although a significant number of pension fund managers decreased their holdings in Columbia/HCA, seven of the pension plans studied held their investment in the stock, indicating that some other fiduciaries determined that maintaining their investment was a sound decision. This is of additional importance considering that the retirement committee was operating under the plan language that the assets of the SBP should be held "primarily or exclusively" in Columbia/HCA stock.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The other pension fund managers who held their investment in the stock were, presumably, not working within the confines of such plan language. Accordingly, the Court finds that an inquiry into the investments of portfolio managers of pension plans would not have revealed to a reasonable fiduciary that the investment at issue was improvident." *Kuper,* 66 F.3d at 1459.

**\*18** With respect to insider trading of company stock during this time, the evidence reflects that Mr. Anderson, who maintains more than 50% of his net worth in company stock, engaged in a cashless exercise of stock options in July, 1998. In this exercise, he sold one quantity of stock to purchase another larger quantity through stock options that were about to expire.

In August, 1996, Mr. Braun exercised an option for Columbia/HCA stock which he sold and used the proceeds to acquire company stock through the exercise of another option in the same month. Mr. Braun testified that in May, 1997, he held 28,000 shares of Columbia/HCA stock plus options, and that the stock made up 80% of his personal wealth. One of his stock options was going to expire in July, 1997, and to exercise the option, he would have had to borrow roughly $460,000.00. Mr. Braun stated that he choose to sell the stock because he was not in a financial position to borrow that much money. Transcript (Docket Entry No. 214) at 627-28.

Mr. Hemphill exercised stock options for 18,000 shares and received cash for his shares instead of receiving the shares. He testified that he sold these shares because he was going through a divorce and had certain housing needs. Mr. Hemphill has not sold any stock since 1996, and testified that he continued to acquire stock until he changed organizations.

Mr. Moore exercised two options for cash: one on December 24, 1996, and one on June 30, 1997. He testified that he exercised these options to help pay for a home he purchased and remodeled. He further testified that he intended to sell more shares to finance these expenses but that after the price went

down, he did not want to sell more shares and, instead, took on extra debt on his house. Transcript (Docket Entry No. 214) at 689.

Mr. Shelton testified that he made purchases of Columbia/HCA stock from the time of the September, 1997, raids to the second purchase of Columbia/HCA stock by the retirement committee in February, 1998.

Dr. Thomas Frist, Jr., and his family, who owned 24.4 million shares of Columbia/HCA stock in March of 1997, did not sell any shares of Columbia/HCA stock during 1997, 1998 or 1999, and acquired 2.7 million shares in 1999. Richard Scott, the former CEO of Columbia/HCA, sold 90,000 shares of company stock in February, 1997. As he held over 9 million shares in Columbia/HCA stock, this sale constituted less than one percent of his shareholdings.

The Court finds that these transactions do not indicate that the members of the retirement committee and other executives were substantially reducing their investments in company stock. As for the minimal sales that took place during this time, there is no indication that the sales were made because the executives thought the stock was an imprudent investment. Moreover, several retirement committee members purchased company stock during this time and all were participants in the SBP and held shares of company stock in their retirement account. Accordingly, the Court finds that such an investigation would not "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Kuper,* 66 F.3d at 1459.

**\*19** Finally, the plaintiffs have argued that the committee was required to take into consideration the SBP investment policy guidelines. The plaintiffs contend that the defendants failed to consider the directive of the guidelines they allege required the defendants to diversify the assets of the SBP if the stock was volatile. Although not directly contrary to the investment policy guidelines, which allow for diversification, the plan language directed that the assets of the SBP "shall be utilized primarily or exclusively to purchase Company stock."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

**(Cite as: 2000 WL 33726564 (M.D.Tenn.))**

Defendants' Exhibit 6 at 48. Therefore, even though the committee could have diversified the assets, there was a strong directive from the plan to maintain the assets in company stock and no directive to diversify. Accordingly, the Court finds that even if the defendants had considered the investment policy guidelines, the plaintiffs have not established that consideration of the investment policy guidelines would "have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.*

III.

In summary, the Court finds that the plaintiffs have not established that a reasonable fiduciary would have determined that the investment of the SBP assets in Columbia/HCA stock was imprudent, thereby rebutting the presumption of reasonableness afforded to the defendants' actions. *Kuper,* 66 F.3d at 1460. Accordingly, the plaintiffs have not established that the defendants breached their fiduciary duty to the SBP, and their claims against the individual defendants must fail. *Id.*

In light of the fact that the Court has found that the individual defendants did not breach their fiduciary duty to the SBP, the Court need not address whether the company was a co-fiduciary with respect to the investment of SBP assets. The Court finds that Columbia/HCA is not liable for breach of fiduciary duty based on its alleged failure to monitor and remove retirement committee members or the investment of the SBP assets.

At oral argument, the counterclaims (Docket Entry Nos. 64 and 69) of the defendants for attorneys' fees and costs under 29 U.S.C. § 1132(g) were withdrawn and will be dismissed.

An appropriate order shall be entered.

Not Reported in F.Supp.2d, 2000 WL 33726564 (M.D.Tenn.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.