**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **In re MBNA Corp. ERISA Litigation** | ) )  **Master Docket No. 05-429 (GMS)** ) ) |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs Sally Cannon, Christian Fondeur, and Ralph Kunes, participants in the MBNA Corporation 401(k) Plus Savings Plan (the "Plan"), on behalf of themselves, a class of all others similarly situated (as defined below), and the Plan, allege as follows:

### INTRODUCTION

1.      Plaintiffs are former employees of MBNA Corporation ("MBNA" or the "Company"). Through their employment with MBNA, Plaintiffs saved for retirement by participating in the Plan. Plaintiffs' retirement accounts in the Plan included MBNA common stock ("MBNA Stock" or "Company Stock"), which was one of the investment options offered by the Plan.

2.      As described herein, the Plan, and consequently Plaintiffs and the other participants and beneficiaries of the Plan, suffered millions of dollars of losses due to the malfeasance of the defendants alleged herein as MBNA Stock steadily declined in value. Defendants breached their fiduciary obligations imposed by the Employee Retirement Income Security Act ("ERISA") and owed to the Plan and all of the Plan's participants and beneficiaries, including Plaintiffs.

3.     Plaintiffs bring this suit as a civil enforcement action under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries for relief on behalf of the Plan.

4.     The Plan is a defined contribution retirement plan that is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986 and is subject to the provisions of ERISA. From January 7, 2005 through April 22, 2005 (the "Class Period"), the Plan significantly invested in MBNA Stock.

5.     Plaintiffs were employees of MBNA and participants in the Plan during the Class Period. Plaintiffs' retirement accounts pursuant to the Plan included MBNA Stock during the Class Period.

6.     Defendants, as fiduciaries of the Plan, violated ERISA and breached their fiduciary duties to the Plan, to the Plaintiffs, and to the other participants and beneficiaries of the Plan in connection with the Plan's investment in and holdings of MBNA Stock.

7.     Throughout the Class Period, the defendants caused or permitted the Plan to imprudently offer, purchase, and hold MBNA Stock. Defendants violated ERISA because it was imprudent for the Plan to do so, because, among other reasons, MBNA's credit card business was facing an industry-wide slowdown that made it an imprudent retirement investment. Moreover, during the Class Period, MBNA issued false estimates as to projected growth and engaged in improper accounting that overstated the Company's financial performance. This caused the price of MBNA stock to rise above its true value.

8.     During the Class Period, defendants had conflicting loyalties between maintaining a high price for Company Stock, in part because of their own holdings and sales of MBNA Stock and in part because of their positions as directors or senior officers of the Company, and the

interests of the Plan participants and beneficiaries, which should have included the timely receipt of accurate information concerning the Company's financial performance and diversification out of investments, like MBNA Stock, that were both overvalued and lacked a reasonable prospect for growth due to industry-wide factors.

9.     In further breach of their fiduciary duties, defendants neither properly monitored the Plan's investment in MBNA Stock nor provided accurate information to Plan participants and beneficiaries concerning MBNA's financial performance. Because of defendants' failure to provide accurate information, Plan participants lacked the proper knowledge to make informed decisions concerning their retirement investments.

10.     Upon MBNA's public disclosure on April 21, 2005 that its growth target and financial performance were overstated, the price of Company Stock plummeted. In a single day of trading, the drop in the stock price caused MBNA's market capitalization to fall $5.8 billion. During the Class Period, MBNA Stock lost approximately 35% of its value. Plaintiffs and all Plan participants who had acquired and held Company Stock suffered as the value of their retirement accounts invested pursuant to the Plan dropped precipitously in line with the decline in the price of Company Stock.

11.     Defendants are liable under ERISA to restore losses sustained by the Plan resulting from the breach of their fiduciary obligations. [1]

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

---

[1] Because much of the information and documents on which Plaintiffs' claims are based are solely within the knowledge and possession of defendants, certain of Plaintiffs' allegations are by necessity upon information and belief.

13.     Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because this is the district where some or all of the breaches took place, where one

or more defendants reside or may be found, and/or where the acts and transactions alleged

herein, including the administration of the Plan, occurred.

## PARTIES

14.     Plaintiff Sally Cannon ("Cannon") is a former employee of MBNA and is a

participant in the Plan pursuant to Section 3(7) of ERISA, 29 U.S.C. § 1002(7). Cannon directed

the Plan to purchase and hold MBNA Stock in her retirement account pursuant to the Plan during

the Class Period.

15.     Plaintiff Ralph Kunes ("Kunes") is a former employee of MBNA and is a

participant in the Plan pursuant to Section 3(7) of ERISA, 29 U.S.C. § 1002(7). Kunes directed

the Plan to purchase and hold MBNA Stock in his retirement account pursuant to the Plan during

the Class Period.

16.     Plaintiff Christian Fondeur ("Fondeur") is a former employee of MBNA and is a

participant in the Plan pursuant to Section 3(7) of ERISA, 29 U.S.C. § 1002(7). Fondeur

directed the Plan to purchase and hold MBNA Stock in his retirement account pursuant to the

Plan during the Class Period.

17.     Defendant MBNA's principal place of business is 110 North King Street,

Wilmington, Delaware 19884. MBNA, the parent company of MBNA America Bank, N.A., is

an international financial services company providing personal and business lending and deposit

account products.

18.     Throughout the Class Period, MBNA was the Plan sponsor, a fiduciary of the

Plan within the meaning of ERISA, and acted within its capacity as a Plan fiduciary. Rather than

delegate all fiduciary responsibility to external service providers, MBNA chose to internalize at least some of these fiduciary functions. Thus, MBNA had (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. MBNA at all times acted through its officers, employees, and members of its Pension and 401(k) Plan Committee (the "Plan Committee"), who performed Plan-related fiduciary functions in the course and scope of their employment and/or service to the Company.

19.     MBNA had, at all applicable times, effective control over the activities of its officers, employees, and Plan Committee, including over their Plan-related activities. MBNA, through its Board of Directors, executive officers, or otherwise, had the authority and discretion to hire and terminate said officers and employees. MBNA, through its Chief Executive Officer, also had the authority and discretion to appoint, monitor, and remove Plan Committee members from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, such defendant-fiduciaries breached duties they owed to participants in the Plan and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to MBNA under the doctrine of *respondeat superior*, and MBNA is liable for such actions.

20.     Throughout the Class Period, defendant Plan Committee was the Plan administrator, charged with primary fiduciary oversight of the Plan, and thus a Plan fiduciary.

21.     Throughout the Class Period, defendant Plan Committee was entrusted with the responsibility to make and enforce rules for the Plan, and to allocate fiduciary responsibilities among themselves and others.

22.     The Plan Committee was a fiduciary of the Plan within the meaning of ERISA in that it had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.  Further, as alleged herein, the Plan Committee acted within its fiduciary capacity.  Therefore, members of the Plan Committee, named herein at ¶¶ 24 – 30, were Plan fiduciaries and acted in that capacity because they had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

23.     The Chief Executive Officer ("CEO") of MBNA is responsible for the appointment, removal, and replacement of the members of the Plan Committee.  Throughout the Class Period, defendant Bruce L. Hammonds ("Hammonds") served as MBNA's President and CEO.  During the Class Period, he also served on MBNA's Board of Directors ("Board").  As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.  As alleged herein, Hammonds acted within his capacity as a Plan fiduciary.  In addition, during the Class Period, Hammonds sold more than $9 million worth of MBNA Stock.

24.     During the Class Period, defendant Kenneth F. Boehl ("Boehl") was a member of the Plan Committee and a Vice Chairman of MBNA America.  As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.  As alleged herein, Boehl acted within his capacity as a Plan fiduciary.

25.     During the Class Period, defendant John Cochran ("Cochran") was a member of the Plan Committee. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Cochran acted within his capacity as a Plan fiduciary.

26.     During the Class Period, defendant M. Scot Kaufman ("Kaufman") was a member of the Plan Committee. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Kaufman acted within his capacity as a Plan fiduciary.

27.     During the Class Period, defendant Charles C. Krulak ("Krulak") was Vice Chairman of MBNA and was a member of the Plan Committee. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Krulak acted within his capacity as a Plan fiduciary. In addition, during the Class Period, Krulak sold more than $13 million worth of MBNA Stock.

28.     During the Class Period, defendant Terri C. Murphy ("Murphy") was a member of the Plan Committee, and was a senior executive at MBNA America. As such, she was a Plan fiduciary because she had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Murphy acted within her capacity as a Plan fiduciary.

29.    During the Class Period, defendant John W. Scheflen ("Scheflen") was a member of the Plan Committee and a Vice Chairman at MBNA America. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Scheflen acted within his capacity as a Plan fiduciary. In addition, during the Class Period, Scheflen sold more than $3.3 million worth of MBNA Stock.

30.    During the Class Period, defendant Michelle Shepherd ("Shepherd") was a member of the Plan Committee. As such, she was a Plan fiduciary because she had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Shepherd acted within her capacity as a Plan fiduciary.

31.    During the Class Period, defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione was also a member of the Plan Committee during the Class Period. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Vecchione acted within his capacity as a Plan fiduciary. In addition, during the Class Period, Vecchione sold more than $2.1 million worth of MBNA Stock.

32.    During the Class Period, defendant Lance L. Weaver ("Weaver") was a member of the Plan Committee and a Vice Chairman of MBNA. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan

management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Weaver acted within his capacity as a Plan fiduciary. In addition, during the Class Period, Weaver sold more than $10 million worth of MBNA Stock.

33.     During the Class Period, defendant Thomas D. Wren ("Wren") was a member of the Plan Committee, and a Treasurer of MBNA America. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Wren acted within his capacity as a Plan fiduciary.

34.     During the Class Period, defendant Vernon Wright ("Wright") was a member of the Plan Committee. As such, he was a Plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. As alleged herein, Wright acted within his capacity as a Plan fiduciary.

35.     Defendants Hammonds, Boehl, Cochran, Kaufman, Krulak, Murphy, Scheflen, Shepherd, Vecchione, Weaver, Wren and Wright are collectively referred to herein as the "Individual Defendants."

## THE PLAN

36.     The Company sponsors the Plan. The Plans is an "employee pension benefit plan," as defined by Sections 3(2)(A) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2)(A) and 1002(3). The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested is for the benefit of the Plan.

37.     Throughout the Class Period, the Plan offered participants the option of investing in MBNA Stock through the MBNA Stock Fund ("MBNA Fund"). The MBNA Fund consisted of shares of MBNA Stock.

38.     The stated purpose of the Plan is to build a "nest egg" and to "allow you to save for the future and have some access to your savings through loans or withdrawals while you're still working." *See* Summary Plan Description.

39.     The Plan is a defined contribution plan available to all "full-time, prime-time, or part-time person[s] [who have] completed one year of service." *Id.* The Plan does not allow union, temporary, leased or non-resident aliens to participate. *Id.*

40.     Participants direct the investment of their contributions into such  investment options made available by the Plan fiduciaries. One of the available investment options is MBNA Stock.

41.     Upon completion of the eligibility requirements, participation in the Plan begins automatically. MBNA automatically contributes 1% of base-pay to the Plan. Participants may make voluntary contributions to the Plan on a before-tax or after-tax basis. Participants may contribute between 1% and 12% of base pay on a before-tax basis, and between 1% and 10% of base pay on an after-tax basis. MBNA will match 50% of the first 6% of base pay set aside each payroll period. *Id.*

42.     During the Class Period, MBNA frequently made certain matching contributions in the form of MBNA Stock.

43.     As of December 31, 2004, immediately prior to the commencement of the Class Period, the Plan held approximately 8,570,887 shares of MBNA Stock worth approximately

$241,613,000. By the end of the Class Period, the Plan's holdings of MBNA Stock had declined

nearly 35% in value.

44.     More than 25% of the Plan's total assets consist of MBNA Stock.

## CLASS ACTION ALLEGATIONS

45.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of themselves and the following class of persons similarly

situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at
> any time from January 7, 2005, through April 22, 2005 (the "Class
> Period"), and whose accounts included investments in MBNA
> Stock.

46.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiffs at this time

and can be ascertained only through appropriate discovery, Plaintiffs believe there are, at a

minimum, thousands of members of the Class who participated in or were beneficiaries of the

Plan during the Class Period. For instance, MBNA's 2003 Form 5500 filed with the Internal

Revenue Service stated that, as of December 31, 2003, there were 20,889 Plan participants.

47.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

> a.      whether defendants each owed a fiduciary duty to the Plan and members
>         of the Class;
>
> b.      whether defendants breached their fiduciary duties to the Plan and
>         members of the Class by failing to act prudently and solely in the interests
>         of the Plan's participants and beneficiaries;

        c.      whether defendants violated ERISA; and

        d.      whether the Plan and members of the Class have sustained damages and, if

             so, what is the proper measure of damages.

48.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

49.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

50.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members of the Class or substantially impair or impede their ability to protect their interests.

51.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

12

## COMMON FACTUAL ALLEGATIONS

52.     MBNA derives a significant portion of its earnings from its credit card lending business.

53.     In January, 2005, the most pressing issue facing holders of MBNA Stock was how the Company planned to fuel growth at a time when the credit card business was maturing, and therefore growth was slowing.

54.     By January, 2005, MBNA was in the midst of a significant retraction in its credit card receivables as customers were using lower interest rate consumer loans to pay off higher interest rate credit card debt.

55.     On January 20, 2005, MBNA announced the initiation of a voluntary early retirement program and a voluntary employee severance program that would result in a one-time restructuring charge in the first quarter of 2005 of "approximately $300 million to $350 million pre-tax."

56.     On January 21, 2005, MBNA followed up on its January 20 announcements by hosting an investor meeting. At that meeting, and despite both the industry-wide slowdown, and the already ongoing retraction in MBNA's credit card receivables, MBNA announced that in 2005, its earnings would grow at the rate of 10% annually. Prior to this announcement, MBNA had historically not provided earnings forecasts.

57.     At the January 21, 2005 investor meeting, defendant Hammond said, "We think [U.S. credit card] industry growth will pick up from where it is today." He also said, "We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [be] 10 percent this year primarily because we're starting the year

off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing."

58. As to zero percent marketing, which offers a 0% interest rate to customers who transfer balances from another credit card company, Hammond said, "we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability."

59. At that same investor meeting, defendant Vecchione said, "we plan to meet our 2005 earnings target of 10% even if the industry has slower growth than expected."

60. Thus MBNA, Hammond, and Vecchione departed from MBNA's past practice of not providing earnings forecasts to forecast 2005 growth of 10%. They provided such a forecast despite the knowing industry-wide slowdown in the credit card business and significant retraction in MBNA's credit card receivables, and various business measures such as the early retirement program that anticipated contraction rather than growth.

61. Following the January 21 meeting with investors and during the Class Period, several MBNA insiders, including defendants Weaver, Vecchione, Scheflen, Cochran, Krulak, and Hammonds sold millions of dollars worth of their holdings of MBNA Stock. Specifically, these transactions are as follows:

| Insider | Date | Shares Sold | Share Price | Gross Proceeds |
|---------|------|-------------|-------------|----------------|
| Weaver | 1/25/2005 | 376,835 | $ 26.76 | $ 10,084,105 |
| Vecchione | 1/25/2005 | 79,829 | $ 26.70 | $ 2,131,434 |
| | 1/25/2005 | 20,633 | $ 26.80 | $ 552,964 |
| Scheflen | 1/25/2005 | 125,810 | $ 26.85 | $ 3,377,999 |
| Krulak | 1/25/2005 | 130,000 | $ 26.61 | $ 3,459,300 |
| | 1/31/2005 | 92,483 | $ 26.50 | $ 2,450,800 |

14

| Insider | Date | Shares Sold | Share Price | Gross Proceeds |
|---------|------|-------------|-------------|----------------|
| | 2/01/2005 | 224,754 | $ 26.75 | $6,012,170 |
| | 2/01/2005 | 50,217 | $ 27.00 | $1,355,859 |
| **Hammonds** | 1/27/2005 | 351,409 | $ 26.51 | $9,315,853 |
| **Cochran** | 1/27/05 | 133,009 | $26.55 | $3,531,388.95 |
| | 1/27/05 | 398,150 | $26.508 | $10,554,160.20 |

62.     Only three months after projecting 2005 growth at 10%, MBNA issued an April 21, 2005, press release announcing that it would not meet – or even come close – to the 10% growth target.

63.     Commenting upon the Company's first quarter 2005 results, the April 21 press release stated that "net income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax. Without the restructuring charge, net income was $514.1 million or $.40 per common share."

64.     The restructuring charge amounted to more than double the approximate charge of $300 million to $350 million provided by MBNA only three months earlier.

65.     The April 21 press release also stated that "MBNA's 2005 earnings per share will be significantly below its 10% growth objective."

66.     MBNA, like other credit card companies, earns income by financing credit card debt. MBNA income increases as credit card customers carrying significant balances fail to pay those balances and, instead, pay finance charges on existing debt. MBNA income decreases, however, as higher debt and higher volume credit card balances are paid down, reducing financing charges paid by customers to MBNA.

67.    MBNA attributed the poor financial results and inability to meet its earnings projections to both the $767.7 million restructuring charge and unexpectedly high payment volumes from U.S. credit card customers, particularly customers with accounts with higher interest rates.

68.    In relation to the higher credit card payments by customers, MBNA wrote down the value of its interest-only strip receivable, which measures anticipated credit-card interest payments, by $206.6 million: "in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million."

69.    The high payment volumes, particularly as to customers who paid higher interest rates, was not unexpected by the Company, its directors, or its senior officers. Defendants knew that as the spread between MBNA's interest rates charged to their customers and mortgage rates grew, more and more of MBNA's credit card customers took out lower interest rate loans, such as home equity loans, to pay their credit card debt and would continue to do so.

70.    Also on April 21, 2005, in an effort to regain lost business, MBNA announced that it would immediately reverse its decision to phase out zero percent marketing, despite the fact the program was less profitable for the Company.

71.    Following MBNA's announcement that it would not meet the earnings target it had set only three months earlier, its stock price plummeted. In a single day, when most major bank stocks rose, the price of MBNA Stock fell 16.6%. During the Class Period, the price of MBNA Stock fell approximately 35%.

72.    As a result, the Plan, and therefore the retirement accounts of Plan participants and beneficiaries, lost tens of millions of dollars.

73.    In fact, MBNA's future prospects were terrible. As Anton Schutz, an investment

manager and president of Mendon Capital Advisors, said, "It looks to me like these guys [MBNA]

are broken in terms of growth."

## CAUSATION

74.    The Plan suffered at least tens of millions of dollars in losses because substantial

assets of the Plan were imprudently allowed to be put at great risk by defendants, through

investment by the Plan in MBNA Stock during the Class Period, in breach of defendants'

fiduciary duties.

75.    Defendants are responsible for losses caused by participant direction of

investment in MBNA Stock because defendants failed to take the necessary and required steps to

ensure effective and informed independent participant control over the investment

decision-making process, as required by ERISA Section 404(c), 29 U.S.C. § 1104(c), and the

regulations promulgated thereunder. Defendants concealed material, non-public facts from

participants and provided misleading, inaccurate, and incomplete information to them regarding

the nature of the defendants' improper activities and therefore the ongoing earnings levels of

MBNA, as well as the true underlying values of MBNA Stock offered by the Plan,

misrepresenting its soundness as an investment vehicle. As a consequence, participants did not

exercise independent control over their investments in MBNA Stock and defendants remain

liable under ERISA for losses caused by such investment.

76.    Where a breach of fiduciary duty consists of or includes misrepresentations and

omissions material to a decision by a reasonable participant that results in harm to the

participant, the participant is presumed as a mater of law to have relied upon such

misrepresentations and omissions to his or her detriment.

77.     Defendants' statements, acts, and omissions alleged herein constituted
misrepresentations and omissions that were fundamentally deceptive concerning the prudence of
investments in MBNA Stock and were material to any reasonable person's decision about
whether or not to invest or maintain any part of its plan assets in MBNA Stock during the Class
Period. Plaintiffs and the other Class members are therefore presumed to have relied to their
detriment on defendants' deceptive statements, acts, and omissions.

78.     Had the defendants properly discharged their fiduciary and/or co-fiduciary duties,
including the provision of full and accurate disclosure of material facts concerning investment in
MBNA Stock, eliminating MBNA Stock as an investment option when it became imprudent, and
divesting the Plan from Company Stock offered by the Plan when maintaining such an
investment became imprudent, the Plan would have avoided a substantial portion of the losses
that it suffered through its continued investment in MBNA Stock.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

79.     ERISA § 404(c), 29 U.S.C. § 1104(c), is an affirmative defense inapplicable here.
ERISA § 404(c) provides a limited exception to fiduciary liability for losses that result from Plan
participants' exercise of "independent control" over investment decisions. ERISA § 404(c) thus
applies only when plan participants in fact exercise independent control over investment
decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive
requirements of the statute and the regulations promulgated pursuant thereto.

80.     There are several reasons why ERISA § 404(c) is inapplicable here. First, ERISA
§ 404(c) does not provide any defense to the Plan's fiduciaries' imprudent decision to select and
continue offering MBNA Stock as investment option in the Plan or to continue matching in

MBNA Stock – both of which are decisions that are completely out of Plan's participants'
control. Neither of those decisions was made or controlled by the Plan's participants.

81.     Second, even as to participant directed investment in MBNA Stock, ERISA §
404(c) does not apply because defendants failed to ensure effective participant control by
neglecting to provide complete and accurate material information to the Plan's participants
regarding MBNA Stock. Due to defendants' failure in this respect, the Plan's participants did
not have informed control over the portion of the Plan's assets that were invested in MBNA
Stock at their direction, and defendants remain entirely responsible for losses arising therefrom.

82.     As a result, ERISA § 404(c) is inapplicable.

## COUNT I
**(as against MBNA, Hammonds, Krulak, Scheflen, Cochran, Vecchione, and Weaver)**

### Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest
### ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)

83.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 82 of this
Complaint as if fully set forth herein.

84.     At all relevant times, ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A),
required defendants to act solely in the interests of the Plan participants and beneficiaries,
including Plaintiffs, and for the exclusive purpose of providing benefits to the Plan participants
and beneficiaries.

85.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and
to resolve them promptly when they occur. A fiduciary must always administer a plan with
single-minded devotion to the interests of the Plan and its participants and beneficiaries,
regardless of the interests of the fiduciaries themselves or the Plan sponsor.

86.    Defendants breached their duty of loyalty owed to the Plan and the Class members.

87.    Defendants had significant personal investments in MBNA Stock.

88.    A significant portion of the compensation received by defendants Hammond and Vecchione was paid in MBNA Stock. Upon information and belief, many of the Individual Defendants have received MBNA Stock pursuant to MBNA's policy of providing shares of its stock pursuant to incentive and nonqualified stock options and restricted share awards to its officers and directors.

89.    During the Class Period, defendants Weaver, Vecchione, Scheflen, Krulak and Hammonds sold millions of dollars worth of their individual holdings of MBNA Stock. *See* ¶ 57.

90.    Thus, defendants had a significant personal financial incentive to maintain a high price for MBNA Stock.

91.    Defendants had an incentive not to disclose negative financial results to the Plan participants in hopes that such participants would select MBNA Stock for their retirement accounts and therefore help maintain a high price for MBNA Stock.

92.    Defendants also had an incentive to maintain MBNA Stock as an investment option under the Plan. If Company Stock were eliminated as an investment option under the Plan, this would have sent a negative signal to Wall Street analysts, which in turn would result in reduced demand for MBNA Stock and a drop in the stock price. Since the compensation of Individual Defendants included MBNA Stock, this sequence of events would reduce their compensation and also reduce their profits from selling MBNA Stock.

93.     As such, defendants breached their fiduciary duty of loyalty because they were

faced with a conflict of interest, which they did not promptly resolve, between their own interest

and the interests of the Plan participants and beneficiaries. Defendants' interest in maintaining

an artificially high price for MBNA Stock was in direct conflict with Plan participants' interests

in (i) avoiding investing their retirement accounts in MBNA Stock when it was imprudent to do

so and (ii) receiving accurate information concerning MBNA upon which to base their

investment decisions.

94.     Defendants also breached their fiduciary duty of loyalty because they endorsed

unreasonable growth estimates for MBNA. Such endorsement was in the interests of defendants

to maintain an artificially high price for MBNA Stock, but was detrimental to the interests of the

Plan participants and beneficiaries who were holding and continuing to invest in MBNA Stock

based upon misinformation.

95.     Defendants also breached their fiduciary duty of loyalty because they did not

timely disclose negative financial information for the Company's 2005 first quarter results. Such

non-disclosure aided the interests of the defendants in maintaining an artificially high price for

MBNA Stock, but ran against the interests of the Plan participants and beneficiaries who were

holding and continuing to invest in MBNA Stock based upon misinformation.

96.     As a direct and proximate result of the breaches of fiduciary duties alleged herein,

the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, not only lost

a significant portion of its retirement investments, but also failed to achieve the gains that the

Plan, and indirectly the Class, would have realized had defendants performed their fiduciary

duties.

97.     Pursuant to ERISA Sections 409(a) and 502(a)(1)(B), 29 U.S.C. §§ 1109(a) and

1132(a)(1)(B), defendants are liable to restore the injury to the Plan caused by their breaches of

fiduciary duties alleged in this Count.

## COUNT II
### (as against MBNA, the Plan Committee, Boehl, Cochran, Kaufman, Krulak, Murphy, Scheflen, Shepherd, Vecchione, Weaver, Wren and Wright)

### Breach of Fiduciary Duty of Care
### ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)

98.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 97 of this

Complaint as if fully set forth herein.

99.     At all times relevant hereto, ERISA Section 404(a)(1)(B), 29 U.S.C. §

1104(a)(1)(B), required defendants to act, with respect to the Plan, with the care, skill, prudence,

and diligence that a prudent person acting in a like capacity and familiar with such matters would

use in managing an enterprise of like character and with like aims.

100.    During the Class Period, defendants breached their duty of care. They failed to

act prudently and failed to use reasonable care, skill, or diligence in offering MBNA Stock as an

investment option, purchasing MBNA Stock for the Plan, monitoring the Plan's investment in

MBNA Stock, and communicating information concerning MBNA's financial performance to

Plan participants and beneficiaries, and holding MBNA Stock when it was no longer a prudent

retirement investment.

101.    MBNA Stock was an imprudent Plan investment because:

      (a)     Defendants distributed misinformation concerning MBNA's earnings

growth, overstated MBNA's interest-only strip receivable, understated the

first quarter 2005 restructuring charge, failed to timely disclose higher

customer credit card payments, and made unjustified statements that

MBNA would phase out zero percent marketing to boost profitability – all of which contributed to the creation of artificially high prices for MBNA Stock during the Class Period;

(b)     the credit card business, MBNA's primary business, was experiencing an industry-wide slowdown that made MBNA Stock an imprudent investment as a significant portion of a retirement portfolio;

(c)     the Company's accounting practices, particularly its failure to accurately set forth the value of its interest-only strip receivable, violated GAAP's requirement that financial reporting be useful to present and potential investors and creditors and other investors, and these accounting violations contributed to the artificially high price of MBNA Stock during the Class Period; and

(d)     the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company.

102.    At all relevant times, defendants knew or should have known by virtue of their status as officers or senior employees of the above-mentioned facts, all of which made MBNA Stock an imprudent Plan investment.

103.    Defendants also knew that the price of Company Stock would trade at a discount once the market became aware that the Company had overstated earnings growth. Yet, defendants failed to impute this knowledge to the Plan and Plan participants and continued to cause the Plan to acquire and retain shares of Company Stock.

104.    Defendants failed properly to take into account the numerous practices that put MBNA Stock at risk as well as the fact that MBNA Stock was inflated in value when determining the prudence of investing and holding Plan assets in MBNA Stock.

105.    As a result of defendants' knowledge of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

106.    Because defendants knew or should have known that Company Stock was an imprudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and reasonably foreseeable losses incurred as a result of the Plan's investment in Company Stock.

107.    Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; divesting the Plan of Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

108.    Despite the availability of these and other options, defendants failed to take any action to protect participants from losses as a result of Plan investment in MBNA Stock.

109.    According to Plan documents, the Plan Committee and its members were responsible for the selection, maintenance, and monitoring of the Plan's investments.

110.    Under ERISA, defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

111.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA Section 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

112.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, these defendants knew or should have known that MBNA Stock was not a suitable and appropriate investment for the Plan.  Nonetheless, during the Class Period, these fiduciaries continued to offer the MBNA Stock as an investment for the Plan and to direct and approve Plan investment in MBNA Stock.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in MBNA Stock.

113.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, not only lost a significant portion of its assets and retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had defendants performed their fiduciary duties.

114.    Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a),

defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties

alleged in this Count.

**COUNT III**
**(as against MBNA, the Plan Committee, Boehl, Cochran, Kaufman, Krulak,**
**Murphy, Scheflen, Shepherd, Vecchione, Weaver, Wren and Wright)**

**Breach of Fiduciary Duty to Provide Complete and Accurate Information**
**ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)**

115.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 114 of this

Complaint as if fully set forth herein.

116.    The fiduciary duties of loyalty and prudence also entail a duty to deal candidly

with Plan participants and beneficiaries. This duty of candor requires Plan fiduciaries to provide

complete and accurate information concerning the Plan's investment options, including the

financial performance of MBNA, to Plan participants and beneficiaries. This duty under ERISA

requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or

Plan assets, and to disclose material information that participants need in order to exercise their

rights and interests under the Plan. This duty to inform participants includes an obligation to

provide participants and beneficiaries of the Plan with complete and accurate information, and to

refrain from providing false information or concealing material information regarding Plan

investment options, such that participants can make informed decisions with regard to the

prudence of investing in such options made available under the Plan. This duty applies to all

Plan investment options, including investment in MBNA Stock.

117.    Because investment in the Plan was not diversified (i.e., the defendants chose to

invest the Plan's assets and/or allow those assets to be invested heavily in MBNA Stock), such

investment carried with it an inherently high degree of risk. This inherent risk made the

defendants' duty to provide complete and accurate information particularly important with respect to MBNA Stock.

118.    The defendants breached their duty to disclose material information to Plan participants and beneficiaries by failing to provide complete and accurate information regarding MBNA Stock, MBNA's business improprieties, public misrepresentations, inflated earnings and growth estimates, and the consequent artificial inflation of the value of MBNA Stock. Defendants also failed to convey accurate information regarding the soundness of MBNA Stock and the prudence of investing retirement contributions in MBNA equity. These failures were particularly devastating to the Plan, and thus Plan participants and beneficiaries, because losses in MBNA Stock had an enormous impact on the value of participants' retirement assets.

119.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance and prospects of both the Company and Company Stock. During the Class Period, the Company fostered a positive attitude toward Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company Stock. As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

120.    Defendants failed to provide Plan participants with material information regarding MBNA Stock, such that the participants could appreciate the true risks presented by investments in MBNA Stock and could make informed decisions regarding investments in the Plan.

121.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the

489779                                        27

participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts, and omissions of the defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in MBNA Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in MBNA Stock during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the defendants as described herein.

122.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had defendants performed their fiduciary duties.

123.    Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV
### (as against MBNA and Hammonds)

### Breach of Fiduciary Duty to Monitor
### ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

124.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 123 of this Complaint as if fully set forth herein.

125.    At all relevant times, ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), required defendants to monitor other fiduciaries.

126.    The duty to monitor entails both giving information to and reviewing the actions
of the monitored fiduciaries.  In this case, that meant that defendants had the duty to:

>    (i)    ensure that the monitored fiduciaries possessed the needed credentials and
>    experience or used qualified advisors and service providers to fulfill their
>    duties.  They must be knowledgeable about the operations of the Plan, the
>    goals of the Plan, and the behavior of Plan participants;

>    (ii)    ensure that the monitored fiduciaries had ready access to such outside,
>    impartial advisors, counsel, and experts when needed;

>    (iii)    ensure that the monitored fiduciaries were provided with adequate
>    financial resources to do their job;

>    (iv)    ensure that the monitored fiduciaries had adequate information to do their
>    job of overseeing the Plan investments;

>    (v)    ensure that the monitored fiduciaries maintained adequate records of the
>    information on which they based their decisions and analysis with respect
>    to Plan investment options; and

>    (vi)    ensure that the monitored fiduciaries reported regularly to the Company.

The monitoring fiduciaries must then review, understand, and approve the conduct of the
hands-on fiduciaries.

127.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries
are performing their fiduciary obligations, including those with respect to the investment of plan
assets, and must take prompt and effective action to protect the plan and participants when they
are not.  The duty to monitor encompasses a duty to periodically monitor the performance of the
appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

128.    The duty of prudence requires that appointing fiduciaries have procedures in place

so that on an ongoing basis they may review and evaluate whether investment fiduciaries are

doing an adequate job (for example, by requiring periodic reports on their work and the plan's

performance, and by ensuring that they have a prudent process for obtaining the information and

resources they need). In the absence of a sensible process for monitoring their appointees, the

appointing fiduciaries would have no basis for prudently concluding that their appointees were

faithfully and effectively performing their obligations to plan participants or for deciding

whether to retain or remove them.

129.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with

complete and accurate information in their possession that they know or reasonably should know

that the monitored fiduciaries must have in order to prudently manage the plan and the plan

assets.

130.    Hammonds breached his duty to monitor the members of the Plan Committee,

over whom he had authority to appoint, remove, and replace.

131.    Hammonds breached his fiduciary monitoring duties by, among other things, (a)

failing to ensure that the monitored fiduciaries had access to knowledge about the Company's

true financial performance and growth prospects, and (b) failing to ensure that the monitored

fiduciaries appreciated the huge risk inherent in the significant investment by rank and file

employees in an undiversified MBNA Fund. Hammonds knew or should have known that the

members of the Plan Committee were imprudently allowing the Plan to continue offering the

MBNA Stock as a Plan investment, and to continue investing in MBNA Stock when it no longer

was prudent to do so, yet failed to take action to protect the participants from the consequences

of these fiduciaries' failures.

132.    In addition, Hammonds, as fiduciary responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Plan Committee to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

133.    Hammonds either failed to conduct an appropriate investigation into whether MBNA Stock was a prudent investment for the Plan or disregarded the information learned from such investigation, that MBNA Stock was an imprudent investment, in breach of his fiduciary duties. In connection with the lack of or disregard of an appropriate investigation, Hammonds failed to provide the Plan participants with information regarding MBNA's true financial condition so that Plan participants could make informed decisions regarding MBNA Stock in the Plan. Hammonds failed to protect the Plan and its participants against inevitable losses.

134.    The failure of Hammonds is particularly acute. As a result of his leadership role within the Company and on the Board, he knew or should have known of the Company's true financial condition. Yet, upon information and belief, despite his obligation to properly and materially inform participants in the Plan of the true risks involved with holding MBNA Stock, he remained silent concerning the earnings shortfall and the conditions that impacted negatively upon MBNA's earnings and growth.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had defendants performed their fiduciary duties.

136.    Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a),

defendants are liable to restore the injury to the Plan caused by their breaches of fiduciary duties

alleged in this Count.

### COUNT V
### (as against all Defendants)

### Co-Fiduciary Liability
### ERISA Section 405(a), 29 U.S.C. § 1105(a)

137.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 136 of this

Complaint as if fully set forth herein.

138.    ERISA Section 405(a), 29 U.S.C. § 1105(a), may impose liability upon a

fiduciary for a breach of fiduciary responsibility committed by another fiduciary.

139.    Each defendant is also liable as a co-fiduciary because each (1) knowingly

participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to

provide complete and accurate information regarding MBNA Stock, (ii) the conflict of interest

facing the other fiduciaries, (iii) the failure to monitor and investigate Plan investments, (iv) the

imprudence of the Plan investing in MBNA Stock, and (v) the failure to diversify the Plan

investments; (2) enabled other fiduciaries to breach their duties as a result of each defendant's

own failure to satisfy his or her fiduciary duties; and (3) had knowledge of the other fiduciaries'

failures to satisfy their fiduciary duties, yet did not make any effort to remedy the breaches.

140.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,

the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a

significant portion of its retirement investments.

141. Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a),

defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties

alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

142. The defendants breached their fiduciary duties in that they knew or should have

known the facts as alleged above, and therefore knew or should have known that the Plan's

assets should not have been so heavily invested in Company Stock.

143. As a consequence of the defendants' breaches, the Plan suffered significant

losses.

144. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to

bring a civil action for appropriate relief under ERISA Section 409, 29 U.S.C. § 1109. Section

409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed

upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also

authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

145. With respect to calculation of the losses to a plan, breaches of fiduciary duty

result in a presumption that, but for the breaches of fiduciary duty, the participants and

beneficiaries in the plan would not have made or maintained its investments in the challenged

investment and where alternative investments were available, that the investments made or

maintained in the challenged investment would have instead been made in the most profitable

alternative investment available. In this way, the remedy restores the value of the plan's assets to

what they would have been if the plan had been properly administered.

146. Plaintiffs and the Class are therefore entitled to relief from the defendants in the

form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan

resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA Section 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA Sections 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA Section 502(g), 29 U.S.C. § 1132(g), the common fund doctrine and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against defendants, jointly, severally, or individually, in the alternative, as follows:

A.      a declaration that defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.      an order compelling the defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

C.      imposition of a Constructive Trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      an order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      an order that defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company Stock;

G.      an order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      an order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      an order for equitable restitution and other appropriate equitable monetary relief against the defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: October 5, 2007

**ROSENTHAL, MONHAIT
& GODDESS, P.A.**

By: */s/ Jessica Zeldin*

Jeffrey S. Goddess (No. 630)
Jessica Zeldin (No. 3558)
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com

*Interim Liaison Counsel For the
Putative Class*

Mark C. Rifkin
Michael Jaffe
Matthew M. Guiney
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
(212) 545-4600

*Interim Counsel for the
Putative Class*

Thomas J. McKenna
**GAINEY & McKENNA**
295 Madison Ave., 4th Floor
New York, NY 10017
(212) 983-1300

David J. Goldsmith
**LABATON RUDOFF
& SUCHAROW LLP**
100 Park Avenue
New York, NY 10017
(212) 907-0700

*Members of the Executive Committee
for the Putative Class*